# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUNT CONSTRUCTION GROUP, INC., | :: | |
| | :: | |
| Plaintiff/Counterclaim Defendant, | :: | |
| | :: | |
| v. | :: | Civil Action No. 1:06cv01850 |
| | :: | Hon. James Robertson, U.S.D.J. |
| THE POOLE AND KENT | :: | |
| CORPORATION, | :: | |
| | :: | |
| Defendant/Counterclaim Plaintiff/ | :: | |
| Third Party Plaintiff | :: | |

## THE POOLE AND KENT CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO HUNT CONSTRUCTION GROUP, INC.'S MOTION FOR SUMMARY JUDGMENT

Defendant/Counterclaim Plaintiff/Third Party Plaintiff The Poole and Kent Corporation ("Poole and Kent") by its undersigned counsel, hereby submits its Opposition to the Motion for Summary Judgment filed by Plaintiff/Counter-Defendant Hunt Construction Group, Inc. ("Hunt"). For the reasons that follow, Hunt's Motion should be denied in its entirety and this case set in for trial.

## I.       GOVERNING LAW AND SUMMARY OF ARGUMENT.

This litigation centers on Hunt's failure to perform its contractual duties to Poole and Kent. Hunt's Motion relies upon alleged (and often mis-interpreted) contractual language to argue that Poole and Kent is not entitled to pursue its counterclaim. Hunt ignores the facts, Hunt's contractual obligations, and applicable District of Columbia case law, all of which are addressed in detail herein.

**A.    Hunt's Contractual Obligations Not Discussed In Its Motion**

Pursuant to the terms of the Prime Contract, Hunt, as the general contractor, was responsible to supervise and direct the work, using its best skill and attention.  Prime Contract, General Conditions ¶3.3.1.  A copy of the Prime Contract is attached hereto as **Exhibit 1**.  Hunt was solely responsible for and had control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract.  Id. The Project Specifications required Hunt to coordinate construction operations, "to assure efficient and orderly installation of each part of the Work.  Coordinate construction operations… that depend on each other for proper installation, connection and operation."  Specifications 1040 ¶1.3(A).[1]  In addition, Hunt was responsible under the Prime Contract to prepare and submit to the Owner a detailed project schedule for the entire project  Id. at Supplemental Conditions, ¶B(9).  The schedule was to be updated monthly.  Id. at ¶B(10).  The Specifications further provided that Hunt must, "schedule construction operations in the sequence required to obtain the best results where installation of one part of the Work depends on the installation of other components, before or after its own installation."  Specifications 1040 ¶1.3(A)(1).  Pursuant to the Prime Contract, Hunt had the responsibility to control, coordinate, schedule and manage the Project.  Hunt failed to properly exercise its authority and failed to properly control, coordinate, schedule, or manage the Project.

Under Section 9.4 of the boilerplate subcontract, Hunt was permitted to "reasonably decide the time, order and priority of Subcontractor's Work," (emphasis added) providing only the premium portion of overtime as compensation for such work.  But Poole and Kent was specifically granted the right to have genuine input into the schedule in multiple provisions

_____

[1] The Specifications are incorporated into the Prime Contract by reference.  A copy of Specifications 1040 ¶1.3 is attached hereto as **Exhibit 3**.

throughout more specific provisions of the Subcontract, and Hunt promised to incorporate such

input:

> Time is of the Essence.    Commencement of the work, continuing
> performance and progress of the work, and the achievement of final
> completion of the Project, all in strict accordance with the Schedule - **to
> which this subcontractor is required to have input which will be
> incorporated - are of the essence**.

> The Contractor will provide and monitor a detailed construction schedule
> for the progress and completion of each phase of the work.    This
> Subcontractor shall provide Scheduling Input for his Scope of Work and
> take whatever measures are necessary to maintain the Project Schedule -
> **to which this subcontractor is required to have input which will be
> incorporated**.

(Attachment II (Scope of Work) to Subcontract at ¶(B)28 as modified by Attachment No. II at

¶(C)(42)(B) item 28) (emphasis added).

> Subcontractor shall provide a sufficient quantity of labor, materials and
> equipment in order to meet or exceed project schedule – **to which this
> subcontractor is required to have input which will be incorporated.**

 (Attachment II (Scope of Work) to Subcontract at Section C(4)) (emphasis added).  A full copy

of the Subcontract is attached hereto as **Exhibit 2**.

Thus, under both the provisions of the prime contract and of the Subcontract it was Hunt

who was supposed to provide and monitor the detailed construction schedule for the progress and

completion of each phase of the work and to coordinate all the construction operations to assure

efficient and orderly installation of each part of the work.  Poole and Kent was entitled to have

schedule input which would be incorporated by Hunt. Hunt's breach of these express contractual

obligations to Poole and Kent as well as Hunt's implied obligations to Poole and Kent discussed

below prevents Hunt from relying upon the contractual provisions it cites to avoid liability for

Poole and Kent's counterclaim.

### B.     Governing Law in the District of Columbia

The Court of Appeals for the District of Columbia has repeatedly recognized that all contracts contain an implied duty of good faith and fair dealing, which means that, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hais v. Smith*, 547 A.2d 986, 987 (D.C. 1988). If a party to the contract "evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party," the party may be liable for breach of the implied covenant of good faith and fair dealing. *Paul v. Howard University*, 754 A.2d 297, 310 (D.C. 2000), *see also Restatement (Second) of Contracts* § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."); and *Willens & Niederman v. 2720 Wisconsin Ave. Coop. Ass'n*, 844 A.2d 1126, 1135 (D.C. 2004). In discussing the concept of "good faith" in connection with the implied covenant the District of Columbia Court of Appeals has observed, that the good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate standards of decency, fairness or reasonableness. *Allworth v. Howard University*, 890 A.2d 194, 201-202 (D.C. 2006) *quoting Restatement (Second) of Contracts* §205, comment (a). "Bad faith," the converse of good faith involves the "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Id. In discussing the "fair dealing" aspect of a breach of the covenant of good faith and fair dealing claim the Court of Appeals has determined

that it involves "reasonable rather than arbitrary or capricious action." *Adler v. Abramson*, 728 A.2d 86, 90 (D.C. 1999).

In a case remarkably similar to the facts in the present matter, the District of Columbia Court of Appeals has applied the breach of the implied covenant of good faith and fair dealing in favor of a subcontractor against a general contractor and permitted recovery in *quantum meruit*. In *Blake Constr. Co., Inc. v. C.J. Coakley Co., Inc.*, 431 A.2d 569 (D.C. 1981), the Court noted that under District of Columbia law, every contract includes an implied duty that each party will not hinder or impede the performance by the other party of its contractual duties. Blake Construction was the general contractor for the construction of the Walter Reed Hospital. Blake engaged Coakley as its subcontractor for the performance of fireproofing work on structural steel. The subcontract contained a no damages for delay clause and a changes clause and expressly provided that Coakley had to prosecute its work in accordance with the project schedule provided by Blake, that Coakley had to perform the work as directed by Blake and Blake had the right to change the schedule from time to time. It also noted expressly in its Specifications section that fireproofing was to be applied prior to the installation of ductwork, piping, conduit, and the like. The installation of such objects first would serve to obstruct the efficient application of the fireproofing to the structural steel by spray in a number of ways; among other things, the spray had an optimum spraying distance, any variance in which would disrupt adherence of the spray or necessitate clean-up of fireproofing falling on other surfaces. Delays in the delivery of structural steel at the outset of the project led to the disruption of the critical path. Consequently, the installation of ductwork and piping was accelerated to be closer in time to the late delivery of the steel which resulted in crowded floors with workers, equipment and supplies. This condition forced Coakley's workers to jump from a floor to floor and

prevented Coakley from completing its work on a systematic, scheduled, floor by floor basis.

Coakley also had to reapply fireproofing damaged by water due to a delay in roof installation and

damage caused by other subcontractors.

Coakley repeatedly advised Blake that its workers were being impeded by the conditions

on the job and that it was incurring costs in excess of those anticipated as a result.  Blake never

formally responded to Coakley's letters and protests and the trial court found no evidence that

Blake ever took any effective steps to prevent its subcontractors from installing pipe and duct

ahead of the fireproofing.  Ultimately, as a result of these and other breaches on the part of

Blake, Coakley walked off the job.

The Court of Appeals first looked to Blake's material breaches that would excuse

Coakley's non-performance:

> The record of this case is, in our view, replete with evidence that Blake did hinder or
> prevent Coakley's performance; scheduled the on-site work in an unreasonable sequence;
> did not provide a job site in suitable condition for Coakley to perform its work; and did
> not cooperate with Coakley when necessary to assure Coakley's performance.  We are
> persuaded therefore that the trial judge properly concluded upon this record that these
> acts collectively and individually constituted a breach of implicit conditions for
> performance by Blake under the subcontract.

431 A.2d at 576-77.  Blake asserted that a "no damages for delay" clause would serve to bar

much of Coakley's recovery, but the court refused to apply it, on the grounds that the damages

were not contemplated by the parties and the damages resulted from the active interference of

Blake.  It then turned to the pricing of Coakley's damages, upholding the trial court's award of

damages based not on the contract price, but on the costs of the work actually performed less any

payments.  431 A.2d at 579.

**C.     Application of Governing Law To This Case**

Just as in *Blake*, *supra*., Poole and Kent's performance of its Subcontract was hindered and interfered with by Hunt's failure to properly supervise, control and coordinate the Project and its failure to properly schedule the project.  The delays caused in the excavation phase forced the other trades to accelerate their performance which lead to crowded floors, working around other trades, jumping from floor to floor because other trades were not completing work on one floor before moving on in the manner originally planned in the baseline schedule.  Like Coakley, Poole and Kent repeatedly informed Hunt of the delays, disruption, and impacts on productivity being caused by the Project conditions but Hunt never responded and did not undertake any effective measures to improve the conditions.  Despite the fact that Hunt was contractually required to incorporate Poole and Kent's input into the schedule and updates, Hunt refused to do so.  Poole and Kent was required to stand-by after hours, nights and weekends waiting for each concrete pour so that its crews could install sleeves and inserts in the concrete slabs before the rebar was installed because the concrete subcontractor and rebar installers were accelerated to such an extent that they would not provide sufficient time for Poole and Kent to perform its work during normal hours.  Hunt's actions and inactions on the Project actively interfered with Poole and Kent's ability to perform its Subcontract work in an orderly, as planned and scheduled manner and as a result, Poole and Kent is entitled to recover its costs and expenses associated with the labor impact and delays outside of the terms and conditions of the Subcontract.

