IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HUNT CONSTRUCTION GROUP, INC.          *

      Plaintiff/Counter Defendant          *

v.                                     *    Civil Court Action No:          1:06CV1850
                                            Judge James Robertson
THE POOLE AND KENT CORPORATION         *

      Defendant/Counter Plaintiff/         *
      Third Party Plaintiff

    *   *   *   *   *   *    *   *   *   *   *

## STATEMENT OF MATERIAL FACTS IN GENUINE DISPUTE
## AND RESPONSE TO THE STATEMENT OF ALLEGED
## MATERIAL FACTS NOT IN DISPUTE

Defendant/Counterclaim Plaintiff/Third Party Plaintiff The Poole and Kent Corporation

("Poole and Kent") by its undersigned counsel, hereby submits, pursuant to Local Rule 7(h), its

Statement of Material Facts in Genuine Dispute and Response to the Statement of Material Facts

Not in Dispute filed by Plaintiff/Counter-Defendant Hunt Construction Group, Inc. ("Hunt").

The first part of this submission responds to Hunt's Statement of Material Facts Not in Dispute

(the "Hunt Statement").  The second part of this submission sets forth additional material facts

supporting Poole and Kent's positions.  As the Court will note from the Responses set forth

below, Hunt's 51 paragraphs of alleged Material Facts is primarily a recitation of selective (often

incomplete) provisions of a written subcontract.  Hunt does not contend that any quoted

provision is ambiguous, thus interpretation is an issue left to the Court and the meaning of the

document does not constitute a "Fact".  Likewise, Hunt's many unsupported conclusions or

argumentative statements do not constitute "Facts".  Hunt's inclusion of these two categories in

its statement has made Poole and Kent's Response far more lengthy than was necessary.

**I.    Response to Hunt's Statement of Alleged Material Facts Not in Dispute.**

1.    In response to Paragraph 1 of the Hunt Statement, Poole and Kent does not dispute that Hunt served as general contractor on the construction of an Embassy Suites Hotel in Washington, D.C. (the "Project").  Hunt has not submitted the entire contract (the "Prime Contract") between Hunt and the Project Owner, 1000K, LLC (the "Owner") in its Motion filing.

2.    In response to Paragraph 2 of the Hunt Statement, Poole and Kent does not dispute that Hunt and Poole and Kent entered into the Subcontract attached as Ex. A to the Declaration of Laura Kamas (the "Kamas Declaration") filed with Hunt's Motion for Summary Judgment (the "Motion").  While the balance of the allegations in Paragraph 2 may serve as a rough summary of the terms of the Subcontract, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ. v. Best*, 484 A.2d 958, 966-67 (D.C.1984), and Hunt does not allege in Paragraph 2 that any portion of the Subcontract is ambiguous.  To the extent Hunt alleges that the Subcontract is ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

3.    In response to Paragraph 3 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 3 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

4.      In response to Paragraph 4 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 4 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

5.      In response to Paragraph 5 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 5 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

6.      In response to Paragraph 6 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 6 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

7.      In response to Paragraph 7 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484

A.2d at 966-67, and Hunt does not allege in Paragraph 7 that the cited portion of the Subcontract is ambiguous. To the extent Hunt alleges that the cited portion of the Subcontract is ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means. Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

8.      In response to Paragraph 8 of the Hunt Statement, some clarification is necessary. The term "Subcontract Balance" typically refers to the unpaid amounts due and owing under the contract and all approved change orders. It does not include items claimed as extras that are the subject of dispute. To the extent Hunt uses the term consistent with the aforementioned meaning, Poole and Kent does not dispute that the Subcontract Balance was $498,090.00 when this lawsuit was commenced. In addition, Hunt belatedly approved certain change orders totaling $60,325.00 (after it filed suit) that must be added to the Subcontract Balance resulting in an updated Subcontract Balance of $558,415.00.

9.      In response to Paragraph 9 of the Hunt Statement, Poole and Kent does not dispute that Hunt has *alleged* such backcharges. However, this is immaterial to the Motion, which does not concern Hunt's Complaint seeking such backcharges. Poole and Kent denies all liability for and reserves all defenses to such alleged backcharges.

