**EXPERT REPORT**
**EMBASSY SUITES CONSTRUCTION CLAIM**
**NATIONAL WRECKING CORPORATION vs**
**HUNT CONSTRUCTION**
**WASHINGTON, DC**

by

**Haley & Aldrich, Inc.**
**Boston, Massachusetts**

for

**Quagliano & Seeger, PC**
**Washington, DC**

**File No. 33056-000**
**27 March 2006**

*[handwritten annotations:]*

5/31  6/1  6/2

Draft Report
Response
4/27/06

5/5/06 ISSUE
Reports

Depositions
wk of 5/22

Mediation Date
wk of 6/19
or
wk of 6/26

Hangoff @ Center construction w/ Con

HU00016816

Haley & Aldrich, Inc.
465 Medford St.
Suite 2200
Boston, MA 02129-1400

Tel: 617.886.7400
Fax: 617.886.7600
HaleyAldrich.com

# HALEY & ALDRICH

27 March 2006
File No. 33056-000

Quagliano & Seeger, PC
2620 P Street, NW
Washington, DC 20007

Attention:     Stephen Seeger, Esq.

Subject:       Expert Report
               Embassy Suites Construction Claim
               National Wrecking Corporation vs Hunt Construction
               Washington, DC

**OFFICES**

Cleveland
Ohio

Dayton
Ohio

Detroit
Michigan

Hartford
Connecticut

Kansas City
Kansas

Los Angeles
California

Manchester
New Hampshire

Parsippany
New Jersey

Portland
Maine

Providence
Rhode Island

Rochester
New York

San Diego
California

Santa Barbara
California

Tucson
Arizona

Washington
District of Columbia

Ladies and Gentlemen:

Quagliano & Seeger, PC, attorney for National Wrecking Corporation (NWC), has asked the undersigned, Robin Dill of Haley & Aldrich, Inc. (Haley & Aldrich) to serve as an expert regarding litigation between NWC and Hunt Construction Group, Inc. (Hunt). NWC was a specialty Subcontractor on the subject project located at 1000 K Street, N.W., Washington, DC, hereinafter referred to as "the Project." NWC was engaged to provide temporary excavation support and to perform excavation for the General Contractor, Hunt.

We understand the dispute involves construction delays and extra work alleged to have been caused in part by problems associated with a deep well dewatering system, with encountering an underground parking structure, and with previously installed soldier piles re-used for excavation support. NWC has been terminated by Hunt, and the dispute is likely to go through mediation and/or litigation.

Details of the claim are summarized in National Wrecking Corporation's Claim for Equitable Adjustment, referenced herein. Mueser Rutledge Consulting Engineers (MRCE) has prepared an Expert Report rebutting certain aspects of the NWC claim. The purpose of this report is to provide my expert opinions regarding several aspects of the NWC claim and to provide rebuttal comments to a number of the statements included in the MRCE Expert Report.

This report is a continuation of a letter that I wrote dated 24 February 2006 in which I expressed my preliminary opinions based on the information I had reviewed at the time. Subsequent to writing the 24 February letter, I received and reviewed a considerable volume of additional information and performed evaluations. I also visited the site and met with representatives from NWC on 1 March 2006 to discuss the project and collect information. After reviewing the additional information and performing my evaluations, my opinions expressed in the 24 February letter have not changed. This report elaborates on and supplements those opinions, and provides the basis and reasoning for my opinions.

HU00016817

Quagliano & Seeger, PC
24 March 2006
Page 2

## MY QUALIFICATIONS AND BACKGROUND

I am a Geotechnical Engineer with the firm of Haley & Aldrich in Boston, Massachusetts, where I have been practicing in the field of geotechnical engineering for over 26 years. I have a Bachelor of Science degree in Civil Engineering (1977) from the Massachusetts Institute of Technology and a Master of Engineering Degree in Civil Engineering (1979) from the University of California at Berkeley, both degrees with a concentration in Geotechnical Engineering.

I have been assisted in my investigation by David Finocchio, P.E., and Senior Geotechnical Engineer with Haley & Aldrich in our Boston office. Mr. Finocchio has worked under my direction. In addition, I have spoken with Mr. David Schoenwolf, P.E., Senior Vice President who is a Geotechnical Engineer in our McLean, Virginia, office. Mr. Schoenwolf has provided information on soil and groundwater conditions for projects in the vicinity of the subject site.

Much of my career has been focused on conducting geotechnical field and design investigations for excavations required for underground facilities. Many of these projects have involved investigating and characterizing groundwater conditions in soils and bedrock and evaluating dewatering requirements. I have worked on projects requiring deep wells, well points, sumps, drainage trenches, as well as permanent underdrains. My experience has included working for both owners and designers in developing groundwater control requirements tailored to site conditions, and working directly for Contractors in designing dewatering systems.

A summary of my experience, including relevant projects and publications authored or co-authored is presented in my resume, which is attached as Appendix A of this letter.

Within the past 4 years, I have testified and/or been deposed in several cases. One case (2004) involved an arbitration to resolve a dispute between a utility Owner and a Contractor. The dispute involved a contract that required excavation and dewatering associated with the remediation of a former manufactured gas plant (MGP) site in Haverstraw, New York. My client was the legal department of the utility Owner. Another case went to arbitration in 2005 and involved a medical building in Jackson, Ohio, which experienced over 6 in. of settlement. I was engaged by the Owner's attorney and wrote an expert report, was deposed, and testified at the arbitration. A third case involved an investigation of subsurface conditions relevant to the replacement of a gas pipeline crossing the Hudson River that had been ruptured when a barge inadvertently dragged its anchor along the bottom of the river. I wrote an expert report in 2004 and was deposed for this case in February 2006.

As expert witness, my billing rate for conducting this study and writing this report is $210/hour.

## INFORMATION REVIEWED AND SITE VISITS

To prepare for this report, I have reviewed documents as listed at the end of the text portion of this report and referenced in the text, and met with representatives from NWC on 1 March 2006 to discuss the project and collect information. I also visited the project site in Washington, DC, on 2 March 2006 to observe existing conditions. In addition, on 14 and 17 March 2006, I had telephone conversations with a representative from Moretrench American Corporation (Moretrench) from Rockaway, New Jersey. Moretrench had been asked by Hunt to provide a proposal for dewatering prior to NWC's work on the project.



Quagliano & Seeger, PC
24 March 2006
Page 3

I reserve the right to modify or supplement my opinions and conclusions stated in this report when documents become available that I have not reviewed in preparation of this report. It is understood that a request has been made to subpoena documents from Moretrench, and I would like to review these when they become available.

## CHRONOLOGY OF GEOTECHNICAL WORK ON PROJECT SITE AND NWC PROJECT INVOLVEMENT UNDER SUBCONTRACT TO HUNT

This section of the report presents a summary of the geotechnical-related work performed on the project site based on my review of documents provided to me and on my communications with NWC and Moretrench. Because of their relevance to the issues under dispute, I have included a description of historical geotechnical-related work completed at the site prior to NWC's involvement on the project. The chronology is presented beginning with geotechnical subsurface exploration programs; subcontractor selection by Hunt related to excavation, temporary excavation support, and construction dewatering; and extending through NWC's excavation work for the Embassy Suites project under subcontract to Hunt.

In March through May 1986, Oosterbaan Associates, P.C. (Oosterbaan) performed a geotechnical subsurface exploration program on the project site for North American Financial Corporation, when it was contemplated that a 9-story office building plus four levels of underground parking would be constructed at the site. This proposed project would have required an excavation to similar depths as for the current project. Eight soil borings were performed, including two observation wells that were utilized to monitor groundwater levels. A geotechnical report was published on 4 June 1986 to summarize subsurface conditions and provide geotechnical design recommendations. A copy of the report is included in Appendix B.

At the time of the field investigation, two 2-story brick buildings existed on the northern third of the site which limited site access for borings. The footprints of these buildings are shown on Figure 2 of the 4 June 1986 report included in Appendix B. Water levels within the observation wells ranged from El. 35 to 37, and Oosterbaan recommended a design groundwater level at El. 40.

In their report, Oosterbaan had the following recommendations related to construction dewatering:

*"Excavations for spread footings will require predrainage by construction dewatering to obtain dry conditions for footing construction. Strategically located monitoring wells should be installed to check the performance of the dewatering system prior to advancing excavations below the piezometric groundwater levels. At least three observation wells should be installed between dewatering wells with the tip at El. 0 to monitor water levels during construction. A specialty dewatering subcontractor should be contacted to plan and install the most effective system that will provide reasonably dry conditions to allow for efficient construction and maintain the groundwater level during construction at least two feet below the excavation level."*

HALEY
ALDRICH

HU00016819

Quagliano & Seeger, PC
24 March 2006
Page 4

For unknown reasons, the project contemplated by North American Financial Corporation was never constructed.

