1 (Pages 1 to 4)

Page 1

```
IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - +
HUNT CONSTRUCTION GROUP,      |
    Plaintiff,                |
v.                            | Case No.
THE POOLE AND KENT CORPORATION,| 1:06CV1850
    Defendant.                |
- - - - - - - - - - - - - - - +


         30(b)(6) Deposition of POOLE AND KENT CORPORATION
                By and through its designee
                    ARTHUR L. SHEPHERD
                    Washington, D.C.
                 Wednesday, August 1, 2007
                      10:57 a.m.

Job No. 1-107967
Pages 1 - 122
Reported by: Cathy Jardim
```

Page 2

```
    30(b)(6) Deposition of POOLE AND KENT
CORPORATION, by and through its designee, ARTHUR L.
SHEPHERD, held at the offices of:


    WHITEFORD, TAYLOR & PRESTON, LLP
    1025 Connecticut Avenue, N.W., Suite 400
    Washington, D.C.  20036






    Pursuant to notice, before Cathy Jardim,
Registered Professional Reporter and Notary Public of
the District of Columbia.
```

Page 3

```
                    APPEARANCES
ON BEHALF OF THE PLAINTIFF:
    LAURA A. KAMAS, ESQUIRE
    Thelen Reid Brown Raysman & Steiner, LLP
    701 8th Street, N.W.
    Washington, D.C.  20001
    (202)508-4296


ON BEHALF OF THE DEFENDANT:
    MICHAEL A. STOVER, ESQUIRE
    Whiteford Taylor Preston, LLP
    Seven Saint Paul Street
    Baltimore, Maryland  21202
    (410)347-8761


ON BEHALF OF THE WITNESS:
    RICHARD E. HAGERTY, ESQUIRE
    Troutman Sanders, LLP
    1660 International Drive, Suite 600
    McLean, Virginia  22102
    (703) 734-4326
```

Page 4

```
                    CONTENTS
EXAMINATION OF ARTHUR L. SHEPHERD           PAGE
    By Mr. Stover                             5




                    EXHIBITS
             (Attached to transcript)

1000 K DEPOSITION EXHIBITS                  PAGE
No. 1   Notice of Deposition                  5
No. 2   Project Schedule, 5/13/5             46
No. 3   6/22/5 Letter from Lynch to Hunt     54
No. 4   Meeting Minutes, 1/12/5              69
No. 5   1/21/5 Letter from Hunt to Kite      72
No. 6   4/29/5 Letter from Vika to WASSA     73
No. 7   E-mail string from and to D. Delcher 76
No. 8   5/20/5 Letter from Hunt to Kite      79
No. 9   Hunt Interoffice Memo                86
No. 10  Excerpt from handwritten notebook    87
No. 11  1/13/5 Letter from Kite to Ferguson  98
No. 12  2/9/5 Letter from Kite to Hunt      102
```

Case 1:06-cv-01850-JR   Document 37-15   Filed 12/10/2007   Page 2 of 6
DEPOSITION OF ARTHUR L. SHEPHERD
CONDUCTED ON WEDNESDAY, AUGUST 1, 2007

2 (Pages 5 to 8)

Page 5

```
 1              PROCEEDINGS
 2          30(b)(60 of 1000 K
 3        By and through its designee
 4            ARTHUR L. SHEPHERD
 5   having been duly sworn, testified as follows:
 6      EXAMINATION BY COUNSEL FOR DEFENDANT
 7      BY MR. STOVER:
 8      Q  Please state your full name and business
 9   address for the record.
10      A  Arthur Lee Shepherd.  Business address is
11   200 West Monroe Street, Chicago Illinois, 60606.
12      Q  Let me show you what we will have marked as
13   Deposition Exhibit No. 1.
14           (1000 K Exhibit No. 1
15            was marked for identification.)
16      BY MR. STOVER:
17      Q  Showing you what has been marked as
18   Deposition Exhibit 1, which is the Notice of Corporate
19   Designee Deposition.  Have you seen this document
20   before?
21      A  Yes.
22      Q  Before we got into the document, I wanted
```

