01/21/2005 09:38 FAX 3175775605        KITE                                    ☒002



January 19, 2005

Kite Companies
30 S. Meridian Street
Indianapolis, IN 46204

Attn: Mr. Jeff Lynch

RE:   Embassy Suites Hotel (Hunt Job No. 5003)
      1000 K Street, NW, Washington, DC
      Schedule Issues Letter of 01/12/05 - Response

*[Handwritten annotation: "I ASK TOM TO GIVE ME A ESTIMATE OF $ FOR REPAIR BY 1-14-05 TO DATE NOTHING"]*

Hunt Construction Group, Inc. is in receipt of Kite Companies' January 12, 2005 letter. Our response to your concerns expressed in that letter follow:

### Fire of 01/05/05

*[Handwritten annotation: "COMPLETED ON 1/14"]*

While an unfortunate event, no one was injured, and building damage appears to be superficial. As you are aware, damage was limited to the west exterior elevation roughly around and between column lines 8 and 9. It is Hunt's understanding that insurance representatives from the owner's builder's risk carrier and the subcontractor's involved have investigated this event. Also, the insurance companies cleaners have mobilized to clean the soot off of the building, a process which is still on-going as of this date. After initially being told that repairs were to proceed without impacting completion, Hunt is now told by Kite that complete pricing is needed so that their insurance carrier can provide direction. Hunt has requested pricing from all the applicable subcontractors and is compiling its own current anticipated future impacts, which will take time to complete (for a detailed status of this, please see the owner meeting of 01/12/05 minutes and attachments issued Monday 01/17/05). This time, as well as any insurance review time needed prior to direction to proceed is an approach that will be detrimental to schedule and completion. It is suggested that a process be quickly established whereby Kite can immediately direct any and all necessary repairs to proceed. We believe that if Kite works in a collaborative manner we can minimize, if not eliminate, any schedule impact.

### Poole & Kent

As Kite is aware, the Davis-Bacon Issue that was the genesis of the lien filed by Hunt's HVAC and plumbing subcontractor – The Poole & Kent Corporation – has to do with a concession allowed by the applicable union affiliated with their sheet metal second tier-

Hunt Construction Group, Inc.
1000 K Street, NW, Washington, DC 20001
P.O. Box 50204, Washington, DC 20091
Phone: (202) 737-3131   Fax: (202) 737-3060   www.huntconstructiongroup.com

Page 1 of 6

Kite Companies
PO Box 50088
Washington, DC 20091

1000K_008639

01/21/2005 09:39 FAX 3175775605        KITE                            ⌀003



subcontractor – Regional Air Systems. This concession allowed Regional to bid this project with R-workers whose wage rates are not currently documented with Davis-Bacon. Poole & Kent's Davis-Bacon requirement is through their subcontract's references to the owner contract, but they claim that this was not known at bid time via any Davis-Bacon wage sheet or otherwise (which is apparently why Regional's union allowed this concession). Every effort has been made to resolve this issue with minimal cost – including contacting the Assistant to the Deputy Mayor for Development's office for assistance in getting these R-worker's wages documented with Davis-Bacon. To date this has not produced any positive results. The cost impact of this to Regional mounts daily as ductwork installation continues. In the near future, Hunt will formally reject this claim, but please note that Poole & Kent will likely dispute this and demand that this claim be pursued. Please also note that the electrical subcontractor – T.A. Beach Corp. has a similar and related cost issue. *IS THIS NEW?*

### Concrete

It must be stated here for the record what has been verbally shared with Kite frequently in the past – that cast-in-place concrete quality in Washington, DC is typically poor (there is one exception to this perception regarding a company entitled Miller & Long, but they were precluded from involvement in this project due to lack of union affiliation). Also as Kite is aware, the TIF requirement for 35% LSDBE percentage required full 100% LSDBE participation in the concrete scope. This resulted in a convoluted contracting scenario of an unbonded material subcontract to a place and finish company – Rapid Response Construction, Inc. - that typically does not get directly involved in formwork coupled with a bonded labor subcontract to them through the drywall subcontractor – Performance Contracting, Inc. Additionally, it was necessary to agree to bi-monthly payments in these subcontracts to keep Rapid's cash flow such that they could appropriately man this project.

Hunt was aware of the concrete challenges described above, and entered into them "eyes open" so this project could proceed from a financial viability standpoint for the owner. Hunt cannot state strongly enough that everything possible was done by the jobsite staff in an "above-and-beyond" dedicated manner to give the owner a concrete frame of acceptable quality. The staff has self-perform concrete formwork, place and finish experience – in particular the project superintendent – whom caught many problems and corrected them before they were placed. Other measures included directing the owner's inspection agency (beyond their agreement at additional cost) to perform flatness and levelness tests on the guest suite decks, which resulted in decks that will allow metal stud walls and most finishes to install without the added time of installing self-leveling compounds (contrary to some other near-by buildings currently being fit-out). Despite Hunt's efforts, there is remedial work ongoing, and remedial work still to do. Hunt is well aware of this and has applied appropriate pressure towards completion of these items with in-field pushing, written lists/notices, and held/retained monies. *WHAT PRESSURE, NO SCHEDULE FROM SUBS.*

