## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
HUNT CONSTRUCTION GROUP,       :
    Plaintiff,             : Civil Court Action
  vs.                       : No.: 1:06CV1850
THE POOLE AND KENT CORPORATION, :
    Defendant.              :
- - - - - - - - - - - - - - - x

      Deposition of THOMAS G. PAGE
          Washington, D.C.
         Tuesday, July 10, 2007
            9:59 a.m.

Job No.: 1-106920
Pages: 1 - 308
Reported by: Sarah M. Bickel

## Page 2

    Deposition of THOMAS G. PAGE, held at the offices of:

    WHITEFORD, TAYLOR & PRESTON, LLP
    1025 Connecticut Avenue, N.W.
    Suite 400
    Washington, D.C. 20036
    (202) 659-6800

    Pursuant to agreement, before Sarah M. Bickel, Court Reporter and Notary Public in and for the District of Columbia.

## Page 3

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
    LAURA A. KAMAS, ESQ.
    Thelen, Reid, Brown, Raysman & Steiner
    701 Eighth Street, N.W.
    Washington, D.C. 20001
    (202) 508-4296

ON BEHALF OF THE DEFENDANT:
    MICHAEL A. STOVER, ESQ.
    Whiteford, Taylor & Preston, LLP
    Seven Saint Paul Street
    Baltimore, Maryland 21202
    (401) 347-9426

## Page 4

CONTENTS

| EXAMINATION OF THOMAS G. PAGE | PAGE |
|---|---|
| By Mr. Stover | 6 |

EXHIBITS
(Attached to the Transcript)

| PAGE DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| No. 1 | Subpoena | 6 |
| No. 2 | ResumT | 15 |
| No. 3 | 3/12/05 Letter | 87 |
| No. 4 | 6/30/04 Letter | 88 |
| No. 5 | 5/19/04 Letter | 91 |
| No. 6 | 4/27/04 Daily Log | 92 |
| No. 7 | 3/1/05 Memorandum | 94 |
| No. 8 | 2/19/04 Letter | 104 |
| No. 9 | 3/23/04 Letter | 112 |
| No. 10 | National Wrecking Cost Summary | 119 |
| No. 11 | 12/9/03 Letter | 123 |
| No. 12 | 1/13/05 Letter | 150 |
| No. 13 | Backcharge Summary | 153 |

**Page 5**

EXHIBITS CONTINUED

| PAGE DEPOSITION EXHIBIT | PAGE |
|---|---|
| No. 14  8/13/04 Schedule Review | 265 |
| No. 15  10/19/04 Letter | 266 |
| No. 16  12/8/04 Letter | 267 |
| No. 17  2/2/05 Schedule Review | 267 |
| No. 18  5/25/05 Letter | 268 |
| No. 19  5/25/05 Letter | 268 |
| No. 20  5/25/05 Letter | 269 |
| No. 21  5/28/05 Schedule Review | 269 |
| No. 22  6/8/05 Schedule Review | 270 |

**Page 6**

PROCEEDINGS

(Page Exhibit No. 1 was marked for identification and was attached to the deposition transcript.)

THOMAS G. PAGE
having been first duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. STOVER:

Q Good morning. My name is Mike Stover and I'm representing Poole & Kent in this matter. Please state your full name and address for the record.

A Thomas Gordon Page, 809 Downs Drive, Silver Spring, Maryland 20904.

Q Mr. Page, have you ever been deposed before?

A One other time.

Q And I presume that was in connection with the National Wrecking matter?

A Yeah, about a year ago.

Q Well, let me just refresh your recollection as to what we're going to do here today. I'm going to be asking questions and showing you some

**Page 7**

documents and basically just trying to get your recollection and your memory of events surrounding the Embassy Suites Hotel project down on, what is it, 10th Street, I guess, New York Avenue?

A Uh-huh.

Q 1000 K, I think the address was. If I ask a question that you don't understand, just ask me to clarify it for you and we'll do the best we can. If you answer a question, we're going to presume that you understood the question and that you were answering it to the best of your ability. If you need to take a break, let us know.

