**Page 1**

```
 1    IN THE UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF COLUMBIA
 3    ----------------+
 4    HUNT CONSTRUCTION GROUP,    |
 5         Plaintiff,             |
 6    v.                          | Case No.
 7    THE POOLE AND KENT CORPORATION, | 1:06CV1850
 8         Defendant.             |
 9    ----------------+
10
11
12    30(b)(6) Deposition of POOLE AND KENT CORPORATION
13         By and through its designee
14              JEFFREY D. LYNCH
15              Washington, D.C.
16         Wednesday, August 1, 2007
17              4:07 p.m.
18
19    Job No. 1-107967
20    Pages 1 - 101
21    Reported by: Cathy Jardim
22
```

**Page 2**

```
 1    30(b)(6) Deposition of POOLE AND KENT
 2    CORPORATION, by and through its designee, JEFFREY
 3    LYNCH, held at the offices of:
 4
 5         WHITEFORD, TAYLOR & PRESTON, LLP
 6         1025 Connecticut Avenue, N.W., Suite 400
 7         Washington, D.C. 20036
 8
 ...
15         Pursuant to notice, before Cathy Jardim,
16    Registered Professional Reporter and Notary Public of
17    the District of Columbia.
```

**Page 3**

```
 1              APPEARANCES
 2    ON BEHALF OF THE PLAINTIFF:
 3         LAURA A. KAMAS, ESQUIRE
 4         Thelen Reid Brown Raysman & Steiner, LLP
 5         701 8th Street, N.W.
 6         Washington, D.C. 20001
 7         (202)508-4296
 8
 9    ON BEHALF OF THE DEFENDANT:
10         MICHAEL A. STOVER, ESQUIRE
11         Whiteford Taylor Preston, LLP
12         Seven Saint Paul Street
13         Baltimore, Maryland 21202
14         (410)347-8761
15
16    ON BEHALF OF THE WITNESS:
17         RICHARD E. HAGERTY, ESQUIRE
18         Troutman Sanders, LLP
19         1660 International Drive, Suite 600
20         McLean, Virginia 22102
21         (703) 734-4326
22
```

**Page 4**

```
 1              CONTENTS
 2    EXAMINATION OF JEFFREY LYNCH              PAGE
 3         By Mr. Stover                          5
 ...
13              EXHIBITS
14         (Attached to transcript)
15    1000 K DEPOSITION EXHIBITS                PAGE
16    No. 16 7/30/4 Letter from A. Shepherd       29
```

**Page 9**

1  Q  Are there any items, categories on there
2  that you cannot testify about here in at the
3  deposition today, whether in whole or in part?
4  A  No. I believe I can answer all these or
5  give you my part --
6  Q  You can speak to all of them?
7  A  Yes.
8  Q  Let's start with your educational
9  background, post-high school.
10  A  University of Connecticut, business
11  administration.
12  Q  When was that?
13  A  Eighty-one.
14  Q  Any formal training or courses post
15  college?
16  A  No -- seminars and real estate things.
17  Q  And your work history, you are currently
18  employed by --
19  A  Kite Realty Group.
20  Q  How long have you been employed there?
21  A  Seven years.
22  Q  Around 2000?

**Page 10**

1  A  Yes.
2  Q  What did you do before Kite?
3  A  Lauth Property Group, under real estate
4  development construction --
5  Q  Did you say Lauth?
6  A  L-A-U-T-H.
7  Q  Construction?
8  A  That was real estate development and
9  construction. That was four years.
10  Q  That was 1996 to 2000?
11  A  I think so.
12  Q  Approximately. What did you do for that
13  company?
14  A  Corporate real estate services, development
15  and construction.
16  Q  What is that, exactly?
17  A  That is working for clients that have
18  multiple needs around the country on a repeat basis.
19  You are working typically for the same type of clients
20  developing their --
21  Q  It is a construction --
22  A  Development company.