Hunt contends, in part, that it is not obligated to pay Poole and Kent because Hunt has settled with the Owner (on terms not disclosed in the Motion).  Hunt is incorrect.  In *Urban Masonry Corp. v. N & N Contractors, Inc.*, 676 A.2d 26, 36 (D.C. 1996), the Court of Appeals held that when one party to a contract entered into a walk-away settlement with a third party it

breached the contract by failing to protect the other party to the contract's interest in the settlement agreement.  At the time of the settlement, the settling party knew of the other party's outstanding claim for additional compensation and nonetheless agreed to a settlement that failed to secure payments for the other party, thus breaching the implied condition which imposed the duty, on the parties, not to frustrate the fulfillment of the contract.  Id., *citing Blake Constr. Co. v. C.J. Coakley Co.*, 431 A.2d 569, 576 (D.C. 1981).  In the instant matter, despite the fact that portions of Poole and Kent's damages are attributable to Owner caused issues (according to Hunt) and Hunt could have made a claim against the Owner on Poole and Kent's behalf as it is required to do in the Subcontract, Hunt chose to enter into a settlement with the Owner that allegedly foreclosed any claim rights that Poole and Kent may have had.  Hunt's actions breach the implied covenant of good faith and fair dealing and eliminate any contractual conditions precedent that would otherwise bar Poole and Kent claims.

Hunt contends that it is not responsible for Poole and Kent's damages because of a pay-if-paid clause.  Pursuant to numerous Hunt directives, Poole and Kent performed over $600,000.00 in extra work or change order work over the course of the two years it was on the Project.  Aside from one change order for $23,000.00, Hunt failed to negotiate and execute any other change orders and refused to pay Poole and Kent for the change order work it performed throughout the entire course of the Project.  Poole and Kent repeatedly requested that Hunt address the change orders but Hunt failed to do so.[2]  While the Subcontract does contain a pay-if-paid clause, that clause by both its express terms and as a matter of law, is not applicable if the failure to receive payment from the Owner was caused solely by Hunt.  *See* Exhibit 2 at ¶4.2.

---

[2]  Hunt's own "expert" witness testified that "a month or two" would be a reasonable amount of time for a general contractor to act upon a change order request.  (Hazen Dep. at 62-63).  A copy of the cited portions of the transcript of the Deposition of Lawrence Hazen, Hunt's "expert" witness, taken November 15, 2007, is attached hereto as **Exhibit 4**.

The clause by its terms does not apply if "the failure to have received payment from the Owner shall have been caused solely by the fault of Hunt." *Id.* Moreover, District of Columbia law does not excuse Hunt's failure to pay the change orders. In *Manganaro Corporation v. Hitt Contracting, Inc.*, 193 F. Supp. 2d 88 (D.D.C. 2002) the United States District Court for the District of Columbia addressed a circumstance where the general contractor failed to properly pay for change order work. The *Manganaro* Court noted that Hitt never paid for change order work in a timely manner and of the $108,301.28 in change orders billed only $34,485.07 had been paid. *Id.* at 96. The Court held that such lack of payment was a material breach. *Id.* The Court further observed that if a party has materially breached the contract in a manner that goes to the very root of the contract, he cannot then terminate his performance and demand that the other party perform. Id. at 98. The same reasoning applies to the circumstance in this case, Hunt's failure to fairly and honestly negotiate and pay for change order work that it directed during the course of the Project constituted a material breach of the Subcontract and Hunt is no longer entitled to stand on the terms of that Subcontract to deny Poole and Kent's claims.

Hunt contends that it is not obligated to pay Poole and Kent amounts owed because of Poole and Kent's execution of a release form. However, Hunt does not point out to the Court the specific language in the Contract where the parties agreed to amend the terms of the release form and except from its terms "unpaid extras or change orders, or claims submitted in accordance with the Contract Documents." The amounts owed to Poole and Kent fall within the numerous exceptions to the release language that the parties incorporated into that document.

## II.    FACTUAL BACKGROUND.[3]

The Project involved the construction of a fifteen story hotel with four underground levels and a penthouse level.  The hotel has approximately 380 guest rooms, a swimming pool, ballroom, meeting rooms, commercial kitchen, restaurant, offices and guest common areas. Each guest room consists of a bathroom, wet bar, living room/sitting area and bedroom.  The mechanical equipment such as boilers, chillers, cooling towers, pumps and other equipment was located in the penthouse level at the top of the structure.  The owner of the Project is 1000K, LLC ("Owner").  Hunt entered into a contract with the Owner to be the general contractor for the Project on or about October 1, 2003 for approximately $52,000,000.00 (the "Prime Contract"). A copy of the Prime Contract is attached hereto as **Exhibit 1**.  Hunt in turn entered into numerous subcontracts with various construction trade subcontractors such as the concrete contractor, steel contractor, electrical contractor, masonry contractor, drywall contractor, framing contractor, window contractor and others for performance of the work and supplying of materials required to construct the Project.  Hunt did not self-perform any of the construction work with its own forces.  Poole and Kent and Hunt entered into a subcontract dated June 16, 2004 (the Subcontract") for construction services related to the installation of the heating, ventilating, air conditioning, and plumbing systems for the Project for approximately $9,400,000.00.  A copy of the Subcontract is attached hereto as **Exhibit 2**.

Work began on the Project in September, 2003 when Hunt mobilized to the site. Excavation activities began in early October, 2003.  Due to the nature of Poole and Kent's work, Poole and Kent did not mobilize to the Project until February, 2004, which was prior to executing the Subcontract.  Poole and Kent performed some of the under-slab and layout

---

[3] The citations to the record for each of the facts set forth herein are located in Poole and Kent's Statement of Facts pursuant to Local Rule 7(h).

Subcontract work as it became available. Poole and Kent achieved substantial completion of its

scope of work on or about October 31, 2005.

From the very beginning of the Project Hunt's mismanagement threw the Project into a

tailspin from which it would never fully recover and Hunt's subsequent efforts to make-up for

the early failures only succeeded in compounding the problem. Adding to the early problems

other significant impacts continued to arise which seriously affected Project and Poole and

Kent's ability to perform its work. Before Hunt even submitted its bid on the Project, the Owner

provided a Geotechnical Report which detailed the condition of the soils and subsurface of the

Project site. In that Report, the Geotechnical Engineer, noted that there was significant water in

the subsurface and recommendations were made for installing a series of deep well dewatering

pumps to lower the water table at the Project site so that water infiltration into the excavation

would not impact the Project. As Hunt mobilized to the Project it should have already had a

dewatering subcontractor in place and immediately installed the deep well dewatering pumps to

begin the process of lowering the water table ahead of the actual excavation work. Hunt failed to

do so and did not start installation of the pumps until October 22, 2003 with pumping

commencing on November 4, 2003. *See* 2/19/04 letter from National Wrecking to Hunt attached

hereto as **Exhibit 5**. The excavation subcontractor, National Wrecking, retained a reputable

geotechnical engineering firm, Haley & Aldrich to provide an expert analysis of the dewatering

issue and the expert concluded among other things that Hunt did not fulfill it contractual

obligations regarding the dewatering system, that the dewatering system was not adequate to

control the ground water as there were not enough wells, there was too large a spacing around

the perimeter of the excavation and the wells should have been run continuously. An excerpt of

the Haley & Aldrich Report is attached hereto as **Exhibit 6**. Poole and Kent personnel will also

testify that Hunt did not install the dewatering system correctly and did not operate the system correctly which resulted in excessive water building-up in the excavation which made it difficult for the excavator to move its equipment and to work productively.  The excavation subcontractor, National Wrecking, ultimately submitted a claim in an amount in excess of $480,000.00 for the impacts and delays caused by the failure to properly dewater the site and acceleration.  National Wrecking was, like Poole and Kent, sued by Hunt.

Hunt also failed to perform other site preparation tasks which interfered with the excavator's ability to timely perform its work.  Specifically, Hunt failed to secure permits for closing an adjacent street so that the excavator could install its crane in a timely fashion and failed to timely obtain a public space permit for the installation of security fencing.  *See* Exhibit 5.  Hunt failed to timely arrange to have old existing utilities on the site terminated by PEPCO which resulted in portions of the site being unavailable for excavation.  Id.  The delays on the excavation were not only because of Hunt's direct failures, but also because of Hunt's excavator's failures, for which Hunt, as the general contractor, is also responsible.  According to Hunt's own admissions, National Wrecking allegedly failed to properly man the project, failed to manage surface water run-off into the excavation and National Wrecking allegedly damaged the dewatering system which caused the pipes to freeze and the excavation to flood.  *See* Hunt 3/23/04 letter to National Wrecking attached hereto as **Exhibit 7**.  Hunt submitted a backcharge against National Wrecking in excess of $235,000.00 and the parties are currently in litigation.  *See* Hunt back charges to National Wrecking attached hereto as **Exhibit 8**.

The net result of the calamity of errors and mismanagement was that the excavation work delayed the Project between 6 and 8 weeks.  On June 22, 2004 the Owner's representative, Kite Realty ("Kite"), estimated in a letter to Hunt that the Project was 6 weeks behind schedule

primarily because of National Wrecking. *See* Kite letter to Hunt attached hereto as **Exhibit 9.**[4]

Hunt itself admitted in a letter to Kite that National Wrecking caused a major problem on the

Project and its scope of work was nearly 8 weeks late. *See* Hunt 1/19/05 letter to Kite at p. 3,

attached hereto as **Exhibit 11.** Hunt earlier noted that as a result of the delays in the excavation

the concrete foundation operation was halted for almost two weeks between the last week in

February and the first week in March, 2004, and was proceeding at a reduced pace. *See* Exhibit

6 at p. 3.

　　　The delays that occurred in the excavation phase were compounded by an error in the

establishment of the control point benchmarks for the Project by Hunt's surveying subcontractor.