10.     The facts alleged in Paragraph 10 of the Hunt Statement are not material to the Motion and are denied.

11.     Poole and Kent does not dispute the allegations contained in Paragraph 11 of the Hunt Statement, but also states that Poole and Kent is entitled to interest on all amounts awarded to it. *See* D.C. Code 15-108.

12.    In response to Paragraph 12 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 12 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

13.    In response to Paragraph 13 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 13 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent objects to Hunt's addition of both emphasis and bracketed content to the portion of the Subcontract it block quotes in Paragraph 13.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

14.    In response to Paragraph 14 of the Hunt Statement, Poole and Kent does not dispute that the portion of Subcontract in the block quote in this paragraph is an accurate transcription of a provision set forth in the Subcontract.

15.    In response to Paragraph 15 of the Hunt Statement, Poole and Kent does not dispute that the portion of Subcontract in the block quote in this paragraph is an accurate transcription of a provision set forth in the Subcontract.

16.     In response to Paragraph 16 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 13 that the cited portions of the Subcontract are ambiguous. To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means. Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

17.     In response to Paragraph 17 of the Hunt Statement, Poole and Kent does not dispute that its work on the Project was substantially complete as of October 31, 2005. (Aff. of MacPhee at 3). However, this fact is not material to the Motion.

18.     Paragraph 18 of the Hunt Statement is ambiguous. It is not clear what Hunt means by "claim". Poole and Kent's Counterclaim concerns numerous claims submitted to Hunt, at various times before September 2006. To the extent Hunt is alleging that the Labor Inefficiency and Extended Overhead Claims of Poole and Kent were first made to Hunt in September 2006, Poole and Kent specifically denies this. Such claims were first made to Hunt in May 2004, and were repeatedly made thereafter -- October 19, 2004; December 8, 2004; February 2, 2005; February 28, 2005; May 18, 2005; May 25, 2005; June 8, 2005; July 6, 2005; July 23, 2005; and August 9, 2005. (Aff. of Maltby at 5)

19.     Paragraph 19 of the Hunt Statement is ambiguous. It is not clear what Hunt means by "claim". In any event, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 19 that the cited portions of the Subcontract are ambiguous. To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in

support of its construction rather than merely making an allegation as to what it thinks the Subcontract means. Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

20.     In response to Paragraph 20 of the Hunt Statement, Poole and Kent does not dispute that the portion of Subcontract in the block quote in this paragraph is an accurate transcription of a provision set forth in the Subcontract, except to note that a portion of this provision has been omitted, as denoted by the ellipses and made clear by comparison to the actual document. It is not clear why Hunt elected to make this omission. The omitted portion is material in that Hunt simply never responded to claims submitted by Poole and Kent (Aff. of Maltby at 6).

21.     In response to Paragraph 21 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 21 that the cited portions of the Subcontract are ambiguous. To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means. Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract. Poole and Kent does not dispute that the portion of Subcontract in the block quote in this paragraph is an accurate transcription of a provision set forth in the Subcontract, except to note that a portion of this provision has been omitted, as denoted by the ellipses and made clear by comparison to the actual document. It is not clear why Hunt elected to make this omission.

22.     Poole and Kent assumes that "Designer", refers to the Owner's architect or engineer responsible for design of a given item.  With that proviso, Poole and Kent does not dispute the allegations contained in Paragraph 22 of the Hunt Statement.

23.     In response to Paragraph 23 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 23 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

24.     In response to Paragraph 24 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 24 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

25.     Paragraph 25 of the Hunt Statement is ambiguous.  It is not clear what Hunt means by "claim".  In any event, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 25 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the

8

Subcontract means.  Poole and Kent denies that any claims for which the Owner would be responsible were submitted in an untimely manner.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract

26.     Paragraph 26 of the Hunt Statement is ambiguous.  It is not clear what Hunt means by "claim".  Poole and Kent denies the premise of Paragraph 26, as noted in its response to Paragraph 25, *supra.*  Whether Hunt can seek additional compensation from the Owner is a matter of construction of the Contract between Hunt and the Owner and of the Settlement Agreement between the two, neither of which were included in the Motion filing.  The construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 25 that the Contract or the Settlement Agreement are ambiguous.  To the extent Hunt alleges that the cited portions of these contracts are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks such documents mean.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.  To the extent that Hunt alleges that the Contract between Hunt and the Owner and/or the Settlement Agreement between Hunt and the Owner are relevant, Hunt has failed to carry its burden of proof because Hunt has failed to submit those allegedly relevant documents in support of its Motion.  Those documents are the only evidence of the terms contained therein. *See Firemen's Ins. Co. v. Amerada Hess Corp.*, 315 A.2d 837, 838 (D.C. 1974).