In March 1999, Schnabel Engineering Associates (SEA) performed another geotechnical field investigation program on the project site for Urban Development Group, who was planning a hotel building at the project site. At the time of SEA's field program, the two 2-story structures formerly occupying the northern portion of the site had been demolished. A total of eight borings were drilled by SEA, several of which were located immediately adjacent to the borings which had been performed by Oosterbaan.

Because of this duplication in location of borings, it is apparent that SEA did not have access to or knowledge of the Oosterbaan geotechnical study when they performed their investigation. Figure 1 of this report shows the locations of the SEA borings as well as the Oosterbaan borings. SEA published a Geotechnical Engineering Report (Reference 37) dated June 30, 2000, revised September 8, 2000. This report is hereinafter referred to as "the SEA Report."

SEA installed one observation well on the site in test boring B-2A to monitor groundwater. One of the SEA borings, B-6, encountered an obstruction at a depth of 8 ft, and the boring was abandoned. This boring location fell within the footprint of the former structures that existed on the site when Oosterbaan did their field work. The SEA Report characterized the permanent groundwater levels as variable, and ranging between El. 22.5 and 32. The SEA Report also suggested that the excavation support system used for the project be a free draining sheeting system consisting of H beams (soldier piles), wood lagging and appropriate bracing.

With respect to construction dewatering, the SEA Report stated the following:

> *"Dewatering of the site will be required during construction. We anticipate that deep wells and sump pits will be required to control groundwater. We suggest that specifications require the contractor to maintain ground water at least one foot below the lowest excavation levels. Local pumping from footing excavations or from perimeter trenches will also be necessary."*

At some point in the same time period, presumably in 1999 or 2000, Schnabel Foundation Company (SFC) was retained to design and install a temporary excavation support system at the site consisting of soldier piles, wood lagging and tiebacks for lateral bracing. For unknown reasons, SFC installed soldier piles at the site for the entity that retained them, but never performed excavation. A Permit Drawing (Reference 39) dated 21 January 2000 indicates the as-built locations of soldier piles as installed by SFC.

Around the same time of publication of SEA's Report, the project Architect, Brennan Beer Gorman Monk, Architects & Interiors PLLC (BBGM), produced a set of contract documents for construction. The final contract drawing bid set was dated 14 June 2002. Final construction set specifications were dated 27 January 2003. Relevant contract requirements that governed the excavation, dewatering and temporary excavation support have been excerpted from the contract documents and are included in Appendix C. These requirements governed all the temporary works construction which was being performed by the General Contractor, Hunt, under their contract with the Owner, 1000K, LLC.



Quagliano & Seeger, PC
24 March 2006
Page 5

On 14 August 2003, SEA published a Technical Memorandum related to dewatering (Reference 38) for the Project. In the memorandum, SEA stated the following:

> *"It is our opinion that a dewatering plan, to be designed by the contractor, will be necessary to relieve the water pressure in the lower aquifer. As footing bearing elevations coincide with pressurized Potomac Sands, a suitable dewatering system should be designed to minimize the possibility of encountering soft subgrades during construction."*

It is understood that Hunt decided to competitively bid various components of the temporary works out to specialty subcontractors, including excavation, groundwater control, and temporary excavation support. NWC was selected to perform the excavation, and to design and install the excavation support system, using the soldier piles that had been installed previously by SFC. NWC engaged Clark Foundations under a separate subcontract agreement to perform the design and installation of the temporary excavation support system.

Regarding the construction dewatering, it is understood that proposals for dewatering the site were provided by at least two subcontractors, Moretrench and Griffin Dewatering Mid-Atlantic, LLC (Griffin). Based on my communication with Moretrench, it is understood that Moretrench, who had experience with dewatering the soils in the area, submitted a proposal calling for 14 deep wells to dewater the site. Moretrench was reportedly told by Hunt that based on budget limitations, they could not afford to install 14 deep wells, and was told to reduce the scope of dewatering. Moretrench reportedly offered a reduction in scope to only install 12 deep wells but refused to reduce the scope to meet the budget that Hunt had established, because they felt that, based on their experience in the area, at least 12 deep wells were necessary to successfully dewater the site.

In Hunt's contract Agreement with the Owner (Reference 40), there is a relevant clause included under Exhibit VII, Contractor Clarifications and Exclusions:

> *"GENERAL CONDITIONS"*
>
> *"1.3    There is no deep well dewatering specification. Hunt has included an allowance of [left blank] for deep well dewatering. We have excluded any fees which may be required by the city to dump ground water from our construction dewatering operation into the city sewer."*

This clause ignored requirements for dewatering that were included in Specification Section 02300 and Drawing S0-00 (see Appendix C), and requirements in the SEA Report.

Griffin was retained directly by Hunt to install a deep well system and rent various dewatering related components. Hunt retained the responsibility to maintain and operate the system during construction. In their subcontract agreement with Hunt (Reference 17) dated 16 October 2003, Griffin was contracted to install *"6 each gravel wells at mutually agreed locations outside the excavation drilled to 80' or refusal from grade."*



Quagliano & Seeger, PC
24 March 2006
Page 6

The Griffin scope of work included review of the SEA Geotechnical Engineering Report
(Reference 37) and the SEA Technical Memorandum (Reference 38). However, there was no
requirement in the subcontract agreement for Griffin to make an independent evaluation of the
specific number and location of wells that would effectively control groundwater in accordance
with the contract requirements. There is a statement on page 2 of the subcontract that states
the following:

> *"A coordination meeting was held at the jobsite on 10/09/03 that was
> attended by representatives of Hunt, National Wrecking (and their shoring
> tier-subcontractor, Clark Foundations), and Griffin. Well locations were
> agreed upon at this meeting – 2 each along the west and east perimeters
> and 1 each along the south and north perimeters of the excavation. It was
> understood by all parties that these well points may move slightly depending
> upon "Miss Utility" existing utility location marks and other jobsite
> considerations."*

There is no assignment of design responsibility in the subcontract agreement given to Griffin,
and there is no documentation that I have seen that provides the technical basis for the number
of or the location of deep wells. It is therefore unclear as to who made the decision that the
six wells installed by Griffin would be adequate and satisfy the contract requirements that Hunt
was bound by. I have reviewed documents obtained from Griffin, and have seen no
calculations or analyses in their files that suggests that an engineering evaluation was
performed.

*[handwritten: spec is open design (related?)]*

Around the same time that Hunt was subcontracting with Griffin to install deep wells at the
site, Hunt was also talking with NWC and preparing their subcontract agreement. The Hunt
subcontract agreement with NWC was dated 6 October 2003 and was signed by both parties on
10 November 2003. NWC was given the responsibility for designing and installing a
temporary excavation support system, designing and installing a bracket pile underpinning
system to support the adjacent building southwest of the site, and performing mass excavation
to subgrade in accordance with the project schedule established by Hunt.

*[handwritten: Griffin proposed # of wells]*

*[handwritten: Also – Surface water management]*

With regard to temporary excavation support, the subcontract agreement contemplated that the
existing soldier piles that had been installed by SFC would be re-used by NWC:

> *"Specific Clarifications"*
> *"44. Installation of all soldier beams (SB's) not previously installed by
> others which is understood to be the bracket piles 92-112 and two corners
> SB's 49 and 81 is included in this scope of work"*

With regard to construction dewatering, the following relevant clauses were included in the
subcontract agreement:

> *"General Clarifications"*
> *"12.    Any and all dewatering beyond the deep well system required for the
> execution of the Scope of Work shall be the responsibility of the
> Subcontractor."*

Quagliano & Seeger, PC
24 March 2006
Page 7

*"Specific Clarifications"*

*63. Any rainwater, perched and/or surface water sumping or pumping required to complete this scope of work is included. This is not intended to include ground water dewatering, which is being provided by others via a deep well dewatering system."*

[handwritten: No it required NWC to control all water not controlled by the deep well sys.]

In essence, the above clauses made Hunt responsible for controlling groundwater in accordance with the contract requirements established by SEA and BBGM, while NWC was made responsible for controlling rainwater, perched and/or surface water.

During bid phase discussions, it is understood from my discussions with NWC that they had told Hunt of their plan to sequence the excavation, to access the site with a ramp from K Street, and the plan to use the "V-cut" excavation geometry to subgrade, working from south to north, following mass excavation to the first bench level which was about 10 ft below grade. It is also understood from my discussions with NWC that using a tieback bracing system was ruled out because the property Owner west of the site along K Street would not grant easements to install tiebacks under their property. Hence, a cross lot bracing system with corner bracing was dictated by project constraints beyond the control of NWC or Hunt.

[handwritten: originally I belive they were going to acces from NY ave]

[handwritten: partially true]

On 18 August 2003, Clark Foundations (Clark), on behalf of NWC, produced a permit set of drawings (Reference 8) which presented the design for the bracket pile underpinning system of the adjacent building, as well as the temporary excavation support system for the main excavation. Clark proceeded to install the remaining piles as designed. Clark was also responsible for installation of the lagging of the excavation and bracing installation throughout the period of excavation activities being performed by NWC.