Page 6

```
 1   to find out, have you ever been deposed before?
 2      A  Yes.
 3      Q  How many times?
 4      A  Four or five.
 5      Q  Have you ever been deposed in connection
 6   with the Embassy Suites project for which we are here
 7   today?
 8      A  No.
 9      Q  The depositions you were in before, were
10   they relating to construction projects you were
11   involved with?
12      A  Yes.
13      Q  Why don't you give me a quick list of those
14   depositions you have been involved with?
15      A  Back in the 1980s, it was Brown Derby
16   Restaurants against a company out of Texas over a
17   disputable purchase order.
18      Q  Where what was that?
19      A  Cleveland, Ohio.
20      Q  That is where the action was pending?
21      A  Yes.
22      Q  And next?
```

Page 7

```
 1      A  Cleveland, Ohio.  The Fee Group versus the
 2   Steubenville, Ohio, over -- the client was suing the
 3   owner -- or the owner of the company I worked for at
 4   the time.
 5      Q  That was a construction dispute?
 6      A  Yes.
 7      Q  Next?
 8      A  Omni Hotels, Omni Hotels versus Webcore
 9   Construction, San Francisco, California.  Construction
10   dispute.
11      Q  You said the first one was in the 1980s.
12   When was the second deposition?
13      A  About 2000.
14      Q  And the third one, the Omni Hotel matter?
15      A  2002.
16      Q  And you said there were four.  So there is
17   another?
18      A  No.  That was it.
19      Q  That is all the depositions?
20      A  Yes.
21      Q  Because you have some experience with it,
22   you understand I want to go through it quickly.  We
```

Page 8

```
 1   have to verbalize responses --
 2      A  Right.
 3      Q  And normal communication is hand gestures
 4   and head nods, so we have to be good about that.  The
 5   other thing is we have to be careful not to talk over
 6   each other.
 7         The other thing is your counsel may want to
 8   make an objection.  If he starts to make an objection,
 9   let him.  Unless you are instructed not to answer the
10   question, he is just making the objection for the
11   record, and then you are expected to answer the
12   question.  Okay?
13      A  Yes.
14      Q  Is there any reason why you cannot testify
15   fully and completely here this morning in this matter?
16      A  No.
17      Q  Take a look then at Exhibit No. 1.  The
18   deposition is for 1000 K, LLC and its corporate
19   designees, and my understanding is that you are
20   testifying today as a corporate designee for 1000 K
21   LLC; is that correct?
22      A  Yes.
```

Page 53

1  Q  Were there any change orders to your
2  recollection where you thought a time extension might
3  have been appropriate, but Hunt didn't ask for it?
4  A  No.
5  Q  What about the changes associated with the
6  Presidential Suite, those changes, were you familiar
7  with those?
8  A  Yes, very.
9  Q  Did those changes involve extra time
10 requirements for subcontractors?
11 A  For certain subcontractors, yes.
12 Q  So, for example, Poole and Kent estimated
13 that the Presidential Suite changes would create 180
14 hours of additional work, and T.A. Beach estimated
15 that it would be about 342 hours for their scope of
16 work.
17 A  I am not aware of that.
18 Q  You are not aware of that. You are not
19 aware of Hunt requesting any time extensions
20 associated with the Presidential Suite?
21 A  Not that I recall.
22 Q  Do you believe that the changes associated

Page 54

1  with the Presidential Suite did actually take some
2  additional time or cause additional time?
3  A  For certain contractors, yes.
4  Q  What about the changes to the restaurant,
5  the restaurant revisions, are you familiar with those?
6  A  I am trying to remember what revisions were
7  made, and I don't recall.
8  Q  You would agree that there was a
9  significant delay in this project from the time you
10 started in December of '03, to about June of '04,
11 during the excavation phase; is that correct?
12     MS. KAMAS: Objection to form.
13     BY MR. STOVER:
14 Q  Would you agree that there was significant
15 delay on the project during the excavation phase of
16 the project?
17 A  Not that I am aware of or was made aware
18 of.
19     (1000 K Exhibit No. 3
20     was marked for identification.)
21     BY MR. STOVER:
22 Q  Let me show you a letter dated June 22,