Page 2 of 6

Kite Companies
PO Box 50088
Washington, DC 20091

1000K_008640



Schedule

Kite is aware the excavation subcontractor – National Wrecking Corporation (NWC) caused a major problem at the beginning of the project by completing their scope of work nearly 8 weeks late. NWC has claimed that this was caused by excessive water in the excavation – note here that dewatering is an allowance in the contract, which Hunt greatly exceeded in good faith to mitigate further schedule impacts. NWC has also claimed impact due to out-of-tolerance existing soldier piles (driven by separate owner agreement) and underground structures not represented or identified in the soils report or elsewhere. These claims are summarized on the P/RCO cost issues Log and have been defended by Hunt on the owner's behalf – including bonding around the associated lien that NWC filed. Hunt also directed, and fronted the cost for, significant overtime – over 16,000 man-hours for the concrete subcontractor alone (which exacerbated the concrete challenges described above) – to get the project back on track. This resulted in the main roof placement completing reasonably within the original schedule on 11/29/04, *12/4/04*

Kite's statements in the 5th paragraph of their letter infer that Hunt is ignoring their suggestions/planning/direction regarding the building enclosure schedule. This is incorrect. For the past few monthly owner meetings Hunt has accommodated Kite's insistence that a separate draft building skin schedule be developed and maintained. Hunt has also accommodated Kite's directions regarding re-sequencing of some of this work. For example, the original skin sequence was south, then east, then north, then west (because this was generally how the concrete frame was being built, and with the west elevation being the most difficult precast installation, it made sense to leave it for last and get the rest of the building ready for other close-up trades). Kite felt that the west elevation should be done prior to last, and Hunt accommodated this – in the middle of completing the east elevation. This direction by Kite has had cost impacts, one of which was the necessity of renting the adjacent west parking lot earlier and longer than would otherwise have been needed, and another was having a separate mobile crane longer than originally anticipated (the original anticipation was to erect the west elevation after concrete main-roof top-out with the tower crane, and erect 20 or so panels there too heavy [for the tower crane] with a mobile crane, and only then in the parking lot if necessary).

There have been other schedule issues with enclosure activities, mostly due to delayed concrete progress due to late NWC excavation impacts (while the concrete frame did finish timely, its progress to that end required a large amount of overtime noted above). Precast activities – both concrete, and GFRC roof cornice – were substantially complete (except for a handful of problem panels and the hoist area, which will not affect follow-up trades) 01/13/05 as opposed to 01/03/04 in the original Oct.'03 schedule. Exterior brick should complete mid-to-late Feb.'05 as opposed to 02/21/05 in the original Oct.'03 schedule. Problems have been encountered with windows with respect to rough opening adjustments. The window installers are installing wherever possible, while the exterior framers are completing the adjustments necessary to allow a warrantable caulk joint width.



Page 3 of 6

Kite Companies
PO Box 50088
Washington, DC 20091

1000K_008641



Curtain wall deliveries are late, but Hunt is mitigating this by temporarily enclosing these openings, as well as any necessary window openings, with reinforced poly installed by carpenters and laborers hired directly through union project labor agreements.

Kite comments on Hek scaffold activity are unfairly exaggerated. These scaffolds are needed for exterior densglass, tyvek and brick screws, steel brick relieving angles, and exterior brick. At any given time one, two, or all three of these subcontractors will occupy a Hek at various times in the same day. There are times between when one sub leaves a Hek and another gets-on that the Hek may be vacant. These sub's also have different staggered working hours and different break and lunch times to maximize production on these scaffolds. These activities are coordinated closely each and every day and are the highest priority for completion on this project. *ORIG SCH. W/NTR p[...]*

Furthermore regarding schedule, please note that Hunt has attempted to be proactive in suggesting ways that completion times could be improved. Specifically, an alternate roofing product was suggested that could be applied in cold weather months rather that waiting for spring to install the temperature sensitive specified product. Also, Victaulic in lieu of welded pipe was suggested for the HVAC piping which would have provided a significant install time savings in the field – particularly at the Penthouse mechanical plant and the 14th level above ceiling distribution area below. Both of these suggestions were presented with no cost issues, and in both cases the owner's technical consultants stated that they were equal to or exceeded the specified versions. Unfortunately in both cases Kite rejected these revisions. While it is probably too late for the Victaulic, it is requested that the alternate roofing be re-visited.