When you're answering questions, we have to be mindful of the fact that the court reporter is taking down everything we say, so head nods and hand gestures won't be recorded. We have to verbalize responses. And the other thing is if, you know, if I'm talking or you're talking, we can't talk over each other because she can only take one of us down at a time when she's typing. We've got to try to work together on that. Your lawyer here -- are you represented by counsel today?

**Page 8**

MS. KAMAS: Yes.

BY MR. STOVER:

Q She may make objections during the course of the examination, and we'll just give her a chance to make her objections. Unless she instructs you not to answer, then go ahead and let her state her objection and then answer the question. She'll tell you what she wants you to do if she wants to.

One thing I wanted to find out, do you have any kind of agreement or arrangement with Hunt to provide your testimony today?

A No.

Q Do you have any kind of an agreement or arrangement with Hunt with respect to the National Wrecking matter in testifying for Hunt in that matter?

A What do you mean by "agreement"?

Q Well, I don't know. Any kind of understanding or arrangement where they will compensate you for your time, for instance?

A No, nothing like that.

Q And today, did you do anything to prepare

**Page 101**

1  south end, but as far as the rest of the project, no.
2      Q  You were able to work around it?
3      A  Yeah.
4      Q  Any other labor problems in terms of being
5  able to get a contractor on the site to do the work
6  for this project?
7      A  No.
8      Q  When you had to switch out masonry, did
9  that put the masonry subcontractor or the masonry
10 work on this project behind at all?
11     A  No, actually, we found Baltimore Masonry
12 and they did pretty well for us.
13         MR. STOVER: I see you looking at your
14 watch. Take a break whenever you want.
15         MS. KAMAS: You want to take a break or
16 are you okay?
17         THE WITNESS: Just to eat at some point.
18         MR. STOVER: That's what I mean. Whenever
19 you want is fine.
20         BY MR. STOVER:
21     Q  Some things we've talked about. Early on
22 in this job you had to deal with contaminated soils

**Page 102**

1  in the excavation process. Do you recall that?
2      A  Uh-huh.
3      Q  What kind of impact did that have on the
4  excavation process in terms of delay?
5      A  Not very much, really.
6      Q  What does that mean?
7      A  Well, I did agree to give the excavator
8  five more days as a result of that issue. It was
9  pretty much over and done with within a couple of
10 weeks. When the contaminated soil was found, it took
11 the owner to get a consultant out there to verify it
12 and start the whole chain.
13     Q  It was an owner problem?
14     A  Yeah.
15     Q  In other words, it was an unknown
16 condition, it wasn't on any of the soil reports?
17     A  That's correct. It was a relatively
18 isolated area, the southeast corner of the job.
19     Q  And then there was also in the excavation
20 process an old concrete foundation that was
21 discovered. Do you recall that?
22     A  Yeah, I do.

**Page 103**

1      Q  What effect did that have on the
2  excavation work in terms of delay or impact?
3      A  Well, at the time, the excavator brought
4  another piece of equipment out, broke it up and
5  hauled it out. So at the time that the work was
6  going on, we weren't really seeing any impact.
7      Q  Was that a known condition, was that
8  something that was identified in the soils reports,
9  the existence of a --
10     A  Not that we could find, although the soil
11 borings did indicate refusal, but you don't -- I
12 mean, that could be anything.
13     Q  In your mind, was that an owner problem,
14 basically an owner foreseen condition?
15     A  That's kind of a gray area. Had that
16 subcontractor made his claim in a timely manner, we
17 would have pushed it. He didn't make a claim for
18 that until three months later. It was pretty hard at
19 that point to do anything.
20     Q  But your recollection --
21     A  And his claim was only dollars, it wasn't
22 time for that item.