**Page 11**

1  Q  Your role was like a project manager for a
2  construction project?
3  A  No. I was the vice president of corporate
4  services. I had underneath me -- I basically ran a
5  department that had development, pre-development,
6  sales and construction project managers and
7  superintendents underneath me. I was the lead.
8  Q  You weren't day-to-day dealing with
9  construction issues and going out to project sites?
10  A  No, just when problems arose.
11  Q  What did you do before that company?
12  A  Lynch Management Group. It was my own
13  company. It was a construction development company.
14  Q  And what specifically did you do there?
15  A  We built automated fueling facilities for a
16  client called Jacobus Energy around the country for
17  about seven years.
18  Q  So we are looking at about 1989, or so, to
19  1996?
20  A  Yes.
21  Q  For Kite, what is your role at Kite?
22  A  Senior vice president of commercial

**Page 12**

1  development and the advisory services.
2  Q  What do you do on a day-to-day basis in
3  that role?
4  A  Real estate development, in terms of -- I
5  handle all of the commercial activities, which are
6  office buildings, medical office buildings, hotels,
7  everything that fits in the non-core business of Kite
8  Realty Group, which is predominantly a retail REIT. I
9  take care of the pension fund advisory services, for
10  example, the owners of 1000 K is a client of mine.
11  Q  Who really is 1000 K?
12  A  1000 K is just a shell entity. Its sole
13  asset is the Embassy Suites Hotel. That entity is
14  then owned by one called PAT Realty International,
15  which is solely owned by the International Union of
16  Painters and Allied Trades and its pension funds --
17  IUPAT is the acronym for that. And they are a client
18  of mine under the advisory. I handle all of their
19  real estate needs.
20  Q  Across the country?
21  A  And including Canada.
22  Q  And so, in this role for Kite, you are

**Page 53**

1  recall, and he was pushing back. It turns out that
2  prior to any excavation occurring in D.C., if your
3  site has utility lines, you are supposed to videotape
4  them prior to any excavation.
5      Q  That was something that Hunt should have
6  been doing?
7      A  That was a Hunt issue.
8      Q  Look at Exhibit No. 6. It is a letter,
9  April 29, 2005, from Vika. Who hired Vika?
10     A  BBG&M, the project architect. That whole
11 design team was put together prior to my involvement.
12 It would have been done by the regional developer.
13     Q  This was somebody on the owner's design
14 team, basically?
15     A  Yes.
16     Q  This letter seems to indicate that
17 according to their review of the site, that the sewer
18 line actually existed where it was shown on the plans,
19 but you said that was not the case?
20     A  To my recollection, the line was supposed
21 to go all the way down 10th Street and it only went
22 halfway down.

**Page 54**

1      Q  This letter is saying at the end that they
2  wanted WASSA authority to expedite televising the
3  lines. This in April. You had a letter back in
4  January of '05 saying the lines need to be videotaped,
5  and then you have this letter in April saying, again,
6  to videotape the lines. Why was there a delay of four
7  months to get the videotape process going forward?
8      A  You would have to ask Hunt that.
9      Q  Was Vika acting on behalf of Hunt in that
10 regard?
11     A  I have never seen this letter.
12     Q  It is from Vika to the WASSA authority. I
13 don't see where Hunt was involved.
14     A  I don't see where any of us were cc'd on
15 it, other than the architect.
16     Q  So you don't know if your design team was
17 undertaking the responsibility to obtain the
18 videotaping or not?
19     A  I don't believe they would do it. I am
20 sure Hunt did it.
21     Q  When do you recall finding out that the
22 line actually didn't exist?