The surveyor used the wrong set of plans to establish the control points for the excavation and as

a result several columns were out of alignment by 4 ¾". This error was discovered in May, 2004

and resulted in impacts to the schedule while the issue was investigated and repairs were

designed, for which Hunt accepted full responsibility. *See* Hunt letter 8/26/04 to Kite attached

hereto as **Exhibit 12**. Letter from Hunt to Kite dated June 9, 2004 is attached hereto as **Exhibit**

**13**. Hunt estimated that the impact was approximately 2 weeks. *See* Exhibit 10. The misplaced

columns also resulted in some openings for duct work and plumbing being out of place in certain

areas, which required corrective work, and numerous conduits for electric being abandoned and

rerun.

　　　On August 4, 2004, Poole and Kent provided a Review of Schedule & Job Site Progress

Analysis ("August Analysis") to Hunt in advance of a meeting that Poole and Kent had

scheduled with Hunt to discuss the delays on the Project. A copy of the August Analysis is

---

[4] This letter was marked as Exhibit 3 to the Deposition of the Corporate Designees of the Owner. (Shepard Dep. at
54). A copy of the cited pages from the transcript of the Deposition of Arthur Shepard as designee of the Owner,
conducted on August 1, 2007, is attached hereto as **Exhibit 10**. Shepard was the Senior Project Manager for the
Project for Kite. (Shepard Dep. 8/1/2007 at 15-16).

attached hereto as **Exhibit 14**.  (Page Dep.[5] at 265).  The August Analysis points out that the

Project has lost 68 calendar days due to lack of structural progress and discusses the Project

schedule and reasons for the delays.  The August Analysis states:

> We have been directly impacted by this concrete delay through the potential of
> prolonged job site presence along with the need to maintain an embeds and sleeve
> crew for an extended duration.  Furthermore, the concrete subcontractor has
> accelerated, working 50 to 60 hour workweeks.  In addition, their
> carpentry/decking crews are not staying sufficiently out in front of the rodmen.
> This has forced us to work unanticipated overtime on short notice in order to pace
> progress and prevent delaying concrete pours, resulting in substantial
> uncontemplated overtime expense.

Exhibit 14 at p. 2.

The August Analysis strongly recommended that Hunt prepare a detailed schedule for the

remaining rough-in and finish work in cooperation with Poole and Kent and the other

subcontractors.  Id.  Poole and Kent's notice of impact, notice of delay and notice of defective

scheduling fell on deaf ears.  On October 19, 2004 (the "October letter"), Poole and Kent wrote

to Hunt advising of the impacts being caused to Poole and Kent by Hunt's failure to properly

supervise, manage and coordinate the Project.  A copy of the 10/19/04 letter is attached hereto as

**Exhibit 16**.  The October letter notes that Poole and Kent and Hunt have had several discussions

over the past five months concerning the lack of timely and coordinated access to concrete slabs

to perform properly sequenced layout and coordinated sleeve/insert placement.  The letter

thoroughly discusses the nature of the impacts that Poole and Kent has been experiencing and the

cause of those impacts.  Id.  The October letter states:

> We have maintained personnel in a standby to jump onto each deck as it comes
> available.  We have maintained staff for additional durations in order to pace the
> structural process.  We have performed our work inefficiently to accommodate
> previously placed reinforcing.  We have provided additional supervision when

---

[5] The August Analysis was marked as Exhibit 14 to the Deposition of Thomas Page, the Project Manager for Hunt, which was conducted on July 10, 2007.  A copy of the cited pages from the transcript of this Deposition is attached hereto as **Exhibit 15**.

work is performed after normal working hours.  This method of operations has
resulted in substantial disruption and uncertainty.  Via transmittal of this letter,
Poole and Kent herein provides written notice of previous and continuing
interference, disruption and delay resulting in additional costs.  As such, Poole
and Kent reserves its rights to pursue all costs associated with the aforementioned
issues.

Id. at p. 4.  There was no formal response from Hunt to the October letter.

On December 8, 2004 (the "December letter"), Poole and Kent wrote to Hunt to again

provide notice of the nature of the impacts and delays that Poole and Kent has experienced on

the Project and to discuss the remaining work.  A copy of the December letter is attached hereto

as **Exhibit 17**.  The December letter notes that the structure is 36 calendar days late in

completing with the availability of the penthouse for mechanical installations estimated to be 63

calendar days late.  The late structural completion "has and will continue to have a substantial

impact on Poole and Kent's labor costs and its ability to meet the original completion date for

this Project."  Id.  The December letter requests that "framing be performed in an orderly

manner, completing interior walls for all guest rooms on a floor prior to moving to another floor.

This will avoid inefficient jump back work sequences for all trades including Poole and Kent"

Id. at p. 2.  There was no formal response from Hunt to the December letter.

On February 2, 2005, Poole and Kent provided Hunt with another Review of Schedule &

Job Site Progress ("February letter").  A copy of the February letter is attached hereto as **Exhibit**

**18**.  The February letter notes that the Project has lost 94 calendar days.  Delays associated with

the windows and installation problems with precast panels contributed to overall delays on the

Project, as did Hunt's inability to fully close-in the site and protect the interior from weather.

The windows were installed incorrectly.  (Shepard Dep. at 62). There was a delay with the

precast concrete.  *Id.*  With the protections from the outside world either defective or absent,

water incursions became common on the Project.  Without close-in insulation and drywall could

not be installed.  In addition to delay, the February letter notes that Poole and Kent has had and

will continue to experience impacts in the productivity and orderly performance of its work.

Issues such as: insufficient and unreasonable layout and embed/sleeve placement, slow and out

of sequence interior wall framing and piecemeal and haphazard drywall installations at tubs and

Fan Coil Units ("FCU").  Id.  Hunt's directives resulted in Poole and Kent jumping back onto a

floor multiple times to perform small segments of rough-in work and testing which dramatically

increases the cost of rough-in while disrupting progress.  The February letter concludes by noting

that Poole and Kent has experienced substantial time and productivity impacts as a result of: late

structural placement, lack of coordinated and planned structural acceleration, lack of proper

scheduling and task sequencing, out of sequence and piecemeal faming and out of sequence and

piecemeal drywall installation.  "Generally, the lack of proper planning, sequencing and

coordination continues to adversely disrupt the timely and orderly flow of work, and threatens to

further impact the project completion, resulting in extended overhead expense and increased

labor costs."  Id.  On February 28, 2005, Poole and Kent provided another letter to Hunt detailing

the impacts as a result of the improper scheduling and the status of the Project.  A copy of the

2/28/05 letter is attached hereto as **Exhibit 19**.

On April 27, 2005, Hunt directed Poole and Kent to accelerate its mechanical work in the

long delayed penthouse so that the equipment could be installed, tested and started up for use in

providing air conditioning to the Project.  Poole and Kent complied with Hunt's direction and

increased the manpower and the number of hours worked on the penthouse and Poole and Kent

added a dedicated foreman to the penthouse.  Poole and Kent continued to work at an accelerated

pace in the penthouse until mid-May, 2005 when Poole and Kent discovered that water, natural

gas and sanitary sewer service would not be available to the penthouse for months because of a

failure by the Owner to obtain necessary permits.  A copy of Poole and Kent's letter to Hunt 5/25/05 re: penthouse acceleration is attached hereto as **Exhibit 20**.  The May 25 Acceleration letter concludes by stating that Poole and Kent expects to be compensated for the acceleration and impact costs associated.  Id.  Poole and Kent submitted a proposed change order in the amount of $181,929.00 for costs associated with the penthouse acceleration effort.  A copy of the acceleration impact cost is attached hereto as **Exhibit 21**.  Additionally, on May 25, 2005, Poole and Kent sent another letter to Hunt commenting on the May 10, 2005 progress schedule which Hunt prepared (the "May 25 schedule comment letter").  A copy of the May 25 schedule comment letter is attached hereto as **Exhibit 22**.  In that letter, Poole and Kent provided numerous examples of the deficiencies of the May 10 updated schedule which did not accurately reflect the state of the Project or the agreements and understandings reached between Poole and Kent and Hunt regarding the penthouse acceleration or the availability of site utility tie-ins.  Further, the updated schedule did not reflect any of the schedule input that Poole and Kent had repeatedly offered.  Attachment No. II to the Subcontract at ¶(B)28 as modified by Attachment No. II at ¶(C)(42)(B) item 28,  provides that Poole and Kent is required to have input into the schedule and that such input would be incorporated by Hunt into the master schedule.  *See* Exhibit 2.  Hunt failed to incorporate any of Poole and Kent schedule input.  Poole and Kent concluded the May 25 schedule comment letter by again putting Hunt on notice of the cost impact.

A major impact to the ability to complete the Project occurred in the critical time frame of the spring of 2005.  The issue is summarized in a letter from Hunt to Kite dated May 20, 2005 wherein it is observed that, "there have been ongoing delays to this project regarding site utility tie-ins."  A copy of the 5/20/05 utility tie-in letter is attached hereto as **Exhibit 23**.  Hunt gives

two causes: the Owner's failure to obtain WASA permits, and a missing sewer main that the Owner represented was in place.  Hunt notes that there was a "substantial impact" caused by Kite's failure to ensure that the WASA had reviewed the utility tie-ins, which delayed the lengthy site utility permitting process which was not completed until April 26, 2005.  Once the permit was issued it was then discovered that the "mystery" sewer pipe in 10th street was an issue and the lengthy lack of resolution of the existence of the sewer line as shown on the plans caused delay to the Project.  Ultimately it was determined that the sewer line did not exist and had to be installed by Hunt, which further delayed the utility tie-ins.  Because the sanitary line coming from the Project had not been tied into the sewer line in the street to pipe away the used water from the Project, WASA would not allow the Project to tie into the domestic water supply service.  Without permanent water supply and water discharge, according to Hunt, the ability to bring the permanent building air conditioning on-line was delayed which impacted building environmental control and ability to install furniture, fixtures and other finish work such as millwork, paint and wallpaper.  *See* Exhibit 23.  Hunt also noted that the lack of permanent water also impacted the ability to perform leak testing of pipes which in turn held up the installation of drywall.  Hunt states in the May 20, 2005 letter that "P/RCO 051A is being initiated to track any and all added scope and/or delay and/or damage costs associated with this Kite caused delay issue – which is also likely to include impacts from other subcontractors including, but not limited to, extended drywall finish mud curing time delays, piping leak testing for drywall close-up without permanent water, etc…"

Of course, Kite has a different story to tell:

Q: [Michael Stover, attorney for Poole and Kent]: …What was your view of the situation and the impact that the sanitary sewer tie-in and domestic water tie-in had?