27.     Paragraph 27 of the Hunt Statement is vague.  It is not clear which portion of the damages sought by the Poole and Kent in the Counterclaim are deemed by Hunt to have been "incurred because of alleged delays and/or acceleration."  However, Poole and Kent does not dispute that a portion of the damages it seeks are in the nature of delay damages.

28.     In response to Paragraph 28 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 28 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

29.     In response to Paragraph 29 of the Hunt Statement, Poole and Kent does not dispute that the portion of Subcontract in the block quote in this paragraph is an accurate transcription of a provision set forth in the Subcontract, except to note that Poole and Kent objects to Hunt's addition of bracketed content to the portion of the Subcontract it block quotes in Paragraph 29.

30.     In response to Paragraph 30 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 30 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

31.     In response to Paragraph 31 of the Hunt Statement, Poole and Kent does not dispute that the portion of Subcontract in the block quote in this paragraph is an accurate transcription of a provision set forth in the Subcontract, except to note that Poole and Kent

objects to Hunt's addition of bracketed content to the portion of the Subcontract it block quotes in Paragraph 31.

32.     In response to Paragraph 32 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 13 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.  Poole and Kent objects to Hunt's addition of emphasis to the portion of the Subcontract it block quotes in Paragraph 32.

33.     Paragraph 33 of the Hunt Statement is vague.  It is not clear which portion of the damages sought by the Poole and Kent in the Counterclaim are deemed by Hunt to have been "the result of Poole and Kent's difficulty coordinating with other subcontractors and/or defects in other subcontractors' work."  However, Poole and Kent does not dispute that a portion of the damages it incurred are the result, in part, of the failure to perform timely by other subcontractors.

34.     In response to Paragraph 34 of the Hunt Statement, Poole and Kent does not dispute that the portion of Subcontract in the quote in this paragraph is an accurate transcription of a provision set forth in the Subcontract, except to note that a portion of this provision has been omitted, as denoted by the ellipses and made clear by comparison to the actual document.  It is not clear why Hunt elected to make this omission.

35.     Poole and Kent does not dispute the allegations contained in Paragraph 35 of the Hunt Statement.  However, such allegations are not material.  Poole and Kent further states that

Hunt failed to have Hunt's electrical subcontractor participate in the coordination drawing

process, causing damages to Poole and Kent.  (Kessler Dep.[1] 11/19/2007 at 232-235).

36.    In response to Paragraph 36 of the Hunt Statement, the construction of the

unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484

A.2d at 966-67, and Hunt does not allege in Paragraph 36 that the cited portions of the

Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract

are ambiguous, it should cite specific facts in support of its construction rather than merely

making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically

denies Hunt's characterization of the terms of the Subcontract.  Poole and Kent objects to Hunt's

addition of bracketed content to the portion of the Subcontract it block quotes in Paragraph 36.

37.    The premise of Paragraph 37 – an allegation that Poole and Kent "fail[ed] to

fulfill its obligations under Section 13.1" – is never actually set out in a sworn statement or other

evidence anywhere.  Instead, it is an unsupported conclusory allegation that cannot be relied upon

by the Court.  Moreover, nowhere in the Hunt Statement or the Motion does Hunt actually set out

how Poole and Kent failed to meet such obligations in any specific instance.  Hunt has the

burden to show that Poole and Kent breached its covenants under Section 13.1, and the

Statement fails to even attempt to meet this burden.  Furthermore, the construction of the

unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484

A.2d at 966-67, and Hunt does not allege in Paragraph 37 that the cited portions of the

Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract

are ambiguous, it should cite specific facts in support of its construction rather than merely

---

[1] The Deposition of Thomas Kessler, Expert Witness for Poole &Kent, conducted November 19, 2007.  A true and correct copy of relevant portions of the transcript of this deposition is attached to the Opposition as **Exhibit 30**.

making an allegation as to what it thinks the Subcontract means. Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

38.    Poole and Kent denies the characterization of its PCO 71 contained in Paragraph 38 of the Hunt Statement. The increased costs were not, in fact, incurred to comply with the Davis-Bacon Act; they were incurred to meet a standard imposed by Hunt higher than that mandated by the Prime Contract.