NWC mobilized on the site on 2 October 2003 to begin excavation. The following is a general timeline of construction activities that occurred at the site, according to my review of available documents and project photographs:

October 2003
- Underground parking structure discovered in northern portion of site on 8 October. Structure included two levels of basement space with intact walls and floor slabs.
- Contaminated soil discovered in southern portion of site on 9 October. Total volume of contaminated soil was approximately 1,200 cubic yards.
- Water pumped out of underground structure from 13 October through 8 November.
- Deep well installation by Griffin began on 22 October.
- Contaminated soil removal completed on about 29 October.

[handwritten: Basement level - Split level / standard slab did not appear to be a story Park, Builder Note to be on site Arthur]

[handwritten: NWC expected Prior to discovery Refer to Unit Price to be established for Remediating Soils Contamination]

[handwritten: was full of dirt, don't remember than pumping for a month?]

Quagliano & Seeger, PC
24 March 2006
Page 8

<u>November 2003</u>
- Handwritten pile locations received from Hunt's surveyor on 3 November. Many of the locations found to be inaccurate.
- Project photographs show initial excavation which exposes soldier beams installed by SFC. First 4 ft of lagging was completed on 8 November.



Photo 1:  Initial Excavation to Expose Existing Soldier Beams (11-5-03)

*Power Cut by Excavation Equipment*

- Deep wells began operating on about 6 November.
- V-cut excavation was begun on 15 November.
- Power failure occurred on 18 November and deep wells not operating.
- Updated as-built soldier pile location survey provided to NWC on 19 November.
- A second piece of excavation equipment was mobilized to site on 22 November to deal with wet soil conditions. *No depth dictated machine. Nope wet soil*

<u>December 2003</u>
- On 3 December, NWC notifies Hunt of pile location variances that would require additional blocking to accommodate the soldier beams that are encroaching into the foundation walls.
- On 19 December, Clark notes *"productivity as it relates to both lagging and installing bracing has fallen significantly behind what we projected in our original schedule to National Wrecking. This drop in productivity is directly related to the pace of excavation and presence of water on site due to lack of pumping. The situation has progressed to a point where the amount of work available to us on a daily basis has dropped considerably."*

HALEY
ALDRICH

HU00016824

Quagliano & Seeger, PC
24 March 2006
Page 9

<u>January 2004</u>
- On 8 January, Clark notes *"...we have not observed any improvement to the pace of the project. In actuality, the presence of water on the jobsite has slowed our productivity rates and made the bottom of the excavation an unsafe working condition for our personnel..."* (Reference 11)
- On 8 January Hunt contracted Griffin to install four additional wells at the bottom of the south end of the excavation.  (Reference 14)
- Construction progress photographs taken on 15 January show excavation process from south to north.



Photo 2:  Excavation to Final Subgrade Level Progresses from South to North (1-15-04)

- Damaged electric line to dewatering pumps discovered on 32 January by Hunt; all dewatering pumps had been off since 27 January per NWC.

<u>February 2004</u>
- Construction photographs taken on 4 February show standing water and muddy conditions on excavation invert.

HALEY
ALDRICH

Quagliano & Seeger, PC
24 March 2006
Page 10



Photo 3: Standing Water and Muddy Conditions on Excavation Invert (2-2-04)

**March 2004**

- On 26 March, NWC notes *"As a result of the constant river of water that is flowing into the excavation all across the north end of the project o[u]r lagging operation is reduced to about one foot at a time and we can only safely open a small amount of area at a time."* (Reference 32)

**April 2004**

- Substantial completion of excavation was achieved on 6 April.

Based on input provided from NWC, the approximate as-drilled locations of the original six deep wells that were installed by Griffin are shown on Figure 1. Based on discussions with NWC, it is understood that these deep wells were not operated continuously (i.e., 24 hours per day), since generators that powered these deep wells often ran out of fuel, and were sometimes turned off during non-work hours. *Not True — Gen Ran, Alg were on occasions where fuel Ran out. Pump was always on unless failure*

**EVALUATION OF SUBSURFACE AND GROUNDWATER CONDITIONS AT THE PROJECT SITE**

Haley & Aldrich has reviewed and evaluated available geotechnical information from the Oosterbaan and SEA geotechnical investigations to characterize subsurface and groundwater conditions at the Project site. We have also collected and reviewed precipitation data obtained from NOAA for the periods when the geotechnical field investigations were performed by both Oosterbaan and SEA, as well as during the period of the excavation and dewatering operations performed by NWC and Hunt.



Quagliano & Seeger, PC
24 March 2006
Page 11

Since groundwater levels fluctuate with season and precipitation, we have plotted precipitation data by cumulative monthly totals, including actual and normal levels for a period of at least 8 to 14 months prior to the relevant site activities described above. These precipitation data plots have been included in Appendix D.

To aid our evaluation of groundwater levels at the site, we have developed two subsurface profiles, Figures 2 and 3, and have plotted geotechnical information obtained from the Oosterbaan and SEA field investigations. Locations of the subsurface profile lines are shown on Figure 1.

### Discussion

One observation well was installed in SEA test boring B-2A. According to a footnote on the test boring log, it was *"a 50 foot long 1-1/4" diameter temporary standpipe."* This screen depth, which has been schematically illustrated on Figure 2, would have penetrated both the Terrace Deposits as well as the Potomac Deposits. Based on water levels recorded on the boring log, it appears that the temporary observation well was monitored once on 26 April, 24 days after completion of the boring, at which time the standpipe was pulled out of the ground. The water level observed in the temporary well 24 days after completion of the borehole was at El. 36.5 as indicated on Figure 2, and had risen 6-1/2 ft higher than the water level observed in the borehole at the time of completion.

Two observation wells were installed in Oosterbaan test borings (B-3 and B-6). Installation details for these wells are provided on the respective test boring logs, and the screen locations have been plotted on Figures 2 and 3. The screen for observation well B-3 was located in granular Terrace Deposit soils while the screen for observation well B-6 was located in granular Potomac Deposits. Water levels in these observation wells were measured approximately 4 weeks after installation, and have been plotted on Figures 2 and 3. The measured water levels were El. 37 and El. 35 for test borings B-3 and B-6, respectively.

Depth to water measurements were obtained in both the Oosterbaan and SEA test borings and are reported on each of the boring logs, which is common geotechnical practice. Typically, water levels were observed in borings when first encountered, at completion of drilling, and after pulling the casing. The highest and lowest measured water levels measured in each test boring have been plotted on the subsurface profiles. In most cases for the SEA borings, the casings were pulled 1 to 3 days after the boring was completed. What is interesting to note is that in all cases for the SEA borings, the water level observed in the borings at the time the casings were pulled, had risen above the levels observed at completion of drilling, suggesting that the levels at completion of drilling did not reflect equilibrium groundwater level, or perhaps were influenced by the caving of the boreholes.

Water levels measured in boreholes are not always a reliable indicator of groundwater levels, since water levels can be affected by the introduction of water into the boring during drilling, removal of borehole cuttings during the drilling process, extraction of drilling tools, caving of boreholes upon removal of casing or augers, or inadequate time for groundwater to seep into the borehole and rise to equilibrium groundwater level in the soil surrounding the borehole. Measurements in observation wells are a more reliable indicator of actual groundwater levels, particularly when they are obtained at later dates after borehole completion, which assures that water levels in the monitoring well have had a chance to stabilize to reflect equilibrium groundwater levels in the surrounding soil.

HALEY
ALDRICH

Quagliano & Seeger, PC
24 March 2006
Page 12

The SEA Report characterizes groundwater at the site as follows:

> *"The ground water level measured in the borings and the temporary well were between about 19.5 and 34.5 feet below existing grades or between about El. 22.5 and El. 42. The higher ground water observed in the borings is believed to be perch water trapped between the clayey soils of Stratum B. We believe the permanent ground water level is between about El. 22.5 and El. 32."*

It is important and relevant to this report to understand the difference between *"permanent groundwater level"* and *"perch(ed)"* water as referenced in the SEA Report. Included in Appendix D is an excerpt from Reference 35, Chapter 1, which provides definitions related to groundwater hydrology. *"Permanent groundwater level"* as referred to by SEA is not conventional terminology, but is likely intended to represent the *"water table"* as defined in Appendix D. Both *Perched water table"* and *water table"* are graphically illustrated on Figure 1.1 included in Appendix D. Definitions for these terms are as follows:

> *"A perched water table occurs when water seeping downward is blocked by an impermeable layer of clay or silt, and saturates the sand above it, as shown on Figure 1.1. The sand below the clay is not saturated, so that the perched water is disconnected from the main ground water body."*

> *"Below the water table we say the soil pores are essentially saturated with water....Above the water table, soil moisture exists as disconnected droplets and capillary films, while a substantial portion of the voids are filled with air. Below the water table, the water body is essentially continuous, except for an occasional bubble of air"*

The Oosterbaan report characterizes groundwater (*i.e.*, *"water table"*) as being higher than characterized by SEA. Their report states the following:

> *"Groundwater levels were checked during and after drilling the borings. Observation wells were installed in borings B-3 and B-6 to obtain more accurate short term levels. The water levels observed in the monitoring wells ranged from Elevation 35 to 37, or to 22 feet to 24 feet below existing grade."*

It is interesting to note that precipitation records show that for about the previous 14 months before the respective test boring programs were performed by Oosterbaan and SEA, there was lower than normal cumulative total precipitation before Oosterbaan's program (see Figure D-1), and about generally normal cumulative total precipitation before SEA's program (see Figure D-2). The precipitation records also show that prior to the period of excavation activities at the site by NWC, there had been relatively wet months of June and July 2003 as compared to normal levels, then very dry months of August through October. During the construction itself, the cumulative total precipitation was slightly below normal levels.