Page 55

1  2004, from Jeff Lynch to Hunt Construction, and you
2  are shown on the cc. Do you recall this letter?
3  A  Okay.
4  Q  Does that refresh your recollection whether
5  there were delays during the excavation phase of the
6  project?
7  A  Yes.
8  Q  Your prior testimony was you didn't think
9  there were, and this letter indicates there were six
10 weeks of delay. Does that refresh your recollection?
11 A  After reading it, yes.
12 Q  What do you recall then about this
13 timeframe during the excavation and the time it was
14 taking to do the work?
15 A  I recall they were taking longer because
16 the soil was wet, is what they were telling me.
17 Q  In terms of comparing the length of time
18 that it was taking versus the schedule, is that
19 something you would have been doing as part of your
20 job there on the project?
21 A  Some, yes.
22 Q  But -- other than seeing this letter, you

Page 56

1  don't recall the excavation work taking longer than
2  scheduled?
3  A  At this point, I don't recall every point
4  of it. It has been too long.
5  Q  It is not a trick question --
6  A  I would have to go back and look at the
7  schedule and the day-to-day logs. I know we were
8  having some problems, but --
9  Q  You indicated that one of the problems they
10 were having with the excavation was wet soil. Were
11 there any other problems associated with the
12 excavation that could have contributed to delay in
13 that scope of work that you recall?
14 A  They said they ran into a foundation, an
15 old foundation on part of the site. I know they ran
16 into an old gas station before I got there, which was
17 removed -- storage tank. That is all I recall at this
18 point.
19 Q  You recall that Hunt was responsible under
20 the contract to dewater the site?
21 A  Yes.
22 Q  Are you familiar with -- it didn't sound

DEPOSITION OF ARTHUR L. SHEPHERD
Case 1:06-cv-01850-JR   Document 37-15   Filed 12/19/2007   Page 4 of 6
CONDUCTED ON WEDNESDAY, AUGUST 15, 2007

15 (Pages 57 to 60)

**57**

1  like you had any project experience in the Washington,
2  D.C., area; is that correct?
3      A  I have worked on two other projects in D.C.
4      Q  I am sorry.
5      A  The Mayflower, that was an interior
6  remodeling, and the Shoreham.
7      Q  In your project experience, did you ever
8  have to deal with dewatering?
9      A  No.
10     Q  Do you know what efforts Hunt took to
11 dewater the site?
12     A  They employed a company to grow wells
13 around the site.
14     Q  Do you know if -- on behalf of the owner,
15 do you believe that Hunt's efforts to dewater the site
16 were sufficient?
17     A  Yes.
18     Q  You think that they were?
19     A  Yes.
20     Q  And why do you think that?
21     A  When I saw them moving the sump pumps
22 around constantly, taking money out specifically,

**58**

1  working at night.
2      Q  The sump pumps, you mean the pumps in the
3  pit?
4      A  In the pit and around the wells around the
5  site, to evacuate the water.
6      Q  So there were wells around the perimeter of
7  the site?
8      A  Yes.
9      Q  But, again, you have no experience with
10 dewatering?
11     A  Correct.
12     Q  Basically you saw some efforts on the part
13 of Hunt to dewater, but you wouldn't have any basis to
14 determine whether that was a sufficient dewatering
15 approach to this project?
16     A  Correct.
17     Q  And ultimately, you believe that the reason
18 there were problems with the excavation phase is
19 because there was water in the site during the
20 excavation?
21     A  Yes.
22     Q  Are you familiar with what is commonly

**59**

1  known as the 4-3/4-inch control problem that arose on
2  the site?
3      A  Yes.
4      Q  You are chuckling.
5      A  Yes.
6      Q  Most people don't chuckle in response to
7  that.
8      A  Yes, that was a very interesting day on the
9  site.
10     Q  I bet.  What do you recall about that
11 issue?
12     A  When Mr. Langhoff informed me that they had
13 a problem and asked me what to do about it, I
14 contacted the architect and asked him what we could
15 do, and the answer was get it corrected.
16     Q  Do you recall when that was, approximately?
17     A  We had just reached like the first floor,
18 lobby level, because we knew we had to correct it
19 before --
20     Q  You mean the project was actually building
21 out of the hole coming up to the lobby level?
22     A  Yes, a slab was poured on the lobby level.