A few additional comments regarding schedule:

> As documented in previous meeting minutes, there has been a schedule impact regarding the installation of utility tie-ins. Apparently, the District Water and Sewer Authority – or WASA – has no record as to ever approving the civil design drawings for this project. This issue, which is a design development responsibility, has been ongoing for upwards of two months now, yet most of the efforts towards resolution have been Hunt's on Kite's behalf. Recently, Hunt's permit expeditor returned a resolution from WASA that Kite needs to write a letter [to WASA] authorizing them to use an in-place deposit as the review fee. As of this writing, this letter has not been written, and Hunt's civil subcontractor still does not have the WASA reference numbers necessary to submit the proposed materials and structures. Furthermore, Hunt's subcontractor has informed Hunt that their crews are getting busier and busier and may not be available once this issue is resolved and any additional public space permitting is received for this work. The cost and schedule impacts of this issue will be tracked with P/RCO 051

> Hunt is concerned about the timeliness of FF&E deliveries – particularly wall covering. On 01/10/05 two each wall covering POs were received from Kite –

Kite Companies
PO Box 50088
Washington, DC 20091

01/21/2005 09:42 FAX 3175775605          KITE                                    ☒006



none of which were for guest suites – but show 6 to 8 week lead times. As late as the 01/12/05 weekly meeting Hunt was told that no wall covering vendors have received their POs. The project schedule shows the need for wall covering starting 03/24/05. As Kite is aware, Hunt has produced a guest suite finish schedule for the subcontractors, which shows the need for wall covering at the 2nd floor as possibly early as 02/28/05. While 02/28 may be optimistic for being wall covering ready, 03/24 is not – and it appears that delivery of material by either of these dates may be a problem.

To summarize the schedule portion of this reply, Hunt has proceeded at all times with full knowledge of impacts to schedule and the requisite sense of urgency towards resolving them. In addition to the concrete frame overtime referred to above, Hunt has worked enclosure trades overtime – including the previous two Saturdays and Sundays – in an effort to get this building enclosed and dried-in with a combination of metal studs, densglass, tyvek, brick and various temporary measures (which now effectively removes the exterior framing subcontractor from the Hek scaffold coordination process described above). Hunt has also purchased additional wet vac's and hired additional laborers to clean-up any water that does get in. The purchase of densglass-type sheetrock has been authorized and drywall hanging will start on or before the 02/01/05 deadline stated in previous schedules and meetings.

Particularly disturbing are Kite's comments in their 7th paragraph regarding Hunt's field staff, who have conducted themselves at all times in a dedicated, driven and professional fashion. This especially since the genesis of this attitude started with a switch of masonry subcontractors at Kite's direction (refer to Hunt 01/30/04 & 02/18/04 letters) which was a situation that arose due to no fault of Hunt (the subcontractor originally proposed had been on lists previously submitted by Hunt, and no objections were raised). Also contributing to this attitude was the 4-3/4" control bust discovered as this project was coming out of the ground (refer to multiple items of previous correspondence) – a problem that had its genesis in a contract drawing conflict but none-the-less Hunt took responsibility for and resolved such that there is no longer an impact on the project (the two week impact it did have was mitigated by the concrete overtime referenced above). It should also be noted that the staff has committed to doing everything possible to accommodate the Hilton training needs requested, but not contractually required (ref. Hunt letter of 08/25/04) which further illustrates the staff's positive commitment to this project.

<u>Pay Applications</u>

Kite's comments in their 8th paragraph regarding timely submittal of pay applications leaves out a significant portion of the story. As Kite is aware, pay application percentages have to be resolved prior to compiling a complete pay application. For most of this project, the negotiations towards these percentages have been difficult if not confrontational with Kite – particularly since Pay App. #8 thru May '04. These discussions drag well into the following month, and in recent months have been



Page 5 of 6

Kite Companies
PO Box 50088
Washington, DC 20091

1000K_008643

01/21/2005 09:43 FAX 3175775605          KITE                    ☒007



exceedingly arbitrary and unfair and required upper management's participation to resolve. As Kite also knows, these continuing pay application delays hold-up the ensuing subcontractor payments, which holds-up the associated wavers – which are also needed for the "complete pay application" clock to start. Hunt's suggestions for facilitating this process such as the use of conditional wavers and bi-monthly payments have yet to be adopted by Kite. (ref. Hunt letter of 08/25/04)

In conclusion, Hunt entered into this project with Kite – and as discussed with Kite prior to going to contract – with the anticipation that its challenges for both Hunt and Kite would be met in a collaborative way as a team.    Hunt took this commitment seriously and adopted it as a management approach – and has been continually disappointed by the corresponding approach from Kite. As demonstrated above, Hunt is and remains committed to completing its scope of work on-time. Please contact the undersigned to discuss this letter, the Kite letter of 01/12/05 that generated it, and most importantly the return to a collaborative team approach.

Please do not hesitate to contact the undersigned with any questions and/or comments.

HUNT CONSTRUCTION GROUP, INC.

Harry Ferguson
Executive Vice-President

Attachments:   None
c:    R.G. Hunt; J. Pienknagura; P. Clark; L. Weisman; T. Page – Hunt (via Email)
      A. Goldstein
      File:   Kite Correspondence

Page 6 of 6

Kite Companies
PO Box 50088
Washington, DC 20091

1000K_008644