**Page 104**

1      Q  Your recollection of events was that that
2  didn't impact the progression of the excavation work?
3      A  No, I didn't recall that specific thing
4  hurting the excavation.
5      Q  There was another -- let me get this
6  letter out.
7         (Page Exhibit No. 8 was marked for
8  identification and attached to the deposition
9  transcript.)
10        BY MR. STOVER:
11     Q  I show you what's been marked as
12 Exhibit 8. It's a letter from National Wrecking
13 Corporation dated February 19th, 2004 to Hunt
14 Construction. Do you recall receiving this letter?
15     A  Uh-huh.
16     Q  And we've talked about some of the issues
17 that National Wrecking has identified. The third
18 bullet point down talks about National Wrecking told
19 that the west side of the site was off limits until
20 existing utilities had been disconnected and
21 abandoned and that he didn't have access to that
22 until the second of November. Did that impact the

Case 1:06-cv-01850-JR   Document 37-20   Filed 12/10/2007   Page 4 of 10
DEPOSITION OF THOMAS G. PAGE
CONDUCTED ON TUESDAY, JULY 10, 2007

27 (Pages 105 to 108)

**Page 105**

1  excavation work, the existing utilities in that area?
2       MS. KAMAS: Object to form.
3       THE WITNESS: I don't believe it did. I
4  mean, first look at the date of the letter.
5  Secondly, there was an existing street light that was
6  left on and in less than a week from when we
7  discovered it, we had the power disconnected.
8  Thirdly, prior to this February 9th date of '04,
9  three, four months or more after the event occurred,
10 we received a schedule from them saying they were
11 going to be right on time in December. This
12 particular item I don't -- you know, their issues had
13 to do with perceived groundwater, not something like
14 that. That's my opinion.
15      BY MR. STOVER:
16      Q You said this was -- you think this bullet
17 point refers to a street light?
18      A Yeah, it was a street light in the alley
19 that was just left behind.
20      Q Because there's a second reference to
21 existing utilities. If you look on the second page,
22 there's a bullet point dated 10/15/03 and that says

**Page 106**

1  alley at west side unavailable due to electric line
2  location, telephone lines and manholes. Is that
3  something different than what you were referring to?
4       A I think the first part of this sentence is
5  the same issue. The second part of the sentence is
6  telephone lines at the north end of the alley, this
7  is my recollection, that were shown to be existing
8  and had to be worked around. As I recall, when they
9  were lagging, the manholes stuck a little bit beyond
10 the lagging and they kind of made a big deal of it.
11 I don't recall it being a big issue.
12      Q Whose responsibility was it to remove
13 existing utilities --
14      A These particular phone lines are off the
15 property. They were not in the footprint of the
16 building.
17      Q What about the electric, the electric line
18 it refers to and --
19      A It should have been off. It should have
20 been off.
21      Q Whose responsibility was that, was that
22 Hunt's responsibility to have existing utilities

**Page 107**

1  turned off on the site?
2       A In that particular case, that light would
3  have been the owner's responsibility to handle that,
4  but that was a minor issue.
5       Q National Wrecking refers to in this letter
6  a couple of permits that they claim were not obtained
7  and that they claim impact their scope of work. One
8  was a public space permit allowing them to install a
9  safety fence. Do you have any recollection of that?
10      A Where's that?
11      Q I think it's the fourth bullet point down
12 dated 10/22/03. You were required to install a
13 perimeter safety fence and have it installed in a
14 different location because a public space permit had
15 not been issued.
16      A That's a little bit misleading. The
17 perimeter safety fence was installed at the time they
18 started and we had a permit for that.
19      Q What is he referring to here, do you know?
20      A Well, he wanted to get a curb lane.
21      Q That's a different permit issue. That's
22 the one down below it, 10/02/03, where he's referring

**Page 108**

1  to a lane closure for 10th Street and that there was
2  a --
3       A From the time he let us know he wanted
4  that, we got it as fast as we could get it. You have
5  to go and appear before ENC committee and make a
6  presentation.
7       Q That wasn't something that was known by
8  Hunt prior to starting the work?
9       A Lane closure?
10      Q Yeah.
11      A No. We had those discussions with them
12 and proceeded to get the permits and -- but from day
13 one he had what he needed to start.
14      Q One of the other issues --
15      A He didn't need the lane closure from day
16 one.
17      Q When did it become an issue for them, if
18 at all?
19      A Well, when he wrote this letter, it became
20 an issue.
21      Q Did he ultimately install a crane on 10th
22 Street and he got a permit and installed the crane