**Page 55**

1      A  I honestly don't know. I don't know if it
2  was when they dug up the street and finally did it or
3  if they TV'd it. I can't tell you a date.
4      Q  Take a look at Exhibit No. 8. This is
5  written by Tom Page to you, and it addresses the site
6  utility issue. In the bottom part of the first page
7  under the title "Lack of sewer main impact," it
8  indicates that on March 8, 2005, the section of
9  supposedly existing sewer main was missing from the
10 northern to southern sanitary sewer connection, and it
11 refers to an RFI. Do you remember determining back in
12 March of '08 that this sewer line was missing there?
13     A  I would have to assume yes, from the
14 correspondence. I don't recall --
15     Q  It doesn't refresh your recollection?
16     A  No. I received this letter at least by May
17 20 telling me.
18     Q  Take a look at Exhibit 7. This an e-mail
19 chain between Art Shepherd and David Delcher, the
20 architect. At the bottom is the originating e-mail
21 indicating that the site work was being held up
22 because revised sewer designs were required, and that

**Page 56**

1  those had to be given to WASSA, and then Mr. Delcher's
2  reply at the top saying that it had been forwarded
3  that morning. Why was there a delay -- if the date of
4  discovery was March 8, to May 18 before a design for
5  the sewer connection was submitted, do you recall?
6      A  I couldn't tell you. I believe just from
7  memory bank that when it was first thought, not
8  proven, that the line wasn't there, then they were
9  going through the TV process, who was going to do that
10 and when would that get scheduled, and that ate up a
11 couple of months and then it was finally determined
12 that it wasn't there, and I am not sure if they opened
13 the street at that point or not.
14     Q  And again, did the issue of the existence
15 of the line that was shown to be existing on the
16 drawings but in fact wasn't, determining whether it
17 was there or not there was an owner issue?
18     A  I honestly don't know. It went back and
19 forth. I don't know that anybody ever resolved it.
20 I know that I paid for the missing line as an owner.
21     Q  Ultimately you paid to have it installed?
22     A  Right.

**Page 57**

Q Look at the bottom part of the first page of Exhibit 8, the May 20 letter. According to Hunt, WASSA was denying the access to water until the sanitary sewer issue was resolved. Do you recall that issue being connected?

A Yes.

Q Earlier you said you didn't think there was an issue with getting the permanent water to the building, but according to this letter there was an issue with that, and it was tied in with the sanitary?

A As I recall, they needed an exit for it before they would connect it.

Q Looking at the second page, Hunt describes a number of impacts that would be caused because of the lack of water service, and one of them is that the air-conditioning system wouldn't be able to be started up. Hunt says it would be impossible by June 1 to do that, and that that would then impact environmental controls that were needed for FF&E installation and other finish items like the vinyl wall covering, millwork, doors, et cetera.

A In Hunt's opinion.

**Page 58**

Q Do you disagree with that?

A Yes, again, there was a lot of spirited conversation.

Q We are getting there. What was your view of the situation and the impact that the sanitary sewer tie-in and the domestic water tie-in had?

A That it should have been started a long time ago, and that was always my point with Hunt. Typically when you start a project --

Q When you say it should have been, what do you mean, it should have been?

A The utility connection process. It is always a process. It is very complicated, especially in a major city. There is a lot of bureaucracy in each of the agencies, and one of my issues with Tom Page is he didn't start this for a year after or better.

Q So your position was that it was basically a mismanagement on Hunt's part?

A Yes.

Q But you don't dispute that regardless of that, assuming that you don't have the water and the

**Page 59**

sanitary sewer, the impact of that is you can't start up the chillers and the environmental controls to the point where you can do this other work?

A No. I pushed back on that because of the fact that the work needed to complete those mechanical systems of higher up were nowhere near done.

Q But they didn't need to be done because they couldn't be turned on anyway, right?

MS. KAMAS: Objection.

THE WITNESS: No, I definitely disagree with that. They should have been completed. That way, when this process got accelerated, it could have been fired up.

BY MR. STOVER:

Q Were you aware that Hunt had ordered Poole and Kent to expedite the work in the penthouse where the mechanical equipment was located in April of '05?

A I know there were repeated requests. Jerry Kerr and I would do our walk and do our manpower counts, and there was a noticeable absence of mechanics up there.

Q On the one day of the month you guys came

**Page 60**

through?

A No. I had also Art Shepherd walk the building and report in every day.

Q I asked Art earlier today if he made man counts, and he said no.