A: [Jeffrey Lynch, Kite]: That it should have been started a long time ago, and that was always my point with Hunt.  Typically when you start a project - -

Q: When you say it should have been, what do you mean, it should have been?

A: The utility connection process.  It is always a process.  It is very complicated, especially in a major city.  There is a lot of bureaucracy in each of the agencies, and one of my issues with Tom Page is he didn't start this for a year after or better.

**Q:      So your position was that it was basically a mismanagement on Hunt's part?**

**A:      Yes.**

(Lynch Dep. [6] at 58) (emphasis added).

Poole and Kent continued to perform site reviews and provide schedule critiques and notices of impacts throughout the summer of 2005 with reports dated May 18, 2005, June 8, 2005, July 6, 2005, July 23, 2005 and August 9, 2005.  Copies of the reports are attached hereto collectively as **Exhibit 25**.  Hunt never responded to these notices.

The Owner likewise complained about Hunt's mismanagement of the Project.  In June 2004, just nine months into the Project, the Owner's representative, Kite, was demanding that Thomas Page, Hunt's Project Manager be replaced.  Jeffrey Lynch of Kite Realty Group ("Kite"), the Owner's representative on the Project, explained Kite's position:

I didn't think he had the experience to do a project of this size and magnitude.  It was evident by letters he had written, contracts that weren't let, overall sequencing in production, management, quality.

(Lynch Dep. at 70).  In a June 17, 2004 letter from Harry Ferguson, Executive Vice President of Hunt to Kite, Mr. Ferguson refers to a conference that was held with Kite and Hunt

---

[6] A copy of the cited pages from the transcript of the Deposition of Jeffrey Lynch as designee of the Owner, conducted on August 1, 2007, is attached hereto as **Exhibit 24**.  Lynch is Kite's Senior Vice President of Commercial Development and the Advisory Services.  (Lynch Dep. 8/1/2007 at 11-12).

representatives on June 15, 2004 wherein Kite expressed concerns about Tom Page and his performance and requested that he be replaced.  A copy of the June 17, 2004 letter is attached hereto as **Exhibit 26**.  Hunt refused to replace Mr. Page but did agree to add another superintendent to the Project and increase oversight by a senior Hunt project manager and revisit the issue in 30 days if no improvement.  On January 13, 2005, Kite again expressed "more concern than ever" with Hunt's project management and demanded that Hunt provide a full-time senior project manager above Mr. Page.  A copy of the 1/13/05 letter is attached hereto as **Exhibit 27**.[7]  Eventually, Mr. Page left the Project and left employment with Hunt in the summer of 2005 as did Mr. Langhoff, Hunt's general superintendent.

Ultimately, the Owner hired WDG Construction in the fall of 2005 to supplement Hunt in completing the Project because it had lost confidence in Hunt's ability to work with the subcontractors and toward completion.  As Lynch explained:

> We were never going to make the [completion] date that we had.  I saw it continuing to slide, and against Hunt's will I brought [WDG] in to take over certain projects or aspects of the project…

(Lynch Dep. at 83).    The Owner paid WDG almost $600,000.00 for its work.  Interestingly, WDG contracted with Poole and Kent to perform some of the completion work.

The record clearly establishes that Poole and Kent repeatedly provided written and verbal notice to Hunt that Hunt's failure to properly coordinate, supervise and/or manage the Project was hindering, interfering with and preventing Poole and Kent from performing its work.  Hunt did not attempt to remedy the situation nor did it even respond to the majority of Poole and Kent's notices.  Hunt's disregard of Poole and Kent's repeated notices of the problems being experienced on the Project, which were caused by Hunt, constitutes active, intentional and

---

[7] This letter was marked as Exhibit 11 to the Deposition of the Corporate Designees of the Owner.  (Lynch Dep. at 71).

willful interference and hindrance and constitutes a breach of Hunt's duty of good faith and fair

dealing as well as a material breach and abandonment of Hunt's contractual duties and

obligations to Poole and Kent under the terms and conditions of the Subcontract.

## III.    HUNT IS NOT ENTITLED TO SUMMARY JUDGMENT ON COUNTS I AND II OF THE COUNTERCLAIM.

"[E]xcept in the middle of a battlefield, nowhere must men coordinate the movement of

other men and all materials in the midst of such chaos and with such limited certainty of present

facts and future occurrences as in a huge construction project." *Blake Construction Co. v. C.J.

Coakley Co., Inc.*, 431 A.2d 569, 575 (D.C. 1984). As noted above, Hunt was contractually

responsible for such direction.  Just as importantly, Poole and Kent was fully entitled to provide

scheduling input that Hunt was obligated to incorporate into the schedule pursuant to numerous

provisions of the Subcontract.  Fundamentally, Hunt repeatedly breached the Subcontract by

refusing to incorporate the scheduling input that was routinely provided by Poole and Kent.

Instead, Hunt allowed the project to proceed in a chaotic fashion.

### A.    Hunt Breached its Obligation to Incorporate Poole and Kent's Schedule Input

The fundamental problem with Hunt's approach in its Motion is that Hunt fails to

acknowledge to the Court that it was Hunt that breached the contract originally and repeatedly.

Hunt's failure to recognize <u>any</u> duty to Poole and Kent is troubling, particularly in light of the

clear requirements of the Contract Documents.  Hunt is not entitled to now rely upon the terms of

that contract to defeat Poole and Kent's counterclaims.  *See Blake Construction Co., Inc. v. C.J.

Coakley Co., Inc.*, 431 A.2d 569, 576-77 (D.C. 1981).  As the District of Columbia Court of

Appeals has made clear, the general contractor cannot rely upon contractual defenses when it is

the party that has breached the contract and hindered the other party's performance. What is

particularly egregious about the facts of the instant case is that not only did Hunt breach implied

obligations to not hinder Poole and Kent's work, it breached express obligations to specifically

incorporate Poole and Kent's scheduling information into the project schedule.  In several

locations, the Subcontract provides as follows:

> Time is of the Essence.  Commencement of the work, continuing performance and progress of the work, and the achievement of final completion of the Project, all in strict accordance with the Schedule - **to which this subcontractor is required to have input which will be incorporated - are of the essence.**

> The Contractor will provide and monitor a detailed construction schedule for the progress and completion of each phase of the work.  This Subcontractor shall provide Scheduling Input for his Scope of Work and take whatever measures are necessary to maintain the Project Schedule - **to which this subcontractor is required to have input which will be incorporated**.

(Attachment II (Scope of Work) to Subcontract at ¶(B)28 as modified by Attachment No. II at

¶(C)(42)(B) item 28) (emphasis added).

> Subcontractor shall provide a sufficient quantity of labor, materials and equipment in order to meet or exceed project schedule – **to which this subcontractor is required to have input which will be incorporated.**

 (Attachment II (Scope of Work) to Subcontract at Section C(4)) (emphasis added).

Under Section 9.4 of the boilerplate subcontract, Hunt was permitted to "reasonably

decide the time, order and priority of Subcontractor's Work," (emphasis added) providing only

the premium portion of overtime as compensation for such work.  But, as evidenced by the

contract provisions set out above, Poole and Kent specifically negotiated for the right to have

genuine input into the schedule in multiple provisions throughout more specific provisions of the

Subcontract, and Hunt promised to utilize such input.  Unfortunately, Hunt repeatedly breached

these provisions throughout the Project; indeed, it incorporated *nothing* Poole and Kent

submitted.  It is the breach of Hunt's obligation to incorporate Poole and Kent's schedule input

that is at the heart of Poole and Kent's damages. Hunt simply ignored its contractual duties to Poole and Kent and not only failed to incorporate Poole and Kent's input, but failed to respond to Poole and Kent on the topic.[8]

Hunt breached its express obligations to incorporate Poole and Kent's scheduling information. Hunt breached its implied obligations to not hinder Poole and Kent from performing its work. Hunt breached its implied contractual obligation to not actively interfere with Poole and Kent's performance of the work. Under District of Columbia law (conveniently ignored by Hunt in its Motion) Hunt is not entitled to rely upon the Subcontract to prevent Poole and Kent from being reimbursed for the damages caused by Hunt. *Blake*, 431 A.2d at 576-77.

## B.    Remaining Contract Balance

Hunt suggests that were the Court to grant the Motion in full, the Counterclaim would be dismissed in full. Poole and Kent's damages total $1,831,063.00 (plus interest) which is comprised of Poole and Kent's remaining subcontract balance of $498,090.00, Extended Overhead claim of $472,879.00, Labor Productivity claim of $242,992.00, and pending change orders totaling $617,102.00. The remaining subcontract balance is the unpaid amounts agreed to be due and owing under the contract and the one approved change order. (Poole and Kent's Response to Statement of Allegedly Undisputed Facts at ¶ 8).[9]  The Motion does not appear to

---

[8] The case cited by Hunt in the Memorandum, *Hunt Construction Group, Inc. v. Construction Services, Inc.*, 375 F. Supp. 2d 612 (E.D. Mich. 2005), is irrelevant to Poole and Kent's argument and does not stand, as Hunt represents, for the proposition that it can sequence work however it likes. In that case, Construction Services, a subcontractor of Hunt's, asserted that Hunt had somehow warranted that the work on the subject project would be sequenced in a precise manner. When the work was sequenced somewhat differently, the subcontractor sued on a breach of warranty theory. 375 F. Supp. 2d at 620. The court in that case cited a provision similar to the instant Section 9.4 as evidence that Hunt had made no such warranty. *Id.* Here, Poole and Kent does not assert that sort of warranty claim. Rather, Poole and Kent's argument is that Hunt unreasonably changed the sequence of the work by 1) failing to incorporate Poole and Kent's input into the schedule, as it had promised to do; and 2) abdicating responsibility to direct the work of Poole and Kent's precursor subcontractors. Therefore, Section 9.4 does not apply to the Extended Overhead and Labor Productivity claims.