39.    In response to Paragraph 39 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 39 that the cited portions of the Subcontract are ambiguous. To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means. Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

40.    In response to Paragraph 40 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 40 that the cited portions of the Subcontract are ambiguous. To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means. Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract. Poole and Kent does not dispute that the portion of Subcontract in the quote in this paragraph is an accurate transcription of a provision set forth in the Subcontract, except to note that a portion of this provision has been

omitted, as denoted by the ellipses and made clear by comparison to the actual document. It is not clear why Hunt elected to make this omission.

41.     In response to Paragraph 40 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 41 that the cited portions of the Subcontract are ambiguous. To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means. Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

42.     In response to Paragraph 42 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 42 that the cited portions of the Subcontract are ambiguous. To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means. Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

43.     In response to Paragraph 43 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 43 that the cited portions of the Subcontract are ambiguous. To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means. Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

44.      In response to Paragraph 44 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 44 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

45.      In response to Paragraph 45 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 45 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

46.      In response to Paragraph 46 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 46 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

47.      In response to Paragraph 47 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484

A.2d at 966-67, and Hunt does not allege in Paragraph 47 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

48.    In response to Paragraph 48, Poole and Kent admits that it executed documents entitled "Affidavit and Partial Waiver of Claims and Liens and Release of Rights" in accordance with the modification of the form set forth in the Subcontract.

49.    Poole and Kent denies the allegations of legal conclusions contained in paragraph 49.  This paragraph contains only alleged legal conclusions and no facts that the Court could consider in connection with the Motion.  The reference to "this waiver" in the singular in paragraph 49 is vague as paragraph 48 referred to "documents" in the plural.  In further response to Paragraph 49 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 46 that the cited documents are ambiguous.  To the extent Hunt alleges that the cited documents are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means.  Poole and Kent specifically denies Hunt's characterization of the terms of the cited documents.

50.    Hunt's reference to "this waiver" in the singular is ambiguous because paragraph 48 refers to "documents" in the plural.  In further response to Paragraph 46 of the Hunt Statement, the construction of the unambiguous portions of a contract is an issue of law rather than fact, *see Howard Univ.*, 484 A.2d at 966-67, and Hunt does not allege in Paragraph 46 that the cited portions of the Subcontract are ambiguous.  To the extent Hunt alleges that the cited

portions of the Subcontract are ambiguous, it should cite specific facts in support of its construction rather than merely making an allegation as to what it thinks the Subcontract means. Poole and Kent specifically denies Hunt's characterization of the terms of the Subcontract.

51.    Paragraph 51 of the Hunt Statement is without a citation to a sworn statement or other admissible evidence and therefore cannot be considered by the Court. The backup documents to which it refers are not found anywhere within the Motion filing, which contains only a summary document, the Unpaid Funds Summary. In any event, the facts alleged are both incorrect and immaterial.

## II.    Additional Material Facts Supporting Poole and Kent's Positions

52.    Work began on the Project in September, 2003 when Hunt mobilized to the site. Excavation activities began in early October, 2003. (MacPhee Aff. at 3).

53.    Due to the nature of Poole and Kent's work, Poole and Kent did not mobilize to the Project until February, 2004, which was prior to executing the Subcontract.

54.    Poole and Kent performed some of the under-slab and layout Subcontract work as it became available. (MacPhee Aff. at 3).

55.    Poole and Kent achieved substantial completion of its scope of work on or about October 31, 2005. (MacPhee Aff. at 3).

56.    National Wrecking has alleged that even before Hunt even submitted its bid on the Project, the Owner provided a Geotechnical Report which detailed the condition of the soils and subsurface of the Project site. In that Report, the Geotechnical Engineer, noted that there was significant water in the subsurface and recommendations were made for installing a series of deep well dewatering pumps to lower the water table at the Project site so that water infiltration into the

excavation would not impact the Project.  (Page Dep. at 104-05; 2/19/04 letter from National Wrecking to Hunt[2]).

57.    National Wrecking has alleged that did not start installation of the pumps for dewatering the jobsite until October 22, 2003 with pumping commencing on November 4, 2003. (2/19/04 letter from National Wrecking to Hunt).