HALEY & ALDRICH

Quagliano & Seeger, PC
24 March 2006
Page 13

**Conclusions**

Based on my evaluation of subsurface and groundwater conditions at the Project site, I conclude the following:

- I believe that the water table at the Project site, which varies with precipitation and season and other factors, likely varies between El. 30 and El. 40. Since no observation wells existed during the excavation and dewatering activities, it is not possible to determine precisely where the actual water table elevation existed within this range at the time of construction. However, based on my review of the Oosterbaan and SEA groundwater data, and comparing precipitation data shown on Figure D-1 and D-2 to Figure D-3, it is likely that the water table at the time of construction was between El. 35 and El. 40.

  In reviewing project photographs, there appears to be confirmation of this conclusion in the photograph shown below dated 2 February 2003. The photograph shows wet lagging and seepage marks at the approximate elevation of the second brace level, which is at El. 37.



Photo 4: Second and Third Levels of Bracing – Note Wet Lagging and Seepage Indicated at Approximate Level of Second Bracing at El. 37 (2-2-04)



Quagliano & Seeger, PC
24 March 2006
Page 14

- All soils below the water table were saturated with groundwater and required dewatering. These soils included the granular layers within both the Terrace Deposits and Potomac Deposits shown colored in yellow on Figures 2 and 3.

- The saturated granular layers were relatively slow-draining soils of typically moderate to low permeability. This conclusion is supported by the behavior noted for the SEA test borings, where water levels in boreholes continued to rise following completion of drilling up to the time the casings were pulled and then continued to rise up to the time the temporary observation wells were pulled, 3 to 4 weeks later.

- Even though not detected during the site investigations, it is likely that some perched water existed at the site within the fill soils, particularly since there is a fairly continuous layer of relatively impervious silt and/or clay beneath the fill which would be expected to cause the perched water condition. Since the construction was completed during a time of near to slightly below normal precipitation, it is likely that the amount of perched water was representative to slightly below what is typical for the season.

- I believe SEA mischaracterized the groundwater levels at the Project site as stated in their report. They captured the right range in groundwater (i.e., El. 22.5 to El. 42), but incorrectly interpreted the higher levels within this range to reflect perched water as opposed to the actual water table. SEA's observation well installed in test boring B-2A actually showed a groundwater reading at El. 36.5, which was very consistent with groundwater levels observed by Oosterbaan. Had SEA installed additional observation wells that remained in service for at least several weeks, they would have obtained consistent information with what was observed in B-2A, and would likely have concluded that the water table was between El. 35 and El. 40.

*[handwritten annotation: Contradicts SEA's Report]*

## SUMMARY OF AND BASIS AND REASONING FOR MY OPINIONS

In our meeting held on 1 March 2006 and subsequent conversations, you asked me to address the following questions relative to the problems associated with deep well dewatering, with encountering an underground parking structure, and with previously installed soldier piles re-used for excavation support:

- *Did Hunt fulfill its contractual obligations regarding the deep well dewatering system it installed at the site as required in their Subcontract Agreement with NWC?*

- *Was the deep well dewatering system adequate to control groundwater at the site in accordance with the contractual requirements that Hunt was bound by?*

- *What dewatering system would have been appropriate to adequately control groundwater in accordance with contract requirements and to fulfill contractual obligations to NWC?*

- *Should NWC have anticipated and be responsible for demolition and associated removal costs of the underground parking structure?*

- *What were the contractual requirements with regard to the excavation support system (soldier beam) location tolerance?*



Quagliano & Seeger, PC
24 March 2006
Page 15

- *In preparing their bid for the work, what should NWC have been able to rely upon regarding as-installed locations of existing soldier beams installed by others?*

- *Was there extra work for which NWC should receive extra compensation as related to as-installed location of existing soldier beams?*

Provided below are my opinions relative to the questions listed above, with a reasonable degree of engineering certainty. Also included in this section of the report, I have expanded on these opinions and provided the basis and reasoning behind them. Pertinent back up information is presented above, as well as in figures and appendices to this report.

### *Did Hunt fulfill its contractual obligations regarding the deep well dewatering system it installed at the site as required in their Subcontract Agreement with NWC?*

 *No.*

According to their subcontract agreement with NWC, Hunt was responsible for groundwater dewatering using a deep well dewatering system, while NWC was responsible for control of rainwater and perched water. NWC, as stated previously, was also responsible for the temporary excavation support and mass excavation to subgrade for foundation construction.

It is important to consider what NWC was being asked to bid on by Hunt in addressing the issue of whether or not the deep well dewatering system was adequate. It is typical in the construction industry that the contractor that is performing excavation and excavation support have full responsibility for controlling groundwater, since the two operations are interdependent on each other.

For example, if an impervious excavation support system (such as continuous interlocking steel sheet piles) is used, then the groundwater control system would need to be coordinated with the design of the sheet piles, and an appropriate design for groundwater control would be a deep well system installed inside the limits of sheeting. The use of the impervious sheeting, itself, is a method of groundwater control, since the wet, unstable soil as well as the groundwater above the tips of the sheet piles is retained by the sheeting, and typically would not impact excavation operations. The function of the deep well system in this case would be to control groundwater levels below the bottom of the excavation to avoid bottom stability problems and subgrade disturbance.

On the other hand, the soldier pile and lagging support system that was used at the site is very dependant on effectiveness of a groundwater control system in lowering groundwater outside of the limits of excavation to at or near excavation subgrade level, since the soils are exposed vertically during excavation and must remain stable upon exposure and stand unsupported long enough to allow lagging boards to be placed and braced against the soldier beams. If groundwater is not controlled, fine sands can exhibit flowing ground behavior, where they become completely unstable and lagging can become difficult, if not impossible, without ground loss.

In addition, since this type of excavation support system is relatively free draining, if groundwater levels outside the excavation are not drawn down to at least the excavation subgrade, then groundwater will continue to seep into the excavation through gaps between the lagging boards for the duration of construction. This groundwater, if not further controlled after seeping into the excavation, can cause difficulties for the excavation operations, including soft subgrades impeding

 HALEY ALDRICH

HU00016831

Quagliano & Seeger, PC
24 March 2006
Page 16

productivity of excavating equipment, increased bulking of excavation volume, and disturbance to bearing grades for foundations. Typically construction dewatering specifications establish a performance requirement that the groundwater levels be drawn down to at least 1 to 3 ft below the excavation subgrade that governs design of the groundwater control system.

For the Embassy Suites project, the choice of excavation support methods was dictated by a previous attempt to build on the site where SFC had installed a system of soldier beams which were eventually abandoned and left in-place. NWC was asked to bid on providing an excavation support system that utilized the existing soldier beams, supplementing them with several additional beams that had not been installed at corners of the excavation limits. The contract documents, specification Section 02260, Excavation Support and Protection (see Appendix C), also required the use of soldier beams and lagging.



Hunt held onto the responsibility for controlling groundwater, which as stated above, was of critical importance to assure the success of lagging installation. Because the means and methods of (temporary excavation support) and construction dewatering was not up to NWC, they had a right to rely on Hunt for providing them with an adequate dewatering system that would control groundwater in such a way that they could perform their lagging operations without difficulties and delays from groundwater seepage.

Regarding excavation operations, Hunt, who was responsible for selecting the means and methods of dewatering at the site, had a contractual obligation to provide an adequate dewatering system that would allow NWC to excavate under reasonably dry conditions, such that the presence of uncontrolled groundwater would not hamper progress of the excavation. NWC was only responsible for dewatering of perched water and rainwater. In my meeting with NWC on 1 March 2006, I asked them what they had assumed in their bid for dewatering. They indicated that they had assumed the need for pumping from up to two sumps installed within the excavation to handle the perched water and rainwater, which I believe is a reasonable assumption, given the size of the excavation.

With a reasonable degree of engineering certainty, I believe that the dewatering system that was installed by Hunt was inadequate, and that Hunt did not fulfill its contractual obligations to NWC. The six deep wells installed by Griffin and operated by Hunt did not lower the groundwater effectively, particularly in granular soil layers above the excavation subgrade level, which resulted in continuing groundwater seepage throughout the construction period which adversely impacted both lagging and excavation operations below the water table.