**60**

1      Q  What kind of impact did the control problem
2  have on the project, if you recall?
3          MS. KAMAS:  Objection to form.
4          THE WITNESS:  I am not aware of any impact
5  because Hunt put together a tremendous effort to
6  correct the problem and stay on schedule.
7          BY MR. STOVER:
8      Q  Hunt estimated to Kite that what it called
9  the control bust caused a two-week impact; is that
10 fair?
11     A  Yes, that is fair.
12     Q  And were you aware of the fact that as a
13 result of the control points changing, that certain
14 imbeds and sleeves and inserts were then in wrong
15 locations?
16     A  Yes.
17     Q  So there was some impact of having to redo
18 those areas?
19     A  Yes.
20     Q  Do you recall in January of 2005 that there
21 was a fire at the project?
22     A  Yes.

Case 1:06-cv-01850-JR    Document 37-15    Filed 12/10/2007    Page 5 of 6
DEPOSITION OF ARTHUR L. SHEPHERD
CONDUCTED ON WEDNESDAY, AUGUST 1, 2007

16 (Pages 61 to 64)

Page 61

Q You were there, I take it.
A I was one of the first responders.
Q You weren't running for your life, you were actually running to the fire?
A In the hotel business, you run to the fire.
Q What was the cause of that fire?
A I believe, and I am not sure if it was proved, it was a spark from somebody welding on the roof, and I personally observed someone welding, and the sparks were falling.
Q Do you recall whether there was impact as a result of the fire on the project?
A Yes.
Q What impacts do you recall there being?
A The part that got burned up or damaged had to be rebuilt, which was one section of the building, one strip --
Q From the ground floor all the way up?
A From the ground floor all the way up.
Q Did that effort affect the work that could be done in those rooms, for instance?
A Yes.

Page 62

Q Do you have any recollection as to whether the fire caused any delay to the project?
A Not aware of any.
Q Correspondence indicates that there was, there were problems associated with closing in the building. Do you recall problems associated with closing in the building?
A The curtain wall company was taking a long time to erect the curtain wall system and install the windows.
Q What was the cause of that delay?
A I don't know.
Q Were there other problems associated with brickwork, roofing work?
A I know there were problems with the roofing work, getting it done completely.
Q To dry --
A Yes, to dry in the building.
Q Did the -- well, let me ask you this. To your recollection, should the building have been dried in sooner than it actually was?
A Based on the schedule, yes.

Page 63

Q Do you recall what kind of timeframe versus when it was scheduled versus when it happened?
A The original schedule called for it to be closed in December January '04.
Q Do you mean '05?
A Yes, and it actually occurred two or three months after that.
Q And you would agree that the failure to close in the building has an impact on the work that is being done in the building?
    MS. KAMAS: Some, but not all.
    BY MR. STOVER:
Q Depending on the scope of work?
A Yes.
Q If the building wasn't closed in, you wouldn't want to be installing drywall or insulation or leaving exposed areas that might get water or --
A You wouldn't want to do finishes, but the items you mentioned are formally done before the roof is put on. Hunt did toke measures to do that and ensure that it wouldn't be damaged.
Q Do you recall if there was any problems

Page 64

with water infiltration in the building during the timeframe when it was not closed in?
A No, not that I many am aware of.
Q In 2005, January through really the summer of 2005, there were questions or issues related to the utility permits and tie-ins. Were you familiar with those issues?
A Yes.
Q And what was your role in connection with that?
A Meeting with the utility companies to get services to the building.
Q What was Kite's responsibility or the owner's responsibility with respect to getting those permits for site utilities?
A I would have to read the contract again because I think most of that is spelled out in the contract.
Q You don't recall -- you don't have any recollection as to who was responsible for it? You said you were involved with the process?
A I don't know if I was responsible for it,