**209**

1  Q That's not how it came back to you?
2  A No.
3  Q Did you actually look at letters he wrote?
4  A I looked at the one you showed me.
5  Q Just now, that was it?
6  A The -- yeah, I mean the job had a lot of
7  problems. But the whole, you know -- his negativity
8  towards me started with the Brentwood Masonry thing
9  because -- that wasn't my fault, I don't mind saying
10 because we listed him at bid time. So I got a box of
11 bids and I -- like that (indicating), I'm going to
12 contract with a low bidder unless I have a reason not
13 to. So I contracted with him. The masons' union
14 found out about it. They don't like him and from
15 what I heard, Jeff nearly lost his job over that.
16      So he's -- that time didn't follow up and,
17 you know, that's where it started. If you look at
18 the PCO log I was keeping, it was well over what he
19 told me he had for that sort of thing.
20     Q In terms of budget?
21     A Yeah. And then we had the four and three
22 quarter inch problem which was ill-timed, then we had

**210**

1  the late windows, on and on and on, you know. It
2  just started to snowball.
3      Q And he was blaming you for that?
4      A I'm the guy in charge of the job so, you
5  know, those things, you know, whether I was directly
6  involved in them or not, fall on me.
7      Q What about internally at Hunt? What were
8  they -- what were they saying to you internally at
9  Hunt?
10     A They were fully behind me with the
11 Brentwood Masonry thing. They believe that was
12 Jeff's fault. He didn't check the sub list when they
13 were done. Before that Brentwood Masonry thing, he
14 and I were basically friends or friendly. The only
15 other thing I hear, you know, he had direct control
16 over day by day was the PCO log and I asked him, you
17 know, should I be doing anything different and I, you
18 know, didn't get any --
19     Q "Him," who?
20     A Pete and/or Larry. Should I be doing
21 anything different with this PCO log, should I be
22 handling it differently? Are there certain things

**211**

1  that shouldn't be on there? Let's go through it. I
2  never got told to take anything off.
3      Q Ultimately Hunt brought in new project
4  management and different additional people and
5  ultimately your role in the project was decreased.
6  Was that a result of the owners and/or Hunt's
7  dissatisfaction with your work on the project?
8      MS. KAMAS: Object to form.
9      THE WITNESS: I think that -- I think they
10 felt like it was all getting to me, you know. Some
11 of my letters were getting a little negative, more
12 than they probably should have, and, you know, my
13 approach to doing the job is a little different than
14 Tim's and Rich's was and I think they wanted to try
15 Tim's and Rich's because my approach wasn't working.
16 The job was not going fast enough.
17     BY MR. STOVER:
18     Q What was your approach versus their
19 approach?
20     A I'm a little less heavy-handed. I'm more
21 of a, you know, let's talk about this, let's work it
22 out. Let's put certain things aside we can't settle

**212**

1  now and settle it later. I think, you know, I think
2  it's just the general philosophy, if something isn't
3  working, try something different.
4      Q When you left the job and then ultimately
5  left Hunt, was that a voluntary choice on your part
6  or was that a mutual decision that it was time for
7  you to leave Hunt or what?
8      A I believe it was voluntary because
9  I -- because they asked me to stay longer when I
10 left. I mean, I turned in my notice right about this
11 time of '05, right after the 4th of July of '05. I
12 said I'll stay four weeks.
13     Q Was that because you had other
14 opportunities already lined up?
15     A Yeah, I already had a job at Davis. I
16 mean, I had been looking -- I actually decided the
17 December before to look because I saw this job
18 ending, you know. At that time I thought we still
19 had a shot to have a descent job if certain things
20 went right. Those things didn't go right. I didn't
21 see Hunt getting another job after this. I saw me
22 having to move again, so I thought I don't want to

213

1   move again. That was the really big -- I don't want
2   to move again.
3         So I looked around and all the people I
4   looked around, I said I want to finish this job
5   first. So basically I -- you know, when I turned in
6   my notice for, you know, the beginning of September
7   when they asked me to stay a couple more weeks, that
8   pretty much got all the cleanup done that I was
9   assigned to do and was, you know, it was a good time
10  to go. But I believe if I -- they would have kept me
11  longer to help clean up and finish the job, if I was
12  willing to stay. And I think if you know Larry, he
13  would say that.
14        Q  Let's look at the Hunt back charges
15  starting with number three. And you'll notice that
16  they're all dated in '06, the actual back charges,
17  but the time that the work was done is in your time
18  frame?
19        A  Okay.
20        Q  They just kind of did them all at one
21  time, apparently. The tabs aren't in here. You're
22  going to have to flip through them and find -- 1