A He didn't do man counts other than to tell me what was going on in the penthouse verbally on the telephone. I believe there was one point in the job where I believe it was Rich Cobb and Tim Vaughn when they were on board did daily counts, and they were fired up.

Q Poole and Kent's records indicate that they did accelerate the penthouse in the April-May timeframe. They had extra men, they dedicated a full-time foreman and they worked work extra shifts. They were ordered to stop by Hunt because the sanitary sewer connections wouldn't allow the equipment to be started up anyway. Are you aware of that?

A I am not aware of that. I had never had any direct conversation with any subcontractor. It was always through Hunt.

Q Down at the bottom, the last full paragraph

**Page 69**

1 controls and deal with the utility tie-in issue?
2   A   I am not sure what you are referring to.
3       MR. HAGERTY: Exhibit No. 8.
4       THE WITNESS: I believe this is where Tom
5 Page was referring to not wanting responsibility for
6 the millwork because the humidity was excessive,
7 probably summertime, it was humid, and shrinkage and
8 warpage and so forth, and vinyl not sticking to the
9 drywall, and I think he was probably referring to
10 bringing in some more fans to the building.
11   Q   Did you ever issue a stop work order?
12   A   No, but I told him he would be responsible
13 for those, that I wasn't accepting that.
14   Q   Fans came in. Anything other than fans
15 that they did to try to affect the condition?
16   A   I don't think so.
17   Q   Ultimately, were there any damages or
18 problems caused by the environmental -- lack of
19 environmental controls at that timeframe?
20   A   I don't believe so.
21   Q   Was there any delay in getting the actual
22 sewer line completed and any connections made by Hunt

**Page 70**

1 in terms of having a contractor lined up and the work
2 actually performed?
3   A   I don't think so. I think it was the civil
4 contractor that did the work. I recall there -- it
5 was slow digging. There were many other utilities in
6 the street. A lot of it was hand work.
7   Q   I think the reference was to June 15, 2004,
8 there was a communication between you and Harry
9 Ferguson and maybe some other people on behalf of Hunt
10 basically where you expressed your belief that Tom
11 Page needed to be replaced on the project. Do you
12 recall that event?
13   A   I am sure, yes. That was definitely my
14 opinion.
15   Q   That was your opinion in June of '04. What
16 was the basis of your belief that Tom Page needed to
17 be replaced?
18   A   I didn't think he had the experience to do
19 a project of this size and magnitude. It was evident
20 by letters he had written, contracts that weren't let,
21 overall sequencing in production, management, quality.
22 I believe I have a very detailed letter which explains

**Page 71**

1 all of that.
2   Q   Exhibit 11 is a January 13, 2005, letter
3 regarding concerns you have over the management of the
4 project, and there are a number of items discussed
5 there. Before you get into that letter, the time
6 frames that I see is June of '04 and then this letter
7 in January of '05. Were there other times in '04
8 prior to this letter of '05 where you discussed with
9 Hunt your belief that Tom Page was not the right
10 person for the job?
11   A   I believe so.
12   Q   When can you recall those?
13   A   I couldn't give you dates. I think I am --
14   Q   How often?
15   A   I would say probably within five or six
16 months on the job, I probably started expressing it.
17   Q   Were you repeatedly doing that throughout
18 the rest of 2004?
19   A   I am sure I was.
20   Q   Let's look at this Exhibit 11 then. Is
21 this the letter you were referring to, a detailed
22 letter about the issue?

**Page 72**

1   A   Yes.
2   Q   Now, you say, in the first paragraph, that
3 the project would be staffed correctly. What
4 specifically with the staffing of the job were you
5 concerned with?
6   A   That there would be additional forces down
7 there. I believe it was probably referencing
8 superintendents, project managers, project engineers,
9 project accountant.
10   Q   Did you think that Hunt failed to properly
11 staff the job from the beginning?
12   A   I am not sure if I would say the beginning,
13 but -- there are different levels in a project this
14 size where you start off staffing it. You might just
15 have one superintendent, one project manager, a
16 contract manager. As you start getting your
17 submittals and start coming up out of the ground, you
18 need more superintendents doing more things and so
19 forth. I wouldn't say necessarily from the beginning,
20 but probably within a six-month time period, something
21 like that.
22   Q   That Hunt wasn't supplying the necessary