[9] After commencing litigation, Hunt did approve a number of the pending change order requests.

contest Poole and Kent's rights to such funds except to say in one instance that Poole and Kent did not submit a "claim" for the remaining contract balance. *See* Memorandum in Support at 12. Under the Subcontract, Poole and Kent is required to submit a payment application (not a claim) for the subcontract balance. *See* Subcontract Article 5.2. Before Poole and Kent could submit its final payment application on the Project the parties would have to know the <u>amount</u> of the final payment application. Hunt would have to address the 40+ pending change orders for additional work that Hunt directed Poole and Kent to perform. Unfortunately, Hunt's management was able to only address <u>one</u> change order during construction of the Project and did not address any of the others until after it commenced litigation. Hunt prevented Poole and Kent from submitting its final payment application by refusing to timely process the change orders. Hunt then filed suit, electing to forego any other process for resolving payment issues. Poole and Kent was then compelled to file its counterclaim. Any requirement that Poole and Kent submit anything to pursue final payment is waived under these circumstances. *See Urban Masonry Corp. v. N&N Contractors, Inc.*, 676 A.2d 26, 36 (D.C. 1996). Hunt states further that it has *alleged* backcharges that exceed the remaining subcontract balance but omits any factual support. (Statement of Undisputed Facts at ¶ 9). Such is far from sufficient, of course, to support summary judgment as to the remaining subcontract balance. Hunt's Motion must be denied as to the remaining subcontract balance.

**C.      Poole and Kent's Routine Progress Payment Waivers Do Not Waive Poole and Kent's Rights To Unpaid Extras And Claims That It Seeks Under The Counterclaim.**

District of Columbia courts[10] "adhere to the 'objective law' of contracts, whereby the written language embodying the terms of an agreement will govern the rights and liabilities of the parties…unless the written language is not susceptible of a clear and definite undertaking." *Capital City Mortg. Corp. v. Habana Village Art & Folklore, Inc.*, 747 A.2d 564, 567 (D.C. 2000) (quoting *Slice v. Carozza Properties, Inc.*, 137 A.2d 687, 693 (D.C. 1958)) (intermediate citations omitted). Moreover, under D.C. law, a contract "must be interpreted *as a whole*, giving a reasonable, lawful, and effective meaning to all its terms." *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C. 1984) (emphasis added) (citations omitted).

In order to receive payment as the Project progressed, Poole and Kent was required by the Subcontract to execute form SF 330, titled "Affidavit and Partial Waiver of Claims and Liens and Release of Rights." However, in language not quoted to the Court by Hunt, Poole and Kent and Hunt agreed at the outset of the Project to alter the waiver language contained in form SF 330. This change is noted in Attachment IV:

> Form SF 330 entitled "Affidavit and Partial Waiver of Claims and Liens and Release of Rights": At the end of the last paragraph after "or invoices" insert "or unpaid extras or change orders, or claims submitted in accordance with the Contract Documents".

As negotiated, Form SF 330 provides (in the paragraph upon which Hunt relies):

> In addition, for and in consideration of the amounts and sums received, the undersigned hereby waives, releases and relinquishes any and all claims, rights, or causes of action whatsoever arising out of or in the course of the

---

[10] The Subcontract must be construed under the laws of the District of Columbia in that it specifies that it is to be so governed; the Subcontract states in Section 34.1 that the applicable law is to be that of the place where the Project is physically located. District of Columbia courts enforce such choice of law provisions. *See Vaughan v. Nationwide Mut. Ins. Co.*, 702 A.2d 198, 200-01 (D.C. 1997) (citing *Restatement (Second) of Conflict of Laws* § 187). As a federal court sitting in diversity, this Court must apply the choice of law principles of the jurisdiction in which it sits. *See Steorts v. American Airlines, Inc.*, 647 F.2d 194, 196-97 (D.C. Cir. 1981).

> work performed on the above-mentioned project, contract or event
> transpiring prior to the date hereof, excepting the right to receive payment
> for work performed and properly completed and retainage, if any, after the
> date of the above-mentioned payment application or invoice **or unpaid**
> **extras or change orders, or claims submitted in accordance with the**
> **Contract Documents**

(emphasis added). Each of the categories of damages sought by Poole and Kent in the

counterclaim falls within the negotiated exception or other exceptions already contained in the

form. Poole and Kent's damages consist of: (1) work performed and completed; (2) retainage;

(3) unpaid extras or change orders; or (4) claims submitted in accordance with the Contract

Documents. The remaining subcontract balance is for work performed and retainage after the

date of the last payment from Hunt. There is no question that the scope of the release does <u>not</u>

extend to the subcontract balance, as even Hunt concedes. <u>See</u> Mem. in Sup. at 15.

The pending change orders numbers 36R through 100, noted on Exhibit G to the Motion,

are unpaid change orders, not yet approved by Hunt, and constitute, as well, unpaid extras[11] – the

work performed and costs incurred thereunder at Hunt's direction are not within the scope of the

Subcontract. As discussed *infra.*, the Labor Productivity and Extended Overhead claims were

submitted in accordance with the Contract Documents. Moreover, both of these claims fall

within the category of "unpaid extras" as well. The Extended Overhead claim is made up of

additional expenses that would not have been incurred had the work under the Subcontract been

completed on schedule. The Labor Productivity claim, similarly, is simply made up of extra

costs that would not have been incurred had Hunt sequenced the job by incorporating Poole and

Kent's scheduling input. The waiver form by its negotiated terms is not applicable.

---

[11] "Extra" is defined as "—*n.* **3.** something extra or additional: *the little amenities and extras that make life pleasant*
**4.** an additional expense." *Random House Compact Unabridged Dictionary* 684 (2d ed. 1996) (italics in original).
Similarly, the *Construction Dictionary* defines the term simply as "An item or work involving additional cost."
*Construction Dictionary* 206 (6th ed. 1985). In finding the plain meaning of a contract, D.C. courts will review
dictionary definitions. *See, e.g., In re Corriea*, 719 A.2d 1234, 1242-43 (D.C. 1998).

The waiver form appended to the Motion did not include such language on its face – it is simply Hunt's general form SF 330.  This is irrelevant.  Hunt agreed at the outset of the project that Poole and Kent's routine progress payment waivers would exclude unpaid extras, change orders, and claims.  The Court must read the Subcontract and the waiver together and not ignore the Subcontract's modification of the form.  *See Clyburn v. 1411 K Street Ltd. Partnership*, 628 A.2d 1015, 1018 (D.C. 1993).

A Pennsylvania court has held that Hunt's form SF 330 waiver must be construed in accordance with the subcontract as a whole and amendments to the subcontract. *Carson/DePaul/Ramos v. Driscoll/Hunt*, 2006 WL 2009054 (Pa. Ct. Com. Pl. June 29, 2006). There, the subcontractor of Hunt's joint venture executed a form Hunt subcontract that included Hunt's form SF 330.  That subcontractor, however, appears not to have negotiated any changes to the form, unlike Poole and Kent.  During the course of performance, the subcontractor was impacted by delays on its project.  It and the Driscoll/Hunt joint venture agreed in writing to wait until the close of the project to address any such impact claims.  Subsequent to that understanding, the subcontractor continued to execute form SF 330 as a routine part of the progress payment procedure.  At the close of the project, the parties were apparently unable to agree on the impact claim, and the subcontractor filed suit.  Driscoll/Hunt defended on the grounds that the subcontractor had waived the impact claim by executing form SF 330 after it had reached the agreement to toll the impact claims.  The court correctly ruled against Driscoll/Hunt, finding no such waiver.  The court cited letters memorializing the agreement to push back the time for deciding the impact claim:

> [T]hese letters evidence an intent by the parties to modify the Subcontract's requirements with respect to the time for submission of certain of RCD's impact claims. In addition, by agreeing that RCD may submit such claims late, DH necessarily agreed to the continued viability

of RCD's existing impact claims, **and thereby modified the language of release contained in the Statements and Waivers with respect to those impact claims**.

*Carson/DePaul/Ramos*, 2006 WL 2009054 at *2 (emphasis added).

Hunt's construction of the waiver language is inconsistent with the Subcontract as a whole. Further, this construction is completely at odds with the change order procedure under the Subcontract. PCO's 36R through 100 are governed by Section 18 of the Subcontract, which requires Poole and Kent to perform changes to the work ordered by the Owner or by Hunt without immediate compensation. A subcontractor must later submit all costs and pricing for the work involved in the contractual change. In the case of an Owner-directed change, Hunt is not liable to pay such sums over to the subcontractor until it is paid therefore by the Owner. The process for payment for extra work will extend beyond the end of a monthly cycle. It took Hunt more than a year to address all but one of Poole and Kent's change orders.

It follows that Hunt's argument as to the effect of waivers such as the October 25 Partial Release would work to nullify Section 18. The change order process simply never proceeds so quickly as to permit the negotiation of the change order, the execution thereof, the application for payment for sums under the change order, and the actual receipt of payment – each of which Hunt alleges are conditions to payment -- to occur in the same month as the work is performed. Moreover, the approach Hunt urges is an invitation to mischief by the beneficiary of the waiver. Hunt controls the manner and timing of its payment applications and submission of change orders to the Owner, and thus would be able to time them so as to thwart payment to its subcontractors. Construction of the document as a whole requires the Court to remove pending change orders, extras, and claims from the release language.

**D.    Poole and Kent's Requests for Equitable Adjustment Are Not Limited by Section 10.**

28

Section 10 is a prime example of the difference between the actual language of the Subcontract and Hunt's spin on the meaning of the language.  Hunt's subcontract form addresses two categories of delays that could be encountered on a construction project.  Hunt claims that these two categories exhaust the universe of possible delays, but Hunt is incorrect.  Poole and Kent's delay damages result from the compounding of multiple causes of delay, and are unaddressed by Hunt's form subcontract.  Section 10.1 applies to delays caused by the Owner (or others for whom the Owner is legally responsible).  When Owner-caused delays are encountered Hunt must "cooperate with Subcontractor in submitting against the Owner or Designer, any just claim arising therefrom which is permitted by the Contract Documents and applicable law." Poole and Kent repeatedly put Hunt on notice of delays and resulting impacts; then without notice to or participation by Poole and Kent, Hunt settled with the Owner.  Hunt cannot now rely upon Article 10.1 to obtain judgment on delay claims when Hunt failed to "cooperate" with Poole and Kent to recover those claims.  *Urban Masonry*, 676 A.2d at 36.