58.    National Wrecking has alleged that Hunt did not fulfill it contractual obligations regarding the dewatering system, that the dewatering system was not adequate to control the ground water as there were not enough wells, there was too large a spacing around the perimeter of the excavation and the wells should have been run continuously.  (2/19/04 letter from National Wrecking to Hunt).

59.    National Wrecking has alleged that Hunt did not install the dewatering system correctly and did not operate the system correctly which resulted in excessive water building-up in the excavation which made it difficult for the excavator to move its equipment and to work productively.  (2/19/04 letter from National Wrecking to Hunt).

60.    National Wrecking has alleged that Hunt failed to secure permits for closing an adjacent street so that the excavator could install its crane in a timely fashion and failed to timely obtain a public space permit for the installation of security fencing.  (2/19/04 letter from National Wrecking to Hunt).

61.    National Wrecking has alleged that Hunt failed to timely arrange to have old existing utilities on the site terminated by PEPCO which resulted in portions of the site being unavailable for excavation.  (2/19/04 letter from National Wrecking to Hunt).

---

[2] This letter, attached to the Opposition as **Exhibit 5**, was marked Exhibit 8 to the Deposition of Thomas Page, the Project Manager for Hunt, which was conducted on July 10, 2007.  A copy of the cited pages from the transcript of this Deposition is attached to the Opposition as **Exhibit 15**.

62.    Hunt alleges that National Wrecking failed to properly man the project, failed to manage surface water run-off into the excavation and damaged the dewatering system which caused the pipes to freeze and the excavation to flood.  Hunt Reply to Counterclaim, Docket No. 10 in *Hunt Construction Group, Inc. v. National Wrecking Corp., et al.*, Case No. 05-00165 in the United States District Court for the District of Columbia, at Para. 9.

63.    As of June 2004, Kite estimated in a letter to Hunt that the Project was 6 weeks behind schedule, primarily because of National Wrecking.  (Kite letter to Hunt attached to the Opposition as **Exhibit 9**).[3]

64.    There was an error in the establishment of the control point benchmarks for the Project by Hunt's surveying subcontractor.  The surveyor used the wrong set of plans to establish the control points for the excavation and as a result several columns were out of alignment by 4 ¾".  (Shepard Dep. at 60).

65.    This error was discovered in May, 2004 and resulted in a two week impact to the schedule while the issue was investigated and repairs were designed, for which Hunt accepted full responsibility.  (Shepard Dep. at 60).

66.    In August 2004, Poole and Kent provided a Review of Schedule & Job Site Progress Analysis ("August Analysis") to Hunt in advance of a meeting that Poole and Kent had scheduled with Hunt to discuss the delays on the Project.  A copy of the August Analysis is attached to the Opposition as **Exhibit 14**.  (Maltby Aff. at ¶ 5; Page Dep.[4] at 265).

---

[3] This letter was marked as Exhibit 3 to the Deposition of the Corporate Designees of the Owner.  (Shepard Dep. at 54).  A copy of the cited pages from the transcript of the Deposition of Arthur Shepard as designee of the Owner, conducted on August 1, 2007, is attached hereto as **Exhibit 10**.  Shepard was the Senior Project Manager for the Project for Kite.  (Shepard Dep. 8/1/2007 at 15-16).
[4] The August Analysis was marked as Exhibit 14 to the Deposition of Thomas Page.

67.     On October 19, 2004 (the "October letter"), Poole and Kent wrote to Hunt advising of the impacts being caused to Poole and Kent by Hunt's failure to properly supervise, manage and coordinate the Project.  A copy of the 10/19/04 letter is attached to the Opposition  as **Exhibit 16**.  (Maltby Aff. at ¶ 6; Page Dep. at 266).

68.     On December 8, 2004 (the "December letter"), Poole and Kent wrote to Hunt to again provide notice of the nature of the impacts and delays that Poole and Kent has experienced on the Project and to discuss the remaining work.  A copy of the December letter is attached to the Opposition as **Exhibit 17**.  (Maltby Aff. at ¶ 6; Page Dep. at 267).

69.     On February 2, 2005, Poole and Kent provided Hunt with another Review of Schedule & Job Site Progress ("February letter").  A copy of the February letter is attached to the Opposition as **Exhibit 18**.  (Maltby Aff. at ¶ 5; Page Dep. at 267).