I base my opinion on evaluations I have done relative to developing an understanding of groundwater levels and soil stratification at the Project site, and on local precipitation data. Subsurface profiles included as Figures 2 and 3 show a very complex interbedded geology within the saturated soils below the water table, both in the Terrace Deposits and the Potomac Deposits. My evaluations indicate that the water table at the project site was somewhere in the range between El. 30 and El. 40, and most likely between El. 35 and El. 40 during the period of construction, and that the granular layers (yellow-colored layers shown on Figures 2 and 3) within both the Terrace Deposits and Potomac Deposits below the water table required dewatering by Hunt.

HALEY
ALDRICH

Quagliano & Seeger, PC
24 March 2006
Page 17

*Should Hunt already been known this Hunt*

The lack of adequate dewatering caused numerous problems for NWC for their excavation and lagging operations below the water table. The difficulties they experienced are documented in project construction November 2003 with the initial excavation for the V-cut, and continued through completion photographs and in NWC's claim document. These problems began for NWC when they first penetrated below the water table in of excavation in April 2004.

Per their subcontract agreement with Hunt, NWC should have been provided with a dewatering system that lowered the water table outside the excavation, which I believe was located between El. 35 and El. 40, to at least the excavation invert, which was located around El. 12. To perform their work, NWC had to rely on Hunt for groundwater lowering, and Hunt failed to lower the groundwater as per their subcontract agreement.

*Was the deep well dewatering system adequate to control groundwater at the site in accordance with the contractual requirements that Hunt was bound by?*

No.

Contractual requirements regarding construction dewatering have been excerpted from the Contract Documents and are included in Appendix C. Pertinent requirements are included on Sheet Number S0-00 and in Specification 02300 Earthwork Item 3.2. Under Item 3.2, the following requirements apply to the construction dewatering: *is NWC Not Hunt*

*why is this hunt*

"A.   Prevent surface water and ground water from entering excavations, from ponding on prepared subgrades, and from flooding the project site and surrounding area."

"B.   Protect subgrades from softening, undermining, washout, and damage by rain or water accumulation.

*Why is this hunt*

1.   Reroute surface water runoff away from excavated areas. Do not allow water to accumulate in excavations. Do not use excavated trenches as temporary drainage ditches.

2.   Install a dewatering system to keep subgrades dry and convey ground water away from excavations. Maintain until dewatering is no longer required."

Sheet Number S0-00, under *"Foundations and Structural Earthwork, Note 1.c"* stated the following:

"c.   Design, install, maintain, monitor and remove dewatering and earth retention systems." *this was supposed to NWC*

Based on the contract requirements stated above, Hunt had an obligation to design a groundwater control system that prevented groundwater from entering the excavation for the duration of construction, and specifically lowered the water table to at least El. 12, which was approximate excavation subgrade level. It should also be noted that the SEA Report actually had recommended that the specifications require the contractor to maintain groundwater at least one foot below the lowest excavation levels. This specific requirement did not in fact make its way into the specifications, although there were references on Drawing S0-00 (see Appendix C) that made requirements in the SEA Report part of the work.

Quagliano & Seeger, PC
24 March 2006
Page 18

It is common practice in underground construction practice that an experienced dewatering subcontractor be retained to design, install and operate a groundwater control system that meets the performance requirements of the construction contract. It is typical that an experienced professional engineer evaluates what dewatering is necessary to meet the performance requirements of the contract, and designs a system that will be capable of meeting the requirements. It is also typical for a submittal including the details of the design (calculations, system layout, pumping quantities, and details of system components). However, this submittal was not required, nor was it required to retain a professional engineer. Nonetheless, it was required that a design be performed.

As stated above, Hunt solicited quotes for dewatering from at least two experienced dewatering subcontractors, Griffin and Moretrench. Moretrench, who had dewatering experience in the project area, advised Hunt of what dewatering would be necessary, and recommended that at least 12 deep wells, and preferably 14, be installed around the perimeter of the excavation. Hunt instead selected Griffin to install six deep wells "*at mutually agreed locations outside the excavation.*" It is unclear as to who made the decision that six deep wells would be adequate to meet the performance requirements of the contract. It is questionable as to if there ever was an actual "design" performed for a system by Griffin, particularly since there subcontract agreement with Hunt was silent on this issue.

Regardless of whether or not there was a design performed, in my opinion Hunt had an obligation to meet the performance requirements stated above in keeping subgrades dry and conveying groundwater away from excavations, since they were the party who was maintaining and operating the deep well system. They did not pass these performance requirements on to NWC in their subcontract agreement. It appears from the General Conditions Clause 1.3 under Exhibit VII that Hunt had in their contract with the Owner that Hunt did not even believe that there were dewatering requirements that had been incorporated into the contract documents. Despite this clause, they still had the contractual obligation to NWC to provide an adequate deep well dewatering system.

When dewatering problems were experienced, Hunt should have acknowledged the problems and taken responsibility for them in accordance with their contractual obligations to the Owner as stated above. They should have installed supplemental wells around the excavation as necessary to control the groundwater, particularly since they had been warned by Moretrench that at least 12 deep wells should have been installed initially.

### *What dewatering system would have been appropriate to adequately control groundwater in accordance with contract requirements and to fulfill contractual obligations to NWC?*

The granular soils at the site were horizontally interbedded with less pervious clays and silts, and vertically were discontinuous as shown by the subsurface profiles, Figures 2 and 3. The granular soils at the site were typically of moderate to low permeability, and given these conditions, were a challenge to dewater. The most effective way to dewater these types of soils is by horizontal drainage through each discrete granular layer to well screens which intercept the groundwater and allow it to be extracted from the ground.

Given that the system of temporary excavation support (soldier piles and lagging) was to be implemented at the site, one of the main goals of the dewatering system should be that enough

HALEY
ALDRICH

Quagliano & Seeger, PC
24 March 2006
Page 19

groundwater is drained from the granular layers at the perimeter of the excavation such that they are able to stand unsupported once they are exposed during excavation long enough to allow lagging boards to be placed and braced against the soldier beams. Although this does not require that all of the groundwater be removed, it does require that each granular layer be depressurized sufficiently for it to remain stable long enough for the lagging to be performed.

In my opinion, given the subsurface conditions at the site, and the need to stabilize the granular soils for effective lagging, a closely spaced system of deep wells located outside the excavation limits and operating continuously would have been necessary. Deep well screens should have extended from approximately El. 40, the highest likely water table elevation, down to at least El. 0.

Horizontal spacing of wells must consider the time that is necessary to allow horizontal drainage to occur from the granular layers to the wells. It must also consider the lateral continuity of the granular layers. Given the variability of fines content (i.e., silt and clay-size particles) in the saturated granular layers and variation in thickness of these layers in the horizontal direction, as shown on Figures 2 and 3, a fairly close spacing of wells is warranted.

For this project, other factors that should have been considered in establishing well spacing would be the fairly aggressive schedule for excavation, and the V-cut approach which called for excavation below the water table early in the excavation period. These two factors suggest that the deep wells would need to accomplish drainage almost immediately after operation commenced, again driving the need for a fairly close well spacing.

Based on my experience and engineering judgment, I believe that a deep well spacing of between 40 and 60 ft would have been required. For an excavation perimeter length of approximately 700 ft, this would require from 12 to 18 deep wells spaced around the perimeter.

The approximate location of the six deep wells that were installed at the site based on input from NWC is shown on Figure 1. The actual spacing of wells that was implemented by Hunt was inconsistent and varied from as close as about 45 ft to as much as about 200 ft. Top of well screens varied between as high as about El. 35 to about El. 22, with well screens length reportedly extending 40 ft below these levels. The fact that the top of the well screens in most cases did not extend up to the water table (which I believe was likely in the range between El. 35 and El. 40) exacerbated the problem of inadequate spacing between wells, since the saturated granular layers above the tops of the well screens would not have been able to drain into the wells.

It is also understood based on my conversations with NWC that the Hunt deep wells were not operated continuously. In addition, they were only operated for a period of nine days before the V-cut excavation began. Given the slow draining nature of the soils at the site, more lead time should have been provided for the deep wells to operate before excavation, and the deep wells should have been operated continuously, to allow sufficient time for drainage of the granular layers before excavation. Notwithstanding these deficiencies, the bigger issue, in my opinion, was not enough wells, and too large a spacing around the perimeter of the excavation.

*Should NWC have anticipated and be responsible for demolition and associated removal costs of the underground parking structure?*

No.