DEPOSITION OF ARTHUR L. SHEPHERD
CONDUCTED ON WEDNESDAY, AUGUST 29, 2007
Case 1:06-cv-01850-JR   Document 37-15   Filed 12/10/2007   Page 6 of 6

20 (Pages 77 to 80)

Page 77

1  drawings for some other reason, this was solely
2  related to the fact that the sewer line was missing?
3     A  Yes.
4     Q  Had to be designed and approved and
5  installed?
6     A  Yes.
7     Q  The way that your e-mail reads, it looks
8  like you were informed of that. Did you not know
9  about that requirement prior to that date?
10    A  We didn't know it didn't exist until Hunt
11 went out and discovered it wasn't there -- or Hunt's
12 subcontractor. Whoever was required -- Hunt hired a
13 contractor to put a sewer line in the street, from the
14 building to the manhole, and when they discovered that
15 the pipe between this manhole and that manhole didn't
16 exist --
17    Q  On 10th Street, north and south?
18    A  Yes.
19    Q  That is when the issue was noted?
20    A  Yes.
21    Q  Now, Delcher's e-mail above in responding
22 says that according to Vika, the design was forwarded

Page 78

1  to WASSA this morning. That would indicate that they
2  were aware of the issue beforehand because they had
3  already prepared a design which had been forwarded, so
4  the issue must have come to light before then?
5     A  No. It is not a big item of work. It is
6  not a big design issue. It would take a couple of
7  hours for someone to do.
8     Q  So you think this May 18 was the first
9  time --
10    A  And since he already showed it on his
11 drawings originally, he probably just had to make sure
12 the pipe was there and sized accordingly and had the
13 right direction of flow.
14    Q  Why was all the site work being held up?
15    A  That was according to Hunt. There was very
16 little site work. Are you familiar with the site?
17    Q  Yes.
18    A  It is curb-to-curb buildings, so the only
19 site work is the little street work and the sewer
20 lines going out into it.
21        (1000 K Exhibit No. 8
22        was marked for identification.)

Page 79

1        BY MR. STOVER:
2     Q  I will show you Exhibit 8, which is dated
3  May 20, 2005, from Hunt to Kite, and you are shown as
4  receiving a copy of this letter. Do you recall the
5  letter?
6     A  Yes.
7     Q  Now, in the first paragraph entitled "Lack
8  of WASSA Permitting," Hunt is indicating that there
9  was a substantial impact caused by Kite's failure to
10 ensure that WASSA had reviewed the utility tie-ins
11 behind until February 2005, which in turn delayed the
12 lengthy site utility permitting process such that it
13 completed only recently, 4/26. Do you know if there
14 was a response to this letter?
15    A  Not aware of one at this point.
16    Q  Did you have any discussions with Tom Page
17 about this letter?
18    A  At this point, probably not.
19    Q  Well, at any point?
20    A  No.
21    Q  You don't recall --
22    A  Tom wrote hundreds of letters a day.

Page 80

1     Q  Do you agree there was delay in obtaining a
2  site utility permit?
3     A  I agree there was delay in getting the
4  permit. I don't know if it was a delay to the
5  project.
6     Q  The last paragraph on the first page
7  entitled "Lack of Sewer Main Impact." It was
8  discovered on March 8, '05, that the section of
9  supposedly existing sewer main was missing from the
10 northern-to-southern sanitary connection. You
11 indicated that was not discovered until May 18, and
12 the last exhibit, Tom is indicating here it was March
13 8.
14    A  He is indicating he wrote an RFI to the
15 architect on that day saying, hey, I can't find it.
16 We have to look at RFI 412.
17    Q  Are you aware of RFI 412 -- you would have
18 seen RFIs?
19    A  Yes.
20    Q  He is indicating in this letter that it was
21 dealing with the missing sewer line connection. Is it
22 possible then that the owner was aware of the missing