214

1   through 26 are not tabbed. 26 and beyond, they are.
2   They actually are in there.
3         A  So what do you want me to go to?
4         Q  Number three.
5         A  How are they numbered, or where's the
6   numbers? Is it based on back change orders?
7         Q  Yes.
8         A  Here's number three, all right.
9         Q  Basically for these I just want you to
10  look at the time, the back up tickets, documentation
11  and tell me if you recall the work -- the
12  circumstances, and if your signature is on any of the
13  tickets there --
14        A  My signature is not on this one and I'm
15  not familiar with it -- this $300 one.
16        Q  If you're not familiar with it, we move
17  on.
18        A  Okay.
19        Q  Quickly.
20        A  This is what you meant by hundreds of
21  change orders, huh?
22        Q  Yes. The next one is number four we want

215

1   to look at.
2         A  No signature on this one. This doesn't
3   even look like the normal T.A. Beach tickets that I
4   was getting. They must have changed their form.
5         Q  I think there is a signature right there
6   in the center of that thing, isn't it?
7         A  Oh yeah, that's our stamp, that's not my
8   signature.
9         Q  Whose signature is that?
10        A  I don't know.
11        Q  Now, that's July. This is --
12        A  They're using my stamp but --
13        Q  You know what, that's August 5th, that
14  ticket, right?
15        A  Yeah, I was still around then but I was
16  doing --
17        Q  You weren't handling this kind of work?
18        A  I was doing other things.
19        Q  Move on. Number five is the next one.
20  Again, number five is an August 31st, '05 extra work
21  ticket which has your stamp, but whose signature is
22  that?

216

1         A  Something W. I don't know. Somebody I
2   don't know.
3         Q  And again, you don't know anything about
4   that change order?
5         A  Something with Regional Air. I am not
6   familiar with it. Sorry.
7         Q  Number seven is the next one.
8         MS. KAMAS: Off the record for a second.
9         (Off the record.)
10        THE WITNESS: I can only surmise it was
11  Larry just because he took the time to put the
12  tracking number on it.
13        BY MR. STOVER:
14        Q  Larry-esqe?
15        A  Yeah, I would do that too.
16        Q  Number seven is the next one. Six was
17  clearly outside your range. Seven is probably also
18  because it's an extra work ticket for work done
19  August 24th.
20        A  I was gone by August 24th.
21        Q  Sometimes it involves a certain stage you
22  might be aware of so if you're aware of it, just let

249

1   A  They wouldn't be. They wouldn't be, but
2   their duct would be enclosed by sheet rock from
3   somebody else.
4       My point is, if you're excluding something
5   that's on the drawings, you've got to be a whole lot
6   clearer than that. I mean, we would have never
7   accepted that if we had known that they were trying
8   to take out all of the toilet exhaust riser ductwork.
9   In fact, we would have been talking about a whole lot
10  bigger dollars than this if we had done that because
11  those would have filled up with mold because they
12  have moisture in the bathrooms and --
13      Q  But it wasn't done, Poole & Kent --
14      A  We made them put ductwork in.
15      Q  To put Sheetrock in?
16      A  They ought to thank us.
17      Q  I assure you that they don't.
18      A  $83,000 is cheap insurance for that. We
19  can all sleep better tonight. I mean, that's my
20  opinion.
21      Q  You think that water's getting in the
22  toilet exhaust risers in the Sheetrock?

250

1       A  Well, when people take a shower, the room
2   fills with moisture and the toilet exhaust takes that
3   moisture out. I mean, just the worry of mold can be
4   very expensive nowadays.
5       Q  Do you think that it's permitted by the
6   code to have the Sheetrock riser instead of --
7       A  I've heard people that should know say
8   it's not permitted by code, but I don't know for a
9   fact. It doesn't seem to make sense to me that a
10  Sheetrock toilet exhaust riser would be acceptable
11  but I don't have first-hand knowledge of what the
12  code says in that regard.
13      Q  So your --
14      A  I think --
15      Q  You recall this condition and --
16      A  Yeah, this is one of the things we
17  discussed early on and I didn't agree with it for
18  that reason. I think if you're going to exclude
19  something that's clearly shown in the drawings, it's
20  there for a reason, you've got to be a lot more
21  direct about it. That's my opinion and that's why I
22  disagreed with it.