Case 1:06-cv-01850-JR   Document 37-29   Filed 12/10/2007   Page 6 of 7
DEPOSITION OF JEFFREY D. LYNCH
CONDUCTED ON WEDNESDAY, AUGUST 1, 2007

21 (Pages 81 to 84)

**Page 81**

1  for work -- billing for more than what work is
2  completed, and that would be based on a walk-through
3  that Jerry and I would do prior to pay-out, and we
4  would typically go through it and hand it to Tom Page
5  or Pete Clark, but again, I don't think at this point,
6  when Tom created this draft, that a subcontractor
7  actually had submitted anything. It was more Hunt
8  trying to draw against the contract, and I can tell
9  you that I routinely cut it.
10     Q  Did Hunt ever discuss -- did Kite ever
11 discuss or did the owner ever discuss terminating Hunt
12 on the project?
13     A  I don't think so.
14     Q  Take a look at Exhibit 12, which is a
15 February 9 letter.
16     A  Follow-up to 13?
17     Q  On the fourth page and the fifth page you
18 talk about the staffing issue, again, in this letter,
19 demanding a full-time senior project manager in
20 February of '05. When did Hunt provide a full-time
21 senior-level guy above Tom Page?
22     A  I am not sure of the date. I know the

**Page 82**

1  first one to come on was Rich Cobb, and then after
2  that was Tim Vaughn. I couldn't tell you the date. I
3  assume it was shortly after these letters because that
4  is when Harry reacted.
5     Q  Harry reacted --
6     A  Ferguson. Reacted to some of my demands.
7     Q  You refer to an agreement. You say
8  additional -- I do appreciate the efforts you have
9  taken to add support staff, lobby scheduler,
10 superintendents, and having Pete Clark three days a
11 week. This did not address your agreement.
12     What agreement did you have with
13 Mr. Ferguson, what was the agreement?
14     A  I am not sure. I assume it would be
15 removing Tom Page and adding senior DM level.
16     Q  On the last page there is a reference to
17 the most-recent schedule was provided to us and had
18 the logic turned off and amazingly shows no negative
19 float. Work is not commencing per the latest schedule
20 dates and activities. So again there is another
21 reference to you. The last reference was in May of
22 '05, and here in February of '05 you are again noting

**Page 83**

1  deficiencies with the schedule.
2     A  Correct.
3     Q  Was that a recurring problem?
4     A  At this time. Tom would try to reassure
5  everybody that he is on schedule, and I probably got a
6  revised schedule from when I noted all of the errors.
7  Now it just had the logic turned off on it.
8     Q  So, eventually toward the end of the
9  project Hunt actually -- the owner actually
10 supplemented Hunt and brought in WDG, correct?
11     A  Yes.
12     Q  Why was that done?
13     A  We were never going to make the date that
14 we had. I saw it continuing to slide, and against
15 Hunt's will, I brought them in to take over certain
16 projects or aspects of the project, water features,
17 Presidential Suite, and then once WDG and Hunt figured
18 out that they liked that arrangement and worked
19 together, then we started to give them more
20 miscellaneous things that Hunt couldn't get to.
21 Terrace dining room, I think, was one, and final
22 outside cleaning of the building, things like that.