Section 10.2 applies to delays caused "solely as a result of acts or omissions of Hunt or anyone employed by Hunt on the Project."  There is no similar provision applying to delays resulting from the actions of several different persons - Hunt, the concrete subcontractor, and the Owner – or to those delays caused by other subcontractors.

Section 10.2 provides:

**10.2    Delays Caused Solely by Hunt**:  Should Subcontractor's Work be delayed, disrupted or interfered with ***solely*** as a result of acts or omissions of Hunt or anyone employed by Hunt on the Project, then, at Hunt's sole discretion, Hunt shall provide Subcontractor either:

(a)    an extension of time for completion of the Work equal to the actual impact of the delay, disruption or interference on the critical path of Subcontractor's Work; or

(b)    additional compensation as provided in Section 9.7(a), but only if a written claim for delay is submitted to Hunt within forty-eight (48) hours from the time of the commencement of such delay, disruption or interference.

(emphasis added).  Section 10.2 does not apply to any of Poole and Kent's claims.  As Hunt itself points out, the testimony of Poole and Kent's expert witness is that the delays, disruptions, and interferences of which Poole and Kent complains were caused in part by Hunt, but also in part by others on the project.  None of these were *solely*[12] caused by Hunt or a Hunt employee[13].

Section 10.1 governs claims for owner-caused delay.  Section 21 then specifies the format for such claims.  Section 21, by its terms, only applies to claims for which the Owner is or may be responsible and does not cover claims under Section 10.2 or claims outside 10.1 and 10.2.  (Subcontract at § 21.3).  Accordingly, Section 21 is not applicable to those claims for which Hunt is solely responsible, or those that arise from a multiplicity of causes including the actions of other subcontractors.  Moreover, change orders submitted under the Section 18 change order procedure would simply be sent upstream by Hunt as part of the change order process in the Prime Contract, so PCO's 36R through 100 are not covered by Section 21.  To the extent Section 21 applies to the Labor Efficiency and Extended Overhead claims, Poole and Kent has fully complied.  Poole and Kent repeatedly provided Hunt with analyses of Hunt's coordination and scheduling problems on this Project, on August 4, 2004; October 19, 2004; December 8, 2004; February 2, 2005; February 28, 2005; May 18, 2005; May 25, 2005; June 8, 2005; July 6, 2005; July 23, 2005; and August 9, 2005.[14]  Hunt simply chose not to pass these on to the Owner

---

[12] "Sole" is defined, relevantly, as "**1.** being the only one; only: *the sole living relative*."   *Random House Compact Unabridged Dictionary* 1815 (2d ed. 1996) (italics in original).

[13] "Employed on the project" plainly includes Hunt's employees, but not its subcontractors.  "Employ" is relevantly defined as "**1.** to hire or engage the services of (a person or persons); provide employment for; have or keep in one's service: *This factory employs thousand of people.*"  *Random House Compact Unabridged Dictionary* 638 (2d ed. 1996) (italics in original).  This would mean those on Hunt's payroll – i.e., its superintendent, project manager, etc.

[14] Hunt's citation to *United States ex rel. Chase Somerset Corp. v. Becon Services Corp.*, 837 F. Supp. 461 (D.D.C. 1993) is inapposite.  In that case, the subcontractor did not provide any sort of notice of a claim for labor

(Lynch Dep. at 92), most likely because it was facing stinging criticism from Kite for its management problems. Each of these analyses contained detailed information about the nature of the Poole and Kent's claim, how such was caused, how such was impacting Poole and Kent, and how damage could be mitigated in the future. While the letters and notices specify the categories of damages incurred by Poole and Kent, none could state Poole and Kent's exact damages because the damages were ongoing and would be impossible to determine with accuracy. Poole and Kent is not required to perform the impossible just to maintain its basic right to compensation for services; forfeitures are disfavored under the law. *See EDM & Assocs., Inc. v. GEM Cellular*, 591 A.2d 384, 389 (D.C. 1991). At no point did Hunt respond to these letters in any substantive manner or request that Poole and Kent quantify its damages.

**E.    Poole and Kent is Entitled To Recover The Extra Costs Its Subcontractor Incurred Due To Hunt's Mistaken Insistence That The Subcontractor Pay A Wage Rate Higher Than That Mandated By The Prime Contract.**

PCO 71 sets forth additional costs incurred by Poole and Kent's subcontractor, Regional Air, as a result of Hunt's imposition of a wage standard *higher* than that mandated by the Prime Contract or by the relevant collective bargaining agreements. Indeed, the Motion only serves to highlight Hunt's failure to understand what the mandated wage rates on the Project in fact were. The owner's Davis-Bacon compliance consultant, CHW, Inc. ("CHW"), specifically found that the wage rates used by Regional Air in bidding on the Project **complied** with the Prime Contract's Davis-Bacon requirements. CHW's March 21, 2005 letter to counsel for Regional Air is in the backup to PCO 71, attached hereto as **Exhibit 29.** But Hunt required payment at a

---

inefficiency: "Never once during this time does Chase allege, either in its pleading or statement of material facts, that it provided Becon with any notice that it would seek damages due to labor inefficiencies." 837 F. Supp. at 464. Here, in contrast, Poole and Kent repeatedly reserved its rights to make such a claim. Similarly, the waivers executed by the subcontractor in that cases do not include the carve-out language negotiated by Poole and Kent

higher rate until that ruling could be issued, when Regional Air's work was eighty-five percent

complete.

The Davis-Bacon Act, 40 U.S.C. §§ 3141, *et seq.*, is a "prevailing wage" law. It

generally applies to contractors on federal government projects,[15] mandating the payment of

wages set by the Department of Labor as prevailing in a given city or county. The Project, of

course, is not a federal procurement but rather a private hotel project. However, as a condition of

the tax increment financing ("TIF") package procured by the Owner to develop the project, the

Owner was required to mandate that the construction contractor and its subcontractors paid

Davis-Bacon wages in the construction of the hotel, at least until substantial completion.[16] (Ex.

B to Kamas Declaration, at Section A(17)(j)). Poole and Kent's subcontractor, Regional Air

Systems ("Regional Air") had a specific agreement with the union for sheet metal workers to

permit a class of workers called "'R' workers," paid at a lower rate than other sheet metal

workers. Regional Air bid this job on the premise that it would be able to use such workers. *Id.*

The 'R' worker classification has not yet been generally recognized by the Department of Labor

under the Davis-Bacon Act, however. Without that classification, Regional Air would be

required to pay its workers at a higher rate.

Unfortunately, Regional Air and Poole and Kent had no efficient means of redress. Were

this an ordinary federal job, Regional Air could use the procedure set down in federal regulations

to obtain a quick ruling on the matter. However, because Davis-Bacon wages were mandated as

a result of contract rather than by law, the usual procedures for getting approval of a payment

rate for a classification not recognized by the Department of Labor did not apply. Indeed, the

---

[15] It also applies to construction projects for which the construction contract is entered into by the D.C. government. *See* 40 U.S.C. § 3142(a). The Prime Contract specifies that the D.C. government is not a party thereto. (Supplemental Conditions at Section A(17) (d)).

[16] Because the Davis-Bacon requirement is imposed by contract, not by law, Hunt's citation to Section 22 (Compliance with Law and Permits) of the Subcontract is inapposite.

District of Columbia appears to have been unsure if it had any jurisdiction over the matter.

Ultimately, after significant delay, a consultant engaged by the Owner found that Regional Air's

employment of 'R' workers complied with the Davis-Bacon mandate.  But the damage was

already done: Regional Air was 85% complete at this time, and Hunt had required that Poole and

Kent mandate that Regional Air pay the higher rate, not the 'R' worker rate.  Indeed, Hunt had

actually denigrated Poole and Kent's request for compensation in its correspondence with Kite.

(1/19/05 letter from Hunt to Kite, attached hereto as Exhibit 10).

The gravamen of PCO 71 is that Poole and Kent would have been in compliance with the

Davis-Bacon requirements of the Contract had it simply been able to perform the job as bid -- as

CHW would, in fact, ultimately permit.  Hunt, though, required that Poole and Kent mandate that

Regional Air not utilize 'R' workers.  Moreover, Hunt failed to pursue Poole and Kent's pass-

through claim to the Owner, electing instead to actively impede it.

### F.    Hunt Prevented The Fulfillment Of Conditions Precedent To Poole and Kent's Right To Payment And Cannot Rely Thereon

Hunt argues that unspecified claims of Poole and Kent are barred by failures of

conditions precedent.  It cites a "pay if paid" provision at Section 4.2 in arguing that some or all

of Poole and Kent's claims are barred by the failure of the condition precedent of Owner

payment.  First and foremost, a party cannot take advantage of failure of condition precedent

when it actively prevented the fulfillment of that condition.  *Urban Masonry Corp. v. N&N*

*Contractors, Inc.*, 676 A.2d 26, 36 (D.C. 1996).  In choosing to settle with the Owner without

cooperating with Poole and Kent to recover for any Owner caused damages, Hunt actively

prevented the condition of owner payment, and so cannot rely on Section 4.2.  *Id.*  Moreover,

much of what Poole and Kent seeks is not within this section because these are items for which

Hunt bears responsibility without the ability to pass these claims upstream to the Owner.

33

Between it and the Owner, Hunt would be responsible, for example, for the costs of accelerating work to make up for the problems incurred during excavation.  Hunt has been paid by the Owner for the subcontract balance.  (Decker Aff.[17] at ¶ 8).  Hunt claims that it settled with the Owner and has been paid all amounts owed to it.  If that is the case, then the "pay if paid" clause is satisfied.  Hunt has been paid.