70.     On February 28, 2005, Poole and Kent provided another letter to Hunt detailing the impacts as a result of the improper scheduling and the status of the Project.  A copy of the 2/28/05 letter is attached to the Opposition as **Exhibit 19**.  (Maltby Aff. at ¶ 6; Page Dep. at 268).

71.     Additionally, on May 25, 2005, Poole and Kent sent another letter to Hunt commenting on the May 10, 2005 progress schedule which Hunt prepared (the "May 25 schedule comment letter").  A copy of the May 25 schedule comment letter is attached to the Opposition as **Exhibit 22**.  (Page Dep. at 268).

72.     Poole and Kent continued to perform site reviews and provide schedule critiques and notices of impacts throughout the summer of 2005 with reports dated May 18, 2005, June 8, 2005, July 6, 2005, July 23, 2005 and August 9, 2005.  Copies of the reports are attached to the Opposition collectively as **Exhibit 25**.  (Maltby Aff. at ¶¶ 5-6; Page Dep. at 269-70).

73.    Hunt never responded to the documents noted in Paragraphs 67 through 72 hereof. (Maltby Aff. at ¶ 7).

74.    Hunt failed to incorporate any of Poole and Kent's schedule input.  (Maltby Aff. at ¶ 7).

75.    On April 27, 2005, Hunt directed Poole and Kent to accelerate its mechanical work in the long delayed penthouse so that the equipment could be installed, tested and started up for use in providing air conditioning to the Project.  (Page Dep. at 255-256).

76.    Poole and Kent complied with Hunt's direction and increased the manpower and the number of hours worked on the penthouse and Poole and Kent added a dedicated foreman to the penthouse.  A copy of Poole and Kent's letter to Hunt 5/25/05 re: penthouse acceleration is attached hereto as **Exhibit 18**.  (Page Dep. at 268).

77.    Poole and Kent continued to work at an accelerated pace in the penthouse until mid-May, 2005 when Poole and Kent discovered that water, natural gas and sanitary sewer service would not be available to the penthouse for months because of a failure by the Owner to obtain necessary permits.  (Exhibit 18).

78.    Poole and Kent submitted a proposed change order in the amount of $181,929.00 for costs associated with the penthouse acceleration effort.  A copy of this proposed change order, PCO 81, is attached to the Opposition as **Exhibit 21**.  (Page Dep. at 255).[5]

79.    There were ongoing delays to this project regarding site utility tie-ins.  A copy of the 5/20/05 letter from Hunt to Kite relating to this problem letter is attached to the Opposition as

---

[5] PCO 81 was part of a voluminous exhibit to the Page Deposition.

**Exhibit 23**.[6]  There were two causes for this delay: a delay in obtaining WASA permits, and a missing sewer main that the Owner represented was in place.  (Shepard Dep. at 79).

80.    Hunt placed the blame for the delay to the Owner, and set up P/RCO 51 in order to track the resulting costs.  (5/20/05 letter from Hunt to Kite).  Kite believed that the problem resulted from Hunt mismanagement.  (Lynch Dep.[7] at 58).

81.    Because the sanitary line coming from the Project had not been tied into the sewer line in the street to pipe away the used water from the Project, WASA would not allow the Project to tie into the domestic water supply service.  (5/20/05 letter from Hunt to Kite).

82.    Without permanent water supply and water discharge, according to Hunt, the ability to bring the permanent building air conditioning on-line was delayed which impacted building environmental control and ability to install furniture, fixtures and other finish work such as millwork, paint and wallpaper.  (5/20/05 letter from Hunt to Kite).

83.    The lack of permanent water also impacted the ability to perform leak testing of pipes which in turn held up the installation of drywall.  (5/20/05 letter from Hunt to Kite).

84.    In June 2004, just nine months into the Project, Kite demanded that Thomas Page, Hunt's Project Manager be replaced.  Hunt did not replace Mr. Page. (Lynch Dep. at 70).

85.    In a letter dated January 13, 2005, a copy of which is attached to the Opposition as **Exhibit 27,**[8]  Kite again expressed "more concern than ever" with Hunt's project management

---

[6] A copy of this letter was marked as Exhibit 8 to Deposition of the Corporate Designee of the Owner.  (Shepard Dep. at 79).