HALEY
& DRICH

Quagliano & Seeger, PC
24 March 2006
Page 20

The MRCE Expert Report opines that NWC should have anticipated that underground remnant foundation structures would be encountered and would require removal as part of NWC's bid cost. While I agree that a nominal amount of building/demolition debris should be anticipated to occur in urban fill and would be normally accounted for with reasonable contingencies in a bid, given the lateral extent of the underground parking structure (per NWC, it occupied approximately one third of the site) and given that it was intact. I believe that it would not reasonably be expected by an experienced excavation subcontractor such as NWC, to have to demolish and remove such an extensive intact structure as part of its work and absorb the cost as part of its original bid.

I have seen nothing in the SEA Report or Contract Documents that would allow for a reasonable anticipation by bidders that an extensive underground intact structure would be encountered. Had SEA done some historical research on previous site use, they could have determined that a two-story brick building had existed on the site in 1986 when Oosterbaan did their field studies. Knowing that the above-grade structure had been demolished would have raised the question as to whether underground portions of the structure were left in place. By doing appropriate subsurface explorations such as using geophysical techniques or drilling a series of unsampled probes, they could have delineated the underground portions of the structure, and then notified bidders as to its presence.

Their boring B-6 did likely encounter the underground structure when it encountered an obstruction at 8 ft, but instead of doing additional investigation to determine the vertical and horizontal extent of the obstruction, the boring was abandoned. This one boring that met refusal on an obstruction does not provide sufficient information to allow for a bidder to price out the demolition and removal of an underground structure that has two levels and is over 6000 square feet in plan area.

I believe that NWC should have provided an allowance for pumping a nominal amount of perched water during excavation. However, given the lateral extent of the intact buried parking structure which served as a "bathtub" to store the perched water, it would not be reasonable to anticipate the large volume of perched water that had to be removed. I believe there is merit to NWC's contention that they are due additional compensation for not only demolishing and removing, but also for pumping the extensive volume of perched water as stored in the buried parking structure.

**_What were the contractual requirements with regard to the excavation support system (soldier beams) location tolerance?_**

There were two specific requirements included in the contract documents that dealt with soldier beam locations. Both of these requirements were included in Specification Section 02260, Excavation Support and Protection, which is included in Appendix C of this report. The relevant clauses are as follows:

"*3.1*    *PREPARATION*

*C.*    *Locate excavation support and protection systems clear of permanent construction and to permit forming and finishing of concrete surfaces.*"

"*3.2*    *SOLDIER BEAMS AND LAGGING*

*D.*    *...Accurately align exposed faces of flanges to vary not more than 2 inches from a horizontal line and not more than 1:120 out of vertical alignment.*"



Quagliano & Seeger, PC
24 March 2006
Page 21

_**In preparing their bid for the work, what should NWC have been able to rely upon regarding as-installed locations of existing soldier beams installed by others?**_

Most of the soldier beams utilized in the temporary excavation support system were installed by another contractor for a previous development. For unknown reasons the previous development was not constructed. The Embassy Suites project decided to incorporate the existing soldier beams into the new design. Apparently, there was a project decision to utilize the existing piles such that the Owner could benefit in a reduced cost for temporary excavation support system.

The project Architect, BBGM, required the use of this system, as specified in Specification Section 02260, Excavation Support and Protection. In addition, BBGM established performance requirements for soldier beams in Section 02260, as discussed above. The Contractor, Hunt, was obligated under the contract, to install new soldier beams that met the performance requirements established by BBGM. Hunt, in their subcontract agreement with NWC, then passed the same requirements down onto NWC/Clark.

Presumably, the existing soldier beam locations were provided to Hunt and NWC/Clark, along with Specification 02260 during the bid period by the Owner/BBGM, and Hunt and NWC/Clark were asked to provide a bid which assumed the re-use of these existing soldier beams. Unless the Owner provided as-installed location information for soldier beams which clearly showed deviations outside of the tolerances stated above, then Hunt and NWC/Clark should have had the right to assume that the existing soldier beams were installed to the satisfy the same tolerance requirements that had been established in the design specification for new soldier beams.

It should be noted that the earth support design drawings prepared by Clark (Reference 8) show the proposed foundation walls flush to the face of the existing soldier beams. Important to note is that neither the location of the soldier beams nor the location of the proposed foundation wall was in the control of NWC/Clark or even Hunt. The foundation wall had been located by BBGM to be flush with the existing soldier beams, again at the benefit of the Owner to gain maximum building footprint.

Recognizing their right to assume that soldier beams had been installed so as not to interfere with permanent construction, Item No. 13 of the General Notes contained in the temporary earth support drawings prepared by Clark (Reference 8) states:

> _"All Soldier piles have been previously installed by others. Clark Foundations takes no responsibility for tip elevation or location."_

It is my opinion that NWC/Clark was justified in assuming that the existing soldier beams were installed as specified. In other words, when bidding their work NWC should have been able to assume that the piles were located such that NWC could install the lagging _"clear of permanent construction and to permit forming and finishing of concrete surfaces."_

_**Was there extra work for which NWC should receive extra compensation as related to as-installed location of existing soldier beams?**_

Yes.

The pile survey information provided by Hunt clearly indicates that the existing soldier beams were not installed in accordance with Paragraph 3.1.C of specification Section 02260. Furthermore,

Quagliano & Seeger, PC
24 March 2006
Page 22

though verticality tolerance measurements were not provided with the soldier beam survey, it would seem likely that the previously installed soldier beams did not meet the specified verticality tolerance since the survey indicated many piles to be located within the plan limit of the foundation wall. Accordingly, NWC had to modify their lagging procedure as follows (Reference 10):

> *"The installation of lagging is normally a two step-process. The first step involves the excavator providing a clean face of earth that is flush with the soldier beams. The second step involves the laborers digging a slot of earth 3" deep between soldier beams and installing lagging in a snug manner and backfilling the lagging."*

> *"The additional work requires labors to hand dig the earth an additional 1 to 22 inches necessary to block back the lagging beyond the outside face of the foundation wall. Then the laborers halt their installation to allow the welder to weld section of angle to each side of each soldier beam. When this occurs, the laborers are inefficient. They are waiting on the welder to complete the installation of angle, before they can complete the installation of the lagging boards."*

> *"The lagging installation productivitiy is reduced by approximately 50%..."*

In my opinion, there was additional work required to accommodate the revised lagging procedure required due to the mis-aligned soldier beams and NWC would not reasonably have been expected to include a cost for the modified procedure in their bid price provided to Hunt. Therefore, I believe there is merit to NWC's contention that they are due additional compensation for the additional work effort resulting from the mis-aligned soldier beams installed by others that were not in conformance with requirements in Specification 02260.

## REBUTTAL COMMENTS TO MRCE EXPERT REPORT

Haley & Aldrich has reviewed the Expert Report (Reference 22), prepared by Mueser Rutledge Consulting Engineers (MRCE), hereinafter referred to as the MRCE Report, which rebuts certain elements of the NWC Claim submitted to Hunt on 9 March 2005. The MRCE Report summarizes available information reviewed, project/claim overview, summary of NWC claim relating to groundwater, summary of Griffin dewatering information and position, underdrain flow rates, MRCE approach to review of the NWC claim with regard to dewatering, opinion of the buried parking structure claim, opinion of the soldier beam mis-alignment claim, and conclusions.

Many of the points discussed in the MRCE Report have been rebutted in-part by my opinions stated above. This section rebuts certain statements contained in the MRCE Report not previously discussed.

### Summary of Griffin Dewatering Information and Position

The MRCE Report summarizes information contained in a letter prepared by Griffin Dewatering and personal communication between MRCE and an individual of Griffin Dewatering who was involved in the project. The section summarized certain points contained in the letter and/or discussed between MRCE and Griffin. In general, this part of the report appears to represent a position statement by Griffin, relative to their scope of work and performance on the Project.

Item No's 1 and 2 of this section of the report state that Griffin installed the dewatering system as a *"turn key"* and that the system was *"adequate to eliminate hydrostatic pressure at the site."* The

HALEY
ALDRICH

HU00016838

Quagliano & Seeger, PC
24 March 2006
Page 23

fact that the system was installed as turn key indicates that Hunt retained the responsibility for operation and maintenance of the dewatering system and thus the responsibility for adequate performance of the system.

Regarding the statement that the system was adequate to eliminate the hydrostatic pressure at the site, I do not believe this statement addresses the issues in the NWC claim regarding the inadequate dewatering that caused them problems. While I agree that the deep well system may have reduced some of the hydrostatic pressures in the granular layers in the Potomac Deposits, the system was inadequate to sufficiently lower groundwater outside of the excavation in the granular layers of the Terrace Deposits above excavation subgrade, such that lagging and excavation operations could be performed in reasonably dry conditions.

Regarding Item No. 3, in which Griffin maintains that the site soils were too silty to dry out the site and that aggressive sumping would be required to supplement deep wells, this essentially acknowledges that six deep wells were inadequate to sufficiently lower groundwater in the granular layers of the Terrace Deposits above excavation subgrade. Hunt had a contractual obligation to dewater the site and control groundwater such that NWC could perform the excavation and lagging work in accordance with the project schedule. They did not meet this obligation, and in my opinion, a more closely spaced deep well deep well system should have been installed. Sumps within the excavation would not have been effective in eliminating the problems faced by NWC.