251

1       Q  But you don't think having a provision in
2   the contract is a way to include something in the
3   drawings?
4       A  Not something this vague. You'd have to
5   say we exclude all sheet metal toilet exhaust risers.
6   I would have understood that, believe me. That would
7   have passed my subtlety threshold. This didn't.
8       Q  You say that based on just your knowledge
9   and experience, not --
10      A  There's nothing about this that says they
11  excluded all that ductwork. It only came out later
12  when they weren't putting it in. I'm just telling
13  you how I saw it.
14      Q  I'm just asking you why you saw it that
15  way. Did you get a legal determination, was there
16  some kind of industry standard that you're referring
17  to?
18      A  The ductwork shown on the drawings and
19  this doesn't say clearly we're excluding it.
20      Q  So that's your interpretation?
21      A  That's my interpretation. It should be
22  more direct language and we should have gotten the

252

1   engineer approval, quite honestly. Even with that,
2   there would be risk. It's not a good situation.
3       Q  If it was permitted by code, would this
4   risk issue that you're talking about not be a factor?
5       MS. KAMAS: Object to form.
6       THE WITNESS: You'd have to get -- the
7   mechanical engineer would have to approve it and
8   change his drawings.
9       BY MR. STOVER:
10      Q  Okay. Look at the next one which is 119
11  which, is the Davis-Bacon.
12      A  Didn't we talk about this earlier?
13      Q  Yeah, I think we did talk about the
14  requirements of the TIF financing and all that.
15      I note that T.A. Beach had a problem with
16  Davis-Bacon compliance and Hunt actually paid them
17  some percentage in a settlement with their money for
18  their Davis-Bacon Act overcharges.
19      A  The difference is they brought it up
20  before signing the contract. Poole & Kent didn't.
21      Q  I don't think that's correct. Your
22  recollection is that the Beach --

**253**

1  A  This came after the contract was executed.
2  Q  Right. But I mean, your recollection is
3  that the T.A. Beach, Davis-Bacon Act issue came up
4  before that contract was signed by Beach?
5  A  That's -- when they signed the contract,
6  they said -- they provided a letter that says we're
7  signing this with the understanding that this will be
8  worked out later, something to that effect. There's
9  a piece of paper that says that.
10  Q  What is your position, then, for why Poole
11  & Kent shouldn't be able to recover for this claim on
12  the Davis-Bacon Act?
13  A  Because of the -- the ties to the owner
14  contract that has that required and we gave them a
15  copy of the owner contract prior to execution. The
16  contract -- you know, it was went through with a
17  fine-tooth comb. There was no reason for us to think
18  it was an issue when we signed and went to contract.
19  Q  Seventy-two, which is tab 120.
20  A  Yeah, I don't see the ticket signed, but I
21  do recall -- I do recall telling Poole & Kent to
22  connect the roof drains on overtime. You know, as

**254**

1  long -- looks like they got the mechanic premium
2  hours right and just got -- just got to take that
3  overhead profit out and it's good.
4  Q  No to the $171,000, yes to the $487 one?
5  A  Pretty magnanimous, huh. I've said
6  enough.
7  Q  Number 80, which is tab 128. This is your
8  favorite one.
9  A  My favorite one. I have lots of favorite
10  ones.
11  Q  You will love this one.
12  A  I remember it being more than this. I'm
13  not as deeply involved in this as Larry was but our
14  position is the same. They should have been able
15  to -- you know, this was something that if you could
16  have done it, if you could have taken out and remade
17  it and made it fit, it could have fit in the first
18  place.
19  Q  I think we talked about that one.
20  A  Yeah.
21  Q  Pretty extensively?
22  MS. KAMAS: You want to say for the record