**Page 84**

1     Q  But it was -- the reason that you brought
2  them in was because Hunt was not demonstrating an
3  ability to get the work finished. Is that correct?
4         MS. KAMAS:  Objection to form.
5         THE WITNESS:  I wouldn't say it was so much
6  Hunt as it was Hunt unable to get the subcontractors
7  to perform.
8         BY MR. STOVER:
9     Q  Mr. Kerr testified about that too. I am
10 not understanding why the general contractor was
11 unable to get the subcontractors to do their work.
12     A  I am not either. I assume there were a
13 host of issues between them. At one point, as it
14 relates to Poole and Kent, for example, they pretty
15 much abandoned the job. We were down to one guy at
16 the crucial point of trying to connect the penthouse
17 equipment.
18     Q  When would that have been?
19     A  Toward the end of the job. I assume it had
20 to be around August or September, somewhere in there.
21     Q  You are saying from August through
22 September through substantial completion, Poole and

89

1  damaged millwork in the lobby from subcontractors.
2      Belfore was, I believe, the fire cleaning
3  that was paid out of the original insurance. Spring
4  Logistics I believe was the trucking of the water
5  feature. Comfort Control would have been strictly
6  balancing issues. Again, the WDG ones would have been
7  specific construction directives from Hunt. I am not
8  sure about the Embassy Suites 4350. There is backup
9  to this document.
10     Q  Those were specifically approved and a
11 change order was issued for those items, correct?
12     A  Correct.
13     Q  And number 2 is allowances that weren't
14 used?
15     A  Correct.
16     Q  Was a change order actually executed for
17 that?
18     A  I believe so.
19     Q  And then number 3, and this is where
20 Mr. Kerr really got fuzzy --
21     A  Part of the negotiations, in terms of
22 settlement, was Hunt had change orders in their hands.

90

1  I don't know that I ever saw all the backup or
2  whatever on them, but as I recall, they were somewhere
3  between 1 and $2 million, and I had been keeping tabs
4  of all of our delays, lost guest sales, rooms that
5  were sold -- we were supposed to open September 1 and
6  did not, and I believe I was somewhere in the $5
7  million range, and we ended up --
8      Q  Let's go back to your number. You kept a
9  tab of delays. Those would be --
10     A  Owner damages, such as having to relocate
11 pre-sold rooms --
12     Q  Lost rooms. So lost rooms was lost
13 income--
14     A  It wasn't potential. It was actual
15 business, that we had to move, to pay to move in
16 sold-out environments, it was very expensive.
17 Additional payroll of having -- I had a full staff
18 hired and I had to keep them on the payroll from
19 September 1 to --
20     Q  Full staff meaning?
21     A  Hotel operating. I won't say full, but
22 basically 80 percent.

91

1      Q  These numbers were all geared from the
2  September 1 timeframe through --
3      A  Right, because we were told we were going
4  to make September 1 as late as August.
5      Q  What else? Additional payroll. What else
6  was on your tab?
7      A  I would have to go back and find the
8  document.
9      Q  You said it was $5 million ?
10     A  I think it was somewhere around that.
11     Q  And Hunt was around 1 or 2 million, so you
12 guys sat down?
13     A  Argued back and forth and got it, and those
14 were washed and then we also took $200,000.
15     Q  So the liquidated damages number was a
16 negotiated number, it wasn't based on particular time
17 period>
18     A  No, because the number would have been a
19 lot higher than that, but we included the washing of
20 change orders back and forth and owner deducts.
21     Q  These change orders, did they include
22 impacts or costs that were incurred by subcontractors?

92

1      A  I never saw the detail, so I don't know.
2      Q  Did Hunt in its 1 to $2 million, was it
3  represented that was just change orders or did it
4  include impacts for delays or anything owner caused?
5      A  I don't think there was any impact for
6  delays as I recall. I think it was all change orders,
7  meaning physical scope change.
8      Q  Did Hunt ever submit to the owner any
9  pass-through claims from any subcontractors?
10     A  Not to my knowledge.
11     Q  These positions you are describing, the 5
12 million and the 2 million, were they memorialized or
13 written down in any way, in other words, formal claims
14 submitted to each other?
15     A  I believe Jerry met with Bob Decker, and he
16 had mine, and it was all itemized out. I don't know
17 that I ever saw his other than Jerry and Bob Decker
18 going over it amongst themselves and then Jerry coming
19 back to me.
20     Q  Was this agreement that was reached over
21 these numbers that resulted in this letter in Exhibit
22 13, was this a final settlement, if you will, of any