Similarly, the conditions precedent contained in Section 34 have been waived or prevented by Hunt.  Hunt elected to initiate the instant litigation.  Poole and Kent was therefore required under the Federal Rules of Civil Procedure to file its compulsory counterclaim.  *See* Fed. R. Civ. Pro. 13(a).  Hunt had not even processed any of Poole and Kent's proposed change orders at that time (with one exception).  It made counteroffers at various times in 2006 – even after it filed the instant Complaint – as to Poole and Kent's proposed change orders.  Such would be the *earliest* date that a "dispute" for purposes of Section 34 could be deemed to exist because until then, Poole and Kent was simply pursuing the procedure called for in Section 18 (Change Orders) regarding negotiation of pricing.  Hunt had already filed suit, short-circuiting the dispute resolution process and actively hindering the fulfillment of any conditions precedent to Poole and Kent maintaining its claims in this Court.  *See Urban Masonry*, 676 A.2d at 36.  Hunt cannot now rely upon the very clauses that it prevented Poole and Kent from satisfying.  *Id.*

**G.    Hunt's Reliance on Provisions Regarding Contiguous Work is Without Merit**

Hunt seems to think that Section 13.1 would somehow excuse its failure to incorporate Poole and Kent's schedule input and sequence the work properly.  However, the plain text of the provision does not mention scheduling or time issues.  Rather, it addresses quality and workmanship problems:

---

[17] The Affidavit of Robert M. Decker, Executive Vice President for Hunt, filed in support of the Motion.

> **13.1   Contiguous Work.**  Should the proper and accurate performance of Subcontractor's Work depend upon the proper and accurate performance of work not covered by this Subcontract, Subcontractor shall carefully examine such other work, determine whether it is in fit, ready, and suitable condition for the proper and accurate performance of the Work hereunder, and before proceeding with the Work hereunder, report promptly any such **improper conditions and defects** to Hunt, in writing, and allow Hunt a reasonable time to have such improper conditions and defects remedied.

(emphasis added).  Hunt offers up no sworn allegations that Poole and Kent actually breached Section 13.1.  It makes the bald allegation of breach in the Memorandum[18] (Mem. in Sup. at 14), but this is not supported by any sworn fact or evidence of any nature in its Statement of Undisputed Facts.  Nor is there any evidence of exactly what Hunt believes was a breach of Section 13.1.  Hunt has not satisfied its burden of proof.  Because Hunt cites no sworn facts, this Court cannot grant Hunt summary judgment in reliance upon Section 13.1.

## IV.    THE COURT CANNOT GRANT SUMMARY JUDGMENT ON COUNT IV BECAUSE HUNT HAS ABANDONED THE SUBCONTRACT.

Hunt moves for summary judgment on Counts IV, V and VI, each of which assert claims for relief in quasi-contract, because Poole and Kent also asserts claims for relief for breach of contract.  Hunt does not address Federal Rule 8(e)(2) (new FRCP 8(d)(3)), which expressly permits a party to assert claims for relief "regardless of consistency," as it is fatal to Hunt's position.  *See In re King Enterprises, Inc.*, 678 F.2d 73, 76-77 (8th Cir. 1982) (permitting construction contractor to take inconsistent theories of breach of contract and quantum meruit to trial).  Further, Hunt is incorrect substantively as well.  The facts of this case will show that the Parties abandoned the Subcontract.  "Contract abandonment occurs when both parties depart

---

[18] Hunt also makes a statement of opinion in suggesting that Poole and Kent's preparation of coordination drawings somehow excuses Hunt's poor scheduling.  It does not, however, put forth a causal link between the preparation of drawings and the election of Hunt not to require its masonry and framing subcontractors to adhere to the schedule, or the hopscotch manner in which the Project was ultimately completed.  Accordingly, even if Hunt were able to show a breach of the covenant contained in Section 13.1, it does not follow therefrom that Hunt is simply excused from its duties on the Project; Hunt has not met its burden of proof or persuasion as to its proposed remedy for the breach.  *Cf. Cahn v. Antioch Univ.*, 482 A.2d 120, 130-31 (D.C. 1984).

from the terms of the contract by mutual consent.  This consent may be express, or it may be implied by the parties' actions."  *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1019 (Nev. 2004) (quoting *Rudd v. Anderson*, 285 N.E.2d 836, 840 (Ind. App. 1972)).  *See also Schiavi v. Mayor & City Council of Baltimore*, 40 F. Supp. 184, 190 (D. Md. 1941).  Because the doctrine of abandonment serves to invalidate the contract, the principle that there can be no recovery in quantum meruit where an express contract exists is inapplicable.  *See Schwartz v. Shelby Constr. Co.*, 338 S.W.2d 781, 787-88 (Mo. 1960).

A contractor's choice to complete the job is not inconsistent with a holding that the contract has been abandoned:

> In the specific context of construction contracts…when an owner imposes upon the contractor an excessive number of changes such that it can fairly be said that the scope of the work under the original contract has been altered, an abandonment of contract properly may be found.  In these cases, the contractor, with the full approval and expectation of the owner, may complete the project.  Although the *contract* may be abandoned, the *work* is not.

*C. Norman Peterson Co. v. Container Corp. of America*, 218 Cal. Rptr. 592, 598 (Cal. App. 1985) (emphasis in original).  *Accord J.A. Jones*, 89 P.3d at 1019.  As with cardinal change, the central issue is whether the nature of the work has been significantly altered, not the building being constructed.  *Id.*  The cases state no specific bright-line test for the application of the doctrine.  Rather, abandonment hinges on evidence of intent by the parties to govern their relationship by something other than their written contract.

In the instant case, Hunt and Poole and Kent abandoned the Subcontract by implied mutual consent.  True, there was no express statement of repudiation.  However, this is a case where, as the *Schwartz* court put it, in finding an implied consent to abandon, "sometimes, according to the old expression, actions do 'speak louder than words.'"  338 S.W.2d at 790.  Even if Poole and Kent's conduct could be interpreted more as acquiescence than assent, such is

36

sufficient to establish a mutual abandonment.  *See Dault v. Schulte*, 187 N.W.2d 914, 915-16

(Mich. App. 1971)

The clearest indication of this intent was in the schedule.  As the Eighth Circuit stated in

upholding a finding of abandonment:

> Most fundamentally, the parties could not keep up with the…schedule
> they set for themselves. Contrary to their expectations in reaching an
> agreement, the kickoff meeting, subcontract execution, and first
> modification were each delayed by several precious weeks or more. Later,
> defective designs and performance by both parties caused further delays,
> which in turn had a detrimental domino effect….In short, the project
> progressed at a different pace from that contemplated by the subcontract.

*O'Brien & Gere Tech. Servs., Inc. v. Fru-Con/Fluor Daniel J.V.*, 380 F.3d 447, 455 (8th Cir.

2004).  Similarly, the instant Project quickly careened off schedule.  Even worse, the

contemplated sequence of work was simply tossed aside, leaving Poole and Kent to perform the

work in a hopscotch manner, moving crews from floor to floor to floor on a single day rather

than being permitted to complete its work in an efficient manner, one floor at a time.  Every

effort by Poole and Kent to provide schedule input to get the Project back on course was ignored

by Hunt.

Similarly, Hunt abandoned the mandated schedule input rights granted to Poole and Kent.

Poole and Kent had no choice but to acquiesce in Hunt's failure to accept such input; Poole and

Kent repeatedly offered input until August 2005.  Such continued, repeated breaches, though,

indicate an abandonment of the Subcontract.  *See Opdyke & Butler v. Silver*, 245 P.2d 306, 310

(Cal. App. 1952) (repeated breaches of contractual changes procedures cited as evidence of

abandonment).  Poole and Kent was substantially delayed by failures of Hunt, including the

failures to obtain permits, to obtain permanent water and sewer, and the failure to ensure that

precursor work was completed.  Such delays are indicative of contract abandonment.  *See C.*

*Norman Peterson*, 218 Cal. Rptr. at 595 (owner's delay in providing drawings cited as evidence of intent to abandon contract).

Where the contract has been abandoned, recovery is in quantum meruit.  <u>Blake</u>, 431 A.2d at 579.  Provisions that limit recovery for delay, extra work, or hindrance, like Section 9, Section 10, Section 18, Section 21, and Section 34, do not apply, in that the contract itself is extinguished.  <u>Id.</u>; *See also C. Norman Peterson*, 218 Cal. Rptr. at 602 (holding that due to abandonment of contract, guaranteed maximum price provision of abandoned contract was inapplicable in fixing damages).  Instead, Poole and Kent is entitled to recover all of its costs together with profit and interest.  *Blake*, 431 A.2d at 579.

## V.    THE COURT CANNOT GRANT SUMMARY JUDGMENT ON COUNT V BECAUSE HUNT HAS CREATED A CARDINAL CHANGE TO THE SUBCONTRACT.

Hunt's mismanagement of the Project and failure to ensure that the work could be performed in a proper sequence caused changes in the work Poole and Kent performed so substantial as to fall within the cardinal change doctrine.  A cardinal change is a breach of contract that occurs where the general contractor has so altered the work to be performed that such changes are outside the contemplation of the parties at the outset of the project and thus outside the clauses used for routine changes to the work:

> [A] fundamental alteration of this type is a contract breach, entitling the contractor to breach damages.  The basic standard…is[] whether the modified job "was essentially the same work as the parties bargained for when the contract was awarded."

*Air-A-Plane Corp. v. United States*, 408 F.2d 1030, 1033 (Ct. Cl. 1969) (quoting *Aragona Constr. Co. v. United States*, 165 Ct. Cl. 382, 391 (1964)).  The test is an objective one:

> Appellant argues, and we will assume for the purposes of considering this motion [for summary judgment, brought by the appellee] that it is proven, that Appellant did not contemplate such changes.  However, that is not the issue.  The question is whether the changes should be regarded as fairly

38

and reasonably within the contemplation of the parties when the contract
was entered into.