[7] A copy of the cited pages from the transcript of the Deposition of Jeffrey Lynch as designee of the Owner, conducted on August 1, 2007, is attached to the Opposition as **Exhibit 24**.  Lynch is Kite's Senior Vice President of Commercial Development and the Advisory Services.  (Lynch Dep. 8/1/2007 at 11-12).

[8] This letter was marked as Exhibit 11 to the Deposition of the Corporate Designees of the Owner.  (Lynch Dep. at 71).

and demanded that Hunt provide a full-time senior project manager above Mr. Page.  (Lynch Dep. at 71).

86.    Mr. Page left the Project and left employment with Hunt in the summer of 2005. (Page Dep. at 212-213).

87.    The Owner hired WDG Construction in the fall of 2005 to supplement Hunt in completing the Project because it had lost confidence in Hunt's ability to work with the subcontractors and toward completion.  (Lynch Dep. at 83).

88.    Hunt passed through no claims of Poole and Kent, or any other subcontractor, to the Owner.  (Lynch Dep. at 92).

89.    Hunt has been paid by the Owner for the subcontract balance.  (Decker Aff.[9] at ¶ 8).

90.    Additional costs were incurred by Poole and Kent's sub-subcontractor, Regional Air Systems ("Regional Air"), as a result of Hunt's imposition of a wage standard higher than that mandated by the Prime Contract or by the relevant collective bargaining agreements.  (Stewart Dep.[10] at 109).

91.    The owner's Davis-Bacon compliance consultant, CHW, Inc. ("CHW"), found that the wage rates used by Regional Air in bidding on the Project complied with the Prime Contract's Davis-Bacon requirements.  A copy of the March 21, 2005 letter from CHW to counsel for Regional Air is in the backup documentation for PCO 71, attached to the Opposition as

---

[9] The Affidavit of Robert M. Decker, Executive Vice President for Hunt, filed in support of the Motion.

[10] The Deposition of Richard Stewart, corporate designee of Montgomery Mechanical Services, conducted September 6, 2007.  A copy of the cited pages of the transcript of this deposition is attached to the Opposition as **Exhibit 28**. Montgomery was the subcontractor to Poole and Kent which in turn subcontracted the relevant work to Regional Air.

**Exhibit 29.**  (Page Dep. at 251[11]).  PCO 71 relates that Regional Air had an agreement with the union for sheet metal workers to permit a class of workers called "'R' workers," paid at a lower rate than other sheet metal workers, and that Regional Air prepared its bid for its work on the Project on the premise that it would be able to use such workers.

93.    Hunt required that Regional Air pay the higher Davis-Bacon rates.  (Page Dep. at 252-53).

94.    Hunt's own expert witness testified that "a month or two" would be a reasonable amount of time for a general contractor to act upon a change order request.  (Hazen Dep. at 62-63).[12]

95.    As of the date of the filing of the Motion, Poole and Kent had not been paid for any of the change orders listed on Exhibit G to the Motion.  (Mem. in Sup. at 15).

Respectfully submitted,

/s/Robert F. Carney
Robert F. Carney (Bar No. 436999)
Cynthia E. Rodgers-Waire (Bar No. 444095)
Michael A. Stover (Pro Hac Vice)
William P. Pearce (Pro Hac Vice)
Whiteford, Taylor & Preston, LLP
Seven Saint Paul Street, Suite 1500
Baltimore, Maryland 21202
(410) 347-8700

Attorneys for The Poole and Kent Corporation

---

[11] PCO 71 was part of a voluminous exhibit to the Page Deposition.
[12] A copy of the cited portions of the transcript of the Deposition of Lawrence Hazen, Hunt's expert witness, taken November 15, 2007, is attached to the Opposition as **Exhibit 4**.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this tenth day of December, 2007, a copy of the foregoing

Statement of Material Facts In Genuine Dispute and Response to The Statement of Material

Facts Not In Dispute was served electronically to counsel of record.

> David T. Dekker, Esquire
> Jeffrey R. Gans, Esquire
> Laura Kamas, Esquire
> Thelen Reid & Priest, LLP
> 701 Eighth Street, N.W.
> Washington, D.C. 20001
>
> Donna M. Crowe
> Bradley Arant Rose & White LLP
> 1133 Connecticut Avenue, N.W., 12th Floor
> Washington, D.C.  20036

> /s/  Robert F. Carney
> Robert F. Carney

1767364