Of key importance is MRCE's acknowledgement in Item No. 5 that Hunt retained Griffin to assist in the sump dewatering effort. Apparently after it was evident that the Hunt's deep well system was not adequately lowering the groundwater, Hunt accepted some responsibility to provide supplemental dewatering to control groundwater. Unfortunately, these sumps installed within the excavation did not have a substantial benefit in lowering groundwater outside of the excavation.

Item No. 6 notes a pumping quantity of 40 gpm was reported by Griffin and *"is approximately what was anticipated for this site."* I have not seen any documents which present design calculations by Griffin or Hunt regarding the anticipated dewatering discharge rate required to dewater the site. If such documents exist, I would like to be provided with a copy of them for my review.

**Underdrain Flow Rates**

The MRCE Report suggests that post construction flow rates into the building's underdrain system might be comparable to dewatering flow rates during the excavation phase of the project construction. Important to note is that Hunt apparently did not keep construction dewatering flow rate records. In the absence of such records, the MRCE Report presents an analogy that the permanent underdrain and perimeter wall drainage system closely approximates a typical construction dewatering well.

According to the report, Hunt obtained several post construction pumping flow rates from the new building's underdrain system, and MRCE somehow assumes that the groundwater is contributing about 6 gallons per minute (gpm) into the underdrain system, although actual measurements were apparently as high as 10 gpm. The report opines that the 40 gpm flow rate reported by Griffin (unsubstantiated) was more than adequate to handle the 6 gpm influx into the excavation.

In my opinion, MRCE makes grossly simplified statements of the adequacy of Griffin's dewatering system based on anecdotal information on the construction dewatering well pumping rate of



Quagliano & Seeger, PC
24 March 2006
Page 24

40 gpm. The underdrain to well comparison is a gross analogy, while good for discussion, is misleading, and seriously oversimplifies a very complex subsurface stratigraphy. Clear evidence is the subsurface information presented in Figures 2 and 3.

An evident flaw in the comparison of the dewatering well to the underdrain system would be the location of the "screened" zone of the "well." For the dewatering wells utilized in the construction, the "screens" were typically located up to about 20 to 30 ft below the excavation subgrade and were influenced by horizontal permeabilities of soil strata below subgrade. The building perimeter and underdrain system, on the other hand, are located at and above the excavation subgrade elevation, and were influenced by vertical permeabilities of soils immediately below subgrade. Given the complicated subsurface stratigraphy, there is clearly a significant difference in the horizontal and vertical permeabilities. I would conclude that MRCE's underdrain flow rate analogy has no merit in proving that Hunt's groundwater dewatering system was adequate.

MRCE further states that *"the primary intent of a deep well system when used at a site with a geologic profile consisting of relatively low permeability strata, with occasional "stringers" of clean (high permeability) sands, is to depressurize the strata below subgrade to prevent subgrade disturbance such as sand boils, or worse a catastrophic bottom "blow."*

I do agree that this is an important goal of the deep well system. However, I believe that since a soldier beam and lagging system was dictated at the site, another important goal of the dewatering system is that enough groundwater needs to be drained from the granular layers at the perimeter of the excavation such that the soils are able to stand unsupported once they are exposed during excavation long enough to allow lagging boards to be placed and braced against the soldier beams. In addition, once the lagging is in place, the quantity of seepage through the lagging boards needs to be controlled to a reasonable level that will allow excavation to proceed such that the seepage does not hamper progress of the excavation.

Hunt's deep well system failed to achieve this equally important goal. The flow rate analogy does not address this issue. Closer spaced deep wells installed outside the excavation would have been required to achieve this goal. In addition, the deep wells installed by Griffin had screens only extending to about El. 25 to El. 33 (see Figures 2 and 3). In my opinion, all the deep wells installed at the site should have been screened higher to at least El. 35 to El. 40, the probable water table level existing at the site.

This section of the MRCE Report also states that *"The deep wells will not typically affect a perched water condition and with the site soils being silty (low to moderate permeability) the deep wells will not "dry" the site soils out."* This statement is inaccurate and misses the fact that the actual water table at the site was likely between El. 35 and El. 40, and there were relatively permeable sand layers in the Terrace Deposits which required dewatering. The groundwater in these layers was not *"perched,"* and according to the subcontract agreement between Hunt and NWC, Hunt was required to dewater these layers. In my opinion, closely spaced deep wells would have been able to dewater these granular layers.

MRCE also discusses the use of perimeter trenches to intercept seepage at the point that it enters the excavation. In my opinion, perimeter trenches around the exterior of the excavation to supplement the deep well system installed by Griffin would have been very effective in eliminating the problems NWC experienced given their V-cut excavation approach. The problem with perimeter trenches is that they only collect seepage that has already entered the excavation.

HALEY
ALDRICH

HU00016840

Quagliano & Seeger, PC
24 March 2006
Page 25

The seepage coming from an excavated face of soil given the soil conditions at the site, although small in quantity, has a destabilizing influence on the soil face, particularly if it is steep to vertical. In essence, the damaging impact to excavation and lagging operations has already occurred by the time it enters the excavation. In addition, given the long narrow geometry of the V-cut excavation, and the need to have operating excavating and hauling equipment at the base of the V-cut, the use of perimeter trenches would not be practical.

The most appropriate method of dewatering given the proposed V-cut approach and soldier pile and lagging system would be the use of closely spaced deep wells installed outside the perimeter of the excavation. This system would have intercepted the seepage before entering the excavation and before causing destabilization of the steep sides of the V-cut, or vertical faces of soil at the perimeter of the excavation were lagging had to be performed.

**MRCE Approach to Review NWC Claim with Regard to Dewatering**

The MRCE Report attempts to analyze the delays experienced by NWC by back-calculating average excavation grades from the cumulative volume of truck loads of soil hauled off site during the period of construction, and comparing the excavation grades to the average groundwater table elevation (El. 27 per MRCE). They present detailed findings and conclude that *"the entire delay occurred while excavating above the permanent groundwater table."* I believe that this simplistic analysis is misleading and does not account for the actual means and methods of excavation implemented at the site (specifically the "V-Cut" approach) by NWC. In addition, they have used the wrong elevation for *"permanent groundwater table"* (i.e., water table).

Based on my opinions expressed in this report, I believe that delays that NWC experienced with regards to excavating, handling, and disposing of wet soils impacted by inadequate dewatering would have occurred when excavation below the water table began. According to the documents I have reviewed, the V-cut excavation first began in mid-November 2003 (15 November). At this point in time, excavation would have begun below the first bench cut level, which reportedly was about 10 ft deep across the entire site.

Although I have not seen documentation that states specifically when excavation below the water table first occurred, it would likely be shortly after 15 November. Project correspondence confirms that problems with water in the excavation began shortly after the 15th; namely that on 22 November, a second piece of excavation equipment had to be mobilized to the site to deal with wet soil conditions.

Any delays in excavation progress prior to 15 November, in my opinion, could not be attributed to deep well dewatering problems related to groundwater at the site. However, there were three other issues before this point in time that I believe resulted in delays to excavation progress:

- Not receiving accurate pile location survey information;
- Encountering contaminated soil which was not anticipated or planned for; and
- Encountering the unanticipated underground parking structure and pumping large quantities of perched water.

As stated before, I believe that MRCE's calculation approach, which is based on the assumption that the site was excavated in a uniform manner in horizontal lifts all the way to the excavation subgrade, is misleading and is an inappropriate method to evaluate delays to the project related to



Quagliano & Seeger, PC
24 March 2006
Page 26

groundwater problems experienced by NWC. In addition, the other factors listed above have not been mentioned in MRCE's analysis of delays to excavation progress.

MRCE's Report dismisses the importance of power disruption to the deep well system. My opinion, as stated previously, is that the issue that caused most of the problems experienced by NWC in excavating and lagging at the site is because the deep well system was inadequate. However, I am also of the opinion that the power disruptions that occurred did have impact to the performance of the deep well system in lowering the groundwater. The saturated granular soil layers above excavation subgrade level are relatively slow draining soils, and time is required to allow the needed groundwater lowering to occur.

The deep wells were only first operated on 6 November and as stated above, the initial excavation below the groundwater table was begun shortly after the 15 November (and certainly before 22 November). This meant that the deep wells were only operated for a period of about 2 weeks before excavation below the groundwater table. Based on my experience, it can often take at least a month or more in these types of soils for significant drainage to occur. The problem of having enough lead time to drain soils is exacerbated by power disruptions. Although the written records are unclear as to how many disruptions occurred and how long they were, they certainly would have an impact on dewatering performance.