**255**

1  what you're talking about here?
2  THE WITNESS: Excuse me. This is the
3  revised ductwork in the K suites.
4  BY MR. STOVER:
5  Q  The next one is PCO 81, which is tab 129.
6  A  Yeah, there's a lot of paper here, but I
7  can tell you, our position is Poole & Kent, stick to
8  the duration you're good at. We're not going to pay
9  you to accelerate to get to the duration you bid at.
10  Q  Do you recall having a meeting with Poole
11  & Kent on April 26th or 27th of '05 about
12  accelerating in the penthouse?
13  A  I wasn't a part of the meeting.
14  Q  You were not part of the meeting?
15  A  No, but I heard the results of it.
16  Q  Who was part of the meeting?
17  A  I think Larry was there and Rich may have
18  been there, but I'm not sure.
19  Q  All right, well, what did you hear as a
20  result of the meeting?
21  A  As I recall, it was -- we directed them to
22  proceed with accelerating and kind of agreed to

**256**

1  disagree on the cost. That's what I recall. To me
2  it's pretty clear.
3  Q  Why was acceleration required in the first
4  place on the penthouse?
5  A  Because from the time we had the penthouse
6  ready which I believe was sometime in February, to
7  the time that they were looking like they were going
8  to get it done was well beyond the time that they
9  committed.
10  Q  You say "they committed." When did they
11  commit?
12  A  There's a letter from Poole & Kent prior
13  to bid that has a duration of the penthouse. I don't
14  remember what it was. I remember 60 days, but
15  they'll --
16  Q  So prior to --
17  A  -- verify with the document.
18  Q  Whatever the time period was. They put a
19  time period in a letter?
20  A  Right.
21  Q  Prior to the time they even submitted
22  their bid?

Page 265

1  that percent. Other than that, I don't recall
2  specific rejection of something in place for quality
3  reasons. I guess that's what you're asking.
4      Q  Yes.
5      A  I don't recall that.
6      Q  Did the owner ever -- again, other than
7  quibbling over the percentage completes on the
8  schedule of values, did the owner ever withhold any
9  monies from Hunt because of Poole & Kent or anyone,
10 like I said before, anyone who Poole & Kent is
11 responsible for?
12     A  Not that I recall. If it did happen, it
13 would have been after May, June, when I stopped going
14 to those meetings.
15     Q  All right. There's a series of letters I
16 wanted to get through.
17        (Page Exhibit No. 14 was marked for
18 identification and attached to the deposition
19 transcript.)
20     BY MR. STOVER:
21     Q  I've shown you what's been marked as
22 Exhibit 14 and ask if you've ever seen that document.

Page 266

1      A  Yes, I have.
2      Q  And you actually had a meeting with Adam
3  Snavely and Poole & Kent to discuss this letter; is
4  that correct?
5      A  I remember talking about a meeting, trying
6  to get it set up, but I don't think it ever happened.
7      Q  Okay. Because the fax cover sheet talks
8  about a meeting the next day.
9      A  Like I said, I remember trying to, you
10 know, the attempt was made to set one up but it
11 never -- it never happened.
12     Q  The stamp on the front of this Exhibit 14
13 up in the left corner, is that the Hunt receipt
14 stamp?
15     A  Yes, it is.
16     Q  I want to first just go through these and
17 then go back and look at them.
18        (Page Exhibit No. 15 was marked for
19 identification and attached to the deposition
20 transcript.)
21     BY MR. STOVER:
22     Q  Exhibit 15 is a letter dated October 19th

Page 267

1  from Poole & Kent to you regarding layout and
2  sleeving difficulties. Do you remember receiving
3  this letter?
4      A  Yes.
5         That's the same letter, isn't it?
6      BY MR. STOVER:
7      Q  I don't know. Is it?
8         MS. KAMAS:  Looks like it.
9         (Discussion off the record.)
10        (Page Exhibit No. 16 was marked for
11 identification and attached to the deposition
12 transcript.)
13     BY MR. STOVER:
14     Q  I show you what's been marked as
15 Exhibit 16, December 8th, 2004 letter from Poole &
16 Kent to you and Hunt. There is a receipt stamp of
17 December 9th. Do you recall receiving that letter?
18     A  Yes.
19        (Page Exhibit No. 17 was marked for
20 identification and attached to the deposition
21 transcript.)
22     BY MR. STOVER:

Page 268

1      Q  What's been marked as Exhibit 17 is titled
2  February 2nd, 2005 Review of Schedule and Job
3  Progress. Do you recall receiving this document?
4      A  Yes.
5         (Page Exhibit No. 18 was marked for
6  identification and attached to the deposition
7  transcript.)
8      BY MR. STOVER:
9      Q  What's been marked as Exhibit 18 is a
10 letter dated May 25th from Poole & Kent to you at
11 Hunt regarding acceleration for building cooling. Do
12 you recall receiving that letter?
13     A  Yes.
14     Q  And the markings -- handwritten markings
15 at the top, is that your handwriting?
16     A  Yes.
17        (Page Exhibit No. 19 was marked for
18 identification and attached to the deposition
19 transcript.)
20     BY MR. STOVER:
21     Q  Exhibit 19 is a letter dated May 25th from
22 Poole & Kent to you. Do you recall receiving that

269

1  letter?
2      A  Yes.
3      Q  It's regarding follow up to delays and
4  interferences experienced in 2004. There's markings
5  at the top of the front of Exhibit 19 and that's your
6  handwriting?
7      A  Yes.
8          (Page Exhibit No. 20 was marked for
9  identification and attached to the deposition
10 transcript.)
11         BY MR. STOVER:
12     Q  Exhibit 20 is another May 25th letter
13 regarding the May 10 construction schedule from Poole
14 & Kent to Hunt. Do you recall receiving that letter?
15     A  Yes.
16     Q  And that's a Hunt receipt stamp on the
17 front?
18     A  Yes.
19         (Page Exhibit No. 21 was marked for
20 identification and attached to the deposition
21 transcript.)
22         BY MR. STOVER:

270

1      Q  Exhibit 21 is a document titled May 18th
2  Job Site Review and Report. Do you recall receiving
3  that document?
4      A  This one I don't recall receiving.
5      Q  You've had a chance to look at it. You
6  don't recall receiving this document?
7      A  No. The other ones, yes, this one no.
8      Q  Is it that you don't recall, that you may
9  have received it and you simply can't recall today or
10 that you have a recollection of not receiving that?
11 If that makes sense. In other words, are you certain
12 that you've never seen this letter before, this
13 document?
14     A  As certain as I can be at this point. I
15 know that's not the best answer. I vividly recall
16 these other ones, I don't recall this one.
17         (Page Exhibit No. 22 was marked for
18 identification and attached to the deposition
19 transcript.)
20         BY MR. STOVER:
21     Q  Exhibit 22 is a June 8th '05 job site
22 review and report document. I ask if you saw that

271

1  document.
2      A  No. I don't recall getting this one.
3      Q  And again, that's as sure as you can be
4  sitting here today you don't recall receiving that?
5      A  Yes.
6      Q  Do you recall receiving any other
7  correspondence from Poole & Kent regarding the
8  schedule or status of the project after June of '05?
9      A  No.
10     Q  So I have, for instance, a July 6th report
11 and a July 23rd schedule review --
12     A  No, I haven't seen any of those, me
13 personally, no.
14     Q  And there's also one from August 9th. You
15 wouldn't have been looking at these documents at that
16 time frame anyway, would you?
17     A  No. Does one of them say when power came
18 on?
19     Q  Yes. I'm going to show you this document
20 and see if you can identify that. Do you know what
21 that is?
22     A  No, I have not seen this one before.

272

1      Q  You don't recognize the handwriting?
2      A  No.
3      Q  Do you know what the initials JRK would
4  be?
5      A  JRK might be Jerry Kerr.
6      Q  JRK?
7      A  Yeah.
8      Q  Who was that?
9      A  He was Kite's construction consultant. He
10 might actually work for Kite.
11     Q  This was produced in Hunt's file, though.
12     A  Really?
13     Q  Yeah.
14     A  Maybe it's not him then, maybe it's
15 somebody's else. I haven't seen this.
16     Q  There's a reference. JRK says, "We are in
17 concurrent delay for power issue." It doesn't mean
18 it's his book. I'm just --
19     A  Oh, okay.
20     Q  Do you know what that reference would be,
21 we are in concurrent delay for the power issue? Do
22 you know what that's referring to?