*Jack Cooper Constr. Co.*, 84-3 BCA ¶ 17,703, 1984 VA BCA Lexis 61, *20-21 (VABCA 1984)

(citing *Freund v. United States*, 260 U.S. 60, 63 (1922)).  There is no bright line test or set

formula for determining a cardinal change; rather, "[e]ach case must be analyzed on its own facts

and in light of its own circumstances, giving just consideration to the magnitude and quality of

the changes ordered and their cumulative effect upon the project as a whole." *Wunderlich*

*Contracting Co. v. United States*, 351 F.2d 956, 966 (Ct. Cl. 1965).  While most notably applied

in government contract cases, the principle is equally applicable to private contracts.  *See, e.g.,*

*J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1020 (Nev. 2004).  *See*

*also L.K. Comstock & Co. v. Becon Constr. Co., Inc.*, 932 F. Supp. 906, 937 (E.D. Ky. 1993)

(noting "essential similarity of public and private construction contracts with regard to

mechanism for unilateral ordering of changes").

   The cardinal change in this case lies in the *manner* in which the Project was built, not in

the final product.  The Project as built is essentially the Project contemplated when ground was

broken.  However, the objective contemplation of Hunt and Poole and Kent when the

Subcontract was entered into was that Poole and Kent would provide schedule input that Hunt

would incorporate into the overall project schedule and that Hunt would update the schedule on a

monthly basis to ensure the efficient performance of the work.  Obviously, the intent of the

Subcontract was completely disregarded by Hunt during the construction of the Project and what

was contemplated to be an orderly and efficient construction project turned into chaos.

   The general rule is that a change to the method or course of the work will constitute a

cardinal change, no matter what the ultimate product of the work, provided that such method is

so different as to be outside of the scope of the contract at its execution.  "Where a cardinal

change is concerned, it is the entire undertaking of the contractor, rather than the product, to which we look." *Edward R. Marden Corp. v. United States*, 442 F.2d 364, 470 (Ct. Cl. 1971). *See also Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1332 (Fed. Cir. 2003); *Amertex Enters., Ltd. v. United States*, 1995 WL 925961, *60 (Fed. Cl. Dec. 15, 1995), *aff'd* 108 F.3d 1392 (unpublished table decision) ("There is no denying that the contract began and ended with substantially the same item, but that does not end the inquiry"); *Brand S Roofing*, 82-1 BCA ¶ 15,513 (ASBCA 1981).

Courts addressing cardinal changes on private contracts have followed the *Edward R. Marden* approach, holding that the entire undertaking, rather than the end product, should be the focus of a cardinal change inquiry. Among the more recent of these decisions is Nevada Supreme Court's holding in *J.A. Jones*. J.A. Jones was the structural concrete subcontractor and Lehrer McGovern Bovis ("LMB") the general contractor/construction manager on a private exposition center construction project. In order to obtain a reduction in contract amount from J.A. Jones's initial bid, LMB agreed to perform certain site preparation tasks that would render J.A. Jones's performance faster and more efficient; J.A. Jones intended to use a rolling concrete formwork system and other processes designed to complete the job more quickly. LMB thwarted the intended efficiencies by failing to have the preliminary groundwork completed and failing to obtain the necessary permits before J.A. Jones started work. As a result, it had to change the way it performed the job; for example, the excavator's late performance meant that ground was too unstable to permit trucks on the floor, so that instead of pouring concrete straight from the truck, J.A. Jones had to use a more expensive pumping process to pour the concrete. Additionally, dirt piles and other debris left by the excavator and other subcontractors obstructed the ability to use the rolling concrete formwork method and it had to use a much less efficient

piece-by-piece method.  The final product, however, was essentially the same building LMB set

out to build.  The court did not view this as affecting J.A. Jones's ability to claim cardinal

change:

> In this case, as LMB points out, the overall physical characteristics of
> Jones's work changed very little.  The real question, however, is whether
> the entirety of the changes and impacts on Jones's work was so extensive
> as to force Jones to perform work beyond the confines of the contract.

89 P.3d at 1021.  *Accord Comstock*, 932 F. Supp. at 940 ("The central consideration should be

the effect on the contractor's anticipated work").  The court reversed the trial court's dismissal of

J.A. Jones's cardinal change count.

The relevance of the cardinal change doctrine to the instant case is that it serves to

invalidate the clauses Hunt wishes to use to evade its responsibility for Poole and Kent's extra

costs.  Because the changes imposed by Hunt's mismanagement were not within the

contemplation of the parties at the time of execution, they were accordingly not within the

clauses used to handle normal, foreseeable changes in the work (such as Section 9.4 cited by

Hunt):

> [A] cardinal change is one which, because it fundamentally alters the
> contractual undertaking of the contractor, is not comprehended by the
> normal Changes clause.

*Edward R. Marden*, 442 F.2d at 369.  *Accord Embassy Moving & Storage Co. v. United States*,

424 F.2d 602, 607 (Ct. Cl. 1970) ("[T]he alleged 'changes' ordered were not of the type intended

to fall within the ambit of the Changes article"); *Air-A-Plane*, 408 F.2d at 1032-33 ("[T]he court

has consistently ruled that such a 'changes' provision does not authorize a 'cardinal' change");

*ThermoCor, Inc. v. United States*, 35 Fed. Cl. 480, 490 (1996); *Jack Cooper*, 84-3 BCA ¶

17,703, 1984 VA BCA Lexis 61 at *21.

In looking to the contemplation of the parties at the outset of the contract, this approach is quite similar to the approach taken by the D.C. Court of Appeals in *Blake*. Blake, the contractor, engaged Coakley as its subcontractor for the performance of fireproofing work on structural steel in the construction of a new building in the Walter Reed complex. The subcontract contained a clause restricting the subcontractor's damages for delay. The court refused to apply a clause restricting damages for delay on the grounds that the delay in question – which resulted from Blake's breach of the subcontractor by hindrance of Coakley's performance – had not been contemplated by the parties. 431 A.2d at 578-79.

Because the delays and impediments caused by Hunt's mismanagement were not within the contemplation of the parties at the outset of the Subcontract, they are not governed by any of the clauses on changes to the work or delays found in Section 9, Section 10, Section 21, or Section 34 of the Subcontract. *Id.* Rather, Hunt should be made to compensate Poole and Kent under the general law of the District of Columbia: Poole and Kent is entitled to be placed in "as good a position as that in which full performance would have placed [it]." *Henry J. Robb, Inc. v. Urdahl*, 78 A.2d 387, 388 (D.C. 1951) (citations omitted). Hunt is not entitled to summary judgment as to Count V of the Counterclaim.

## VI.    THE COURT CANNOT GRANT SUMMARY JUDGMENT ON COUNT VI BECAUSE OF HUNT'S ACTIONS SUBSEQUENT TO EXECUTION OF THE SUBCONTRACT.

Unjust enrichment and quantum meruit are typically used to refer to actions in quasi-contract – those contracts implied by law to avoid an unjust result. *See Fred Ezra Co. v. Pedas*, 682 A.2d 173, 175 (D.C. 1996). Hunt's suggestion that an implied-in-law contract cannot be found where an express contract on the subject matter exists "does not apply if the implied agreement is based upon the conduct of the parties subsequent to, and not covered by, the terms

of the express contract." *Scott Co. v. MK-Ferguson Co.*, 832 P.2d 1000, 1002 (Col. App. 1991) (citations omitted).  Courts imply such a contract where:

1)      Substantial changes not covered by the contract occur;
2)      Such changes were not within the contemplation of the parties at the outset of the project; and
3)      The changes result in extra cost for the contractor.

*See Bignold v. King County*, 399 P.2d 611, 616 (Wash. 1965).  *See also Schiavi v. Mayor & City Council of Baltimore*, 40 F. Supp. 184, 190 (D. Md. 1941); *Rudd v. Anderson*, 285 N.E.2d 836, 840 (Ind. App. 1972); *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1019 (Nev. 2004).  Hunt ignores this principle in its Motion.

The substantial changes to the Subcontract came in Hunt's abandonment of the schedule and its breaches of the Subcontract by failing to incorporate Poole and Kent's schedule input, failing to update the schedule monthly, and mismanaging the sequencing of the work.  Stung by criticism from its subcontractors and from Kite, Hunt stopped updating the schedule in a realistic manner in late 2004.  (1/13/05 ltr. from Kite to Hunt at 2).  Already, the progression of work on the Project had become inconsistent with the schedule.  Accordingly, the Project on which Poole and Kent found itself was qualitatively different from the one to which it had contracted to provide mechanical work.

These changes were not within the contemplation of the parties at the outset of the Subcontract.  While there is a clause permitting Hunt to reasonably direct Poole and Kent's work, this clause does not address the situation in which Hunt's own breaches of duty result in extra work or extra cost to Poole and Kent.  As a Colorado court recently explained:

> Here, the extra work claimed was not occasioned by changes, errors, or lack of clarity in the plans, design, or specifications for the project. **The subcontractor could not have reasonably anticipated that the contractor would breach its contractual obligations**…

43

*Specialized Grading Enters., Inc. v. Goodland Constr. Co.*, __ P. 3d __, 2007 WL 3197096, *3 (Colo. App. Nov. 1, 2007) (emphasis added).

As a result of Hunt's breaches of its contractual obligations to incorporate Poole and Kent's schedule input, Poole and Kent incurred significant extra costs. Poole and Kent has submitted sworn testimony which, if believed, would permit it to recover in quantum meruit or unjust enrichment. Accordingly, the motion for summary judgment as to Count VI of the Counterclaim must be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51 (1986).

## VII.    CONCLUSION.

For the foregoing reasons, Hunt has failed to show that it is entitled to judgment as a matter of law and Poole and Kent respectfully requests that the Court set this matter in for trial at its earliest convenience.

Respectfully submitted,


/s/ Robert F. Carney
Robert F. Carney (D.C. Bar # 436999)
Michael A. Stover (pro hac vice)
William P. Pearce (pro hac vice)
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Suite 1900
Baltimore, Maryland 21202-1626
Telephone: (410) 347-8700

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of December, 2007, a copy of the foregoing

Opposition was served electronically to the following counsel of record:

David T. Dekker, Esquire
Jeffrey R. Gans, Esquire
Laura Kamas, Esquire
Thelen Reid & Priest, LLP
701 Eighth Street, N.W.
Washington, D.C. 20001

Donna M. Crowe
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, N.W., 12th Floor
Washington, D.C.  20036

/s/  Robert F. Carney
Robert F. Carney

*1767352*