The MRCE Report references a letter written by Griffin which is attached to their report. The Griffin letter states the Griffin position with regards to dewatering at the site, as summarized by MRCE as Item No's 1 through 6 on page 3 of their report. I have previously addressed these issues and do not believe it is necessary to repeat my rebuttal statements. One point I would like to make here is that I would question MRCE's contention that NWC should have excavated in successive horizontal layers across the site, using perimeter trenching. I question whether MRCE has considered all the project constraints faced by NWC in developing their means and methods for excavation.

Based on input received during my meeting with NWC, it was pointed out that various factors were considered in coming up with their V-cut approach. Specifically, due to site access constraints with excavating equipment, the fact that certain easements were not granted by an adjacent property owner which prevented the use of tiebacks and necessitated the use of cross-lot bracing, the need to establish a ramp for truck access into the excavation, the need to maneuver excavating equipment beneath cross lot bracing, and given the long narrow geometry of the excavation footprint, it was determined by NWC that it would not be feasible to meet project schedule requirements using the horizontal lift method of excavation. In addition, this method would be more expensive.

In addition to the horizontal lift excavation approach not being any faster or less expensive than the V-cut approach, I do not believe that it would have eliminated NWC problems with regards to the difficulties they faced in slow lagging progress, given the deep well system that was installed by Griffin. This system was not capable of sufficiently lowering groundwater levels in the granular layers within the Terrace Deposits above the excavation subgrade to provide stability to these soils for effective lagging.

Quagliano & Seeger, PC
24 March 2006
Page 27

**CLOSURE**

As noted herein, this letter summarizes my preliminary findings regarding the NWC claim and MRCE Expert Report. I reserve the right to modify or supplement my opinions after I have had the opportunity to complete my review of the available documents that I have not reviewed prior to preparation of this letter.

Sincerely yours,
HALEY & ALDRICH, INC.

Robin B. Dill, P.E., DBIA
Vice President

Attachments
    REFERENCES
    Figure 1 - Site and Subsurface Exploration Location Plan
    Figure 2 - Subsurface Profile A-A
    Figure 3 - Subsurface Profile B-B
    Appendix A - Resume for Robin B. Dill
    Appendix B - Oosterbaan Geotechnical Report
    Appendix C - Excerpted Portions of Contract Documents Related to Temporary
                  Excavation Support, Excavation and Dewatering
    Appendix D - Cumulative Precipitation Data for Washington, DC – Figures D-1 to D-3
                  Groundwater Definitions from Reference 35

HALEY
ALDRICH

REFERENCES

1. Brennan Beer Gorman Monk, "BBGM Project No. 9302.00 Technical Specification Sections 02260 - Excavation Support and Protection, and 02300 – Earthwork," dated 27 January 2003.

2. Brennan Beer Gorman Monk, Contract Drawing No. S0-00, Entitled "General Notes" dated 14 June 2002.

3. Brennan Beer Gorman Monk, Contract Drawing No. S1-01, Entitled "Foundation/ Parking Level Three B4 Plan," dated 14 June 2002.

4. Brennan Beer Gorman Monk, Contract Drawing No. S3-01, Entitled "Foundation, Slab On Grade, Typical Stair and Elevator Details," dated 14 June 2002.

5. Brennan Beer Gorman Monk, Contract Drawing No. S3-02, Entitled "Basement Wall Details," dated 14 June 2002.

6. Brennan Beer Gorman Monk, Contract Drawing Nos. S3-07, Entitled "Ramp Sections and Details," dated 14 June 2002.

7. Clark Foundations, "Supplemental Daily Reports" dated 5 November 2003 through 13 February 2004.

8. Clark Foundations, Drawing Nos. SE-0, SE-1, SE-2 and SE-5, Entitled "Embassy Suites Hotel, 1000 K Street, N.W., Washington, D.C., Permit Set," dated 18 August 2003.

9. Clark Foundations, Letter Entitled "Embassy Suites Hotel, Clark Foundations Job #122459," dated 13 November 2003.

10. Clark Foundations, Letter Entitled "Embassy Suites Hotel, Clark Foundations Job #122459, PCO #810002 – Additional Information For Back Lagging Proposal," dated 9 December 2003.

11. Clark Foundations, Letter Entitled "Embassy Suites Hotel – 1000 K Street N.W., Clark Job #122459, Clark PCO #810005, Extended General Conditions due to Delay," dated 8 January 2004.

12. Griffin Dewatering Mid-Atlantic, LLC, Dewatering Proposal, "Embassy Suite Hotel, 1000 K Street, NW, Washington, DC 20005," dated 14 August 2002.

13. Griffin Dewatering Mid-Atlantic, LLC, "Invoice Number 131153 to Hunt Construction Group," dated 13 February 2004.

14. Hunt Construction Group, Inc., "Change Order No. 1" to Griffin Dewatering Mid-Atlantic, LLC, dated 8 January 2004.

HALEY
& ALDRICH

HU00016844

15. Hunt Construction Group, Inc. "Subcontractor Daily Report Form" for Griffin Dewatering, dated 27 October.

16. Hunt Construction Group, Inc., "Embassy Suites Hotel (Hunt Job No. 5003), 1000 K Street, NW, Washington, DC, Subcontractor Coordination Meeting No. 7 Minutes," dated 9 December 2003.

17. Hunt Construction Group, Inc., "Hunt Job No. 5003, Subcontract No. 09412, Subcontractor: Griffin Dewatering Mid-Atlantic, LLC," dated 16 October 2003

18. Hunt Construction Group, Inc. "Subcontractor Daily Report Forms", dated 6 October 2003 through 6 April 2004.

19. Hunt Construction Group, Inc., "Civil & Structural Drawings, Existing Sheeting/Shoring Drawings, Embassy Suites", dated 7 November 2003.

20. Hunt Construction Group, Inc., "Existing Pile Locations, Embassy Suites", dated 18 November 2003.

21. JA Jones/ Tompkins, "Subcontractor Daily Reports" (one sheet), dated 2 October 2003.

22. Mueser Rutledge Consulting Engineers, "Expert Report, Review of Geotechnical Issues Contained in the Embassy Suites Claim Prepared by National Wrecking Corporation", dated 22 December 2005.

23. National Wrecking Corporation, Jobsite Photos, October 2003 through March 2004

24. National Wrecking Corporation, "Claim for Equitable Adjustment, Embassy Suites Hotel, (Hunt Job No. 5003), 1000 K Street, NW, Washington, DC, Subcontract No. 09418", dated 9 March 2005

25. National Wrecking Corporation, "Construction Records – Truck Load Sheets", dated 3 October 2003 through 2 April 2004.

26. National Wrecking Corporation, "Construction Records, Daily Reports", dated 2 October 2003 through 6 April 2004.

27. National Wrecking Corporation, "Proposed Change Order Tracking Log", dated 20 May 2004.

28. National Wrecking Corporation, "Change Order Request", dated 12 November 2003.

29. National Wrecking Corporation, Marked-up copy of Drawing No. S1-02, Entitled "Parking Level Two/B3, Framing Plan" dated 27 January 2003. Drawing marked-up by National Wrecking Corporation indicating construction dewatering deep well Locations, received by Haley & Aldrich on 13 March 2006.

30. National Wrecking Corporation, Letter Entitled "Embassy Suites Hotel, Back-Lagging Information", dated 13 December 2003.

HALEY
ALDRICH

HU00016845

31. National Wrecking Corporation, Letter Entitled "Embassy Suites Hotel, Lagging-Into House", dated 30 January 2004.

32. National Wrecking Corporation, Letter Entitled "Embassy Suites Hotel", dated 26 March 2004.

33. Oosterbaan Associates, P.C., "Report of Subsurface Investigation, Proposed Office Building, 1001 New York Avenue, N.W., Washington, D.C.", 4 June 1986.

34. Patton Harris Rust & Associates, PC, Drawing Entitled "Existing Sheeting and Shoring, Face of Pile Location, Embassy Suites Hotel", dated 6 November 2003.

35. Powers, J. Patrick, "Construction Dewatering, New Methods and Applications", Second Edition, 1992, John Wiley & Sons, Inc., Chapter 1 pages 1 to 6.

36. Robin Dill, Personal Communications with Paul Schmall of Moretrench on 14 and 17 March 2006.

37. Schnabel Engineering Associates, Inc., "Geotechnical Engineering Report, Proposed Hotel Building, 1000 K Street, N.W., Washington, D.C., dated 30 June 2000, Revised 8 September 2000.

38. Schnabel Engineering North, LLC, "Technical Memorandum, Dewatering for 1000 K Street" dated 14 August 2003.

39. Schnabel Foundation Company, Drawing No. SFC-1, Entitled "Plan – Pile Location As-Builts, 1001 New York Avenue, Washington, DC", dated 21 January 2000.

40. 1000K, LLC, "Standard form of Agreement Between Owner and Contractor", Between 1000K, LLC and Hunt Construction Group, Inc., dated 1 October 2003.

HALEY
A. DRICH

HU00016846



HU00016847



HU00016848

Figure 3 — Subsurface Profile B-B

HU00016849



HU00016850