DEPOSITION OF THOMAS KESSLER - VOLUME 2
CONDUCTED ON MONDAY, NOVEMBER 19, 2007

1 (Pages 191 to 194)

---

Page 191

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
HUNT CONSTRUCTION GROUP,     :
    Plaintiff,               : Civil Court Action
    vs.                      : No.: 1:06CV1850
THE POOLE AND KENT CORPORATION, :
    Defendant.               :
- - - - - - - - - - - - - - - x

Volume 2
Deposition of THOMAS KESSLER
Washington, D.C.
Monday, November 19, 2007
10:01 a.m.

Job No.: 1-116097
Pages: 191 - 344
Reported by: Sarah M. Bickel

---

Page 192

Deposition of THOMAS KESSLER, Volume 2, held at the offices of:

THELEN, REID, BROWN, RAYSMAN
& STEINER, LLP
701 Eighth Street, Northwest, 8th Floor
Washington, D.C. 20001
(202) 508-4296

Pursuant to agreement, before Sarah M. Bickel, Court Reporter and Notary Public in and for the District of Columbia.

---

Page 193

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
    LAURA A. KAMAS, ESQUIRE
    Thelen, Reid, Brown, Raysman & Steiner, LLP
    701 Eighth Street, Northwest, 8th Floor
    Washington, D.C. 20001
    (202) 508-4000

ON BEHALF OF THE DEFENDANT:
    MICHAEL A. STOVER, ESQUIRE
    Whiteford, Taylor & Preston LLP
    Seven Saint Paul Street
    Baltimore, Maryland 21202
    (401) 347-8700

---

Page 194

CONTENTS

EXAMINATION OF THOMAS KESSLER                PAGE
    By Ms. Kamas                              195

EXHIBITS
    (Retained by Counsel)
KESSLER DEPOSITION EXHIBIT                   PAGE
No. 1  Notice of Deposition                   200
No. 2  Designation of Opposition
       Expert Witnesses                       209

---

DEPOSITION OF THOMAS KESSLER - VOLUME 2
CONDUCTED ON MONDAY, NOVEMBER 19, 2007

2 (Pages 195 to 198)

Page 195

```
 1            PROCEEDINGS
 2              THOMAS KESSLER
 3   having been first duly sworn, testified as follows:
 4         EXAMINATION BY COUNSEL FOR PLAINTIFF
 5         BY MS. KAMAS:
 6      Q  Good morning, Mr. Kessler.  Thank you for
 7   coming in again.  I'm sure you know I'm here on
 8   behalf of Hunt Construction, and you are here today
 9   pursuant to a notice of deposition; is that correct?
10      A  Yes.
11      Q  Okay.  I know that I took your deposition
12   a few months ago, so you're familiar with the basic
13   process.  But just to go over the basics, again, I'm
14   going to ask you questions and you have to respond to
15   those verbally if you can respond to them.  She can't
16   take down hand gestures, head nods, things like that.
17      A  Okay.
18      Q  Also, if I start speaking too quickly or
19   if I -- if you don't understand one of my questions,
20   just ask me, tell me you didn't understand, and I'll
21   try to rephrase or ask the question again.
22         And I realize that we're talking about a
```

Page 196

```
 1   project that you worked on several years ago and that
 2   you might not remember all the details specifically.
 3   And if something happens where you don't recall
 4   exactly, I don't want you to try to guess, just tell
 5   me you don't remember.
 6      A  Okay.
 7      Q  If at some point later in the deposition
 8   you do remember an answer to a question that maybe we
 9   had passed by before, just, you know, let me know
10   about that too and we can always go back, we don't
11   have to stay in order.
12      A  Okay.
13      Q  Okay.  And during this deposition, I'm
14   going to refer to "the project," which is the Embassy
15   Suites Hotel project in Washington, D.C.  If I ever
16   use a term that you don't -- you're not really sure
17   what I'm talking about, just tell me and we'll
18   explain that.  And if you need to take a break for
19   any reason, just let me know and we can certainly do
20   that.
21      A  Okay.
22      Q  I think that's the basics.  You're
```

Page 197

```
 1   represented today by counsel; is that correct?
 2      A  Yes.
 3      Q  Okay.  And I'm sure you remember from your
 4   last deposition, Mr. Stover may object to one of my
 5   questions from time to time.  That doesn't prevent
 6   you from answering the question unless he instructs
 7   you not to answer.
 8      A  Okay.
 9      Q  Okay.  I think that's it.  Can you please
10   state your name for the record.
11      A  Thomas Mark Kessler.
12      Q  Mr. Kessler, what, if anything, did you do
13   to prepare for today's deposition?
14      A  I met with Tom MacPhee and did a basic
15   discussion of the documents we've already reviewed.
16   And I did the same with Mr. Stover.
17      Q  When was this meeting?
18      A  We met on Thursday.
19      Q  Okay.  Did you speak with Don Campbell
20   after his deposition?
21      A  Very briefly.
22      Q  And what did you discuss?
```

Page 198

```
 1      A  Pardon?
 2      Q  What did you discuss?
 3      A  Well, we discussed that he had been
 4   deposed.  It was very brief, a couple of sentences.
 5      Q  Okay.
 6      A  So it was really mostly small talk, how
 7   are you doing kind of conversation.
 8      Q  Okay.  Since the time of your last
 9   deposition, have you discussed this litigation or
10   Poole & Kent's claims with anyone?
11      A  Yes.
12      Q  Who have you talked to?
13      A  Thomas MacPhee, Mr. Stover, very briefly
14   with Adam Snavely.
15      Q  And on how many occasions have you talked
16   to these people?
17      A  Well, Adam, Friday; Mr. Stover, we talked
18   briefly after my last deposition.  Really, we've
19   communicated by e-mail a couple of times to set up
20   coming in and preparing for this, no specific talk
21   about the case itself, but we talked Thursday.
22         And Tom MacPhee, on occasion, when I've
```

231

1   A Not to my recollection, no.
2   Q Okay. We're on 7.
3   A A fan coil unit, that's going to be an
4   HVAC system unless it's -- I do know that the -- in
5   this one here, that the exercise room, there was a
6   change in location of the exercise room --
7   Q Are you on change order number 7?
8   A I'm on number 7. I don't know if this is
9   the same issue, but they wound up -- the architect
10  relocated the fan coil unit in that room to
11  accommodate his architectural issues.
12  Q Do you know what those issues were?
13  A Apparently it didn't fit in the space that
14  he originally provided.
15  Q Okay. Who would know more about this back
16  charge from Poole & Kent, would that be --
17  A That would be somebody more involved in
18  the HVAC.
19  Q Can you think of anyone?
20  A Well, Regional Air or somebody from
21  Montgomery Mechanical or the project manager, Matt
22  Maltby. Matt Maltby might be the best.

232

1   Q Number 8, change order 8. Description is
2   damage to conduit from chipping holes.
3   A Well, I take exception to most of this
4   chipping. Most all of these chippings are for the
5   same reason. It basically -- the electrician made no
6   reference to do any coordination of his work.
7   Q And what do you mean by that?
8   A I mean that according to the contract
9   documents, he was required to provide coordination
10  for the installation of all of his work. And when he
11  took the step to install most of his conduit in
12  plastic piping in the slab as opposed to having it
13  exposed on the ceiling, he didn't locate on any kind
14  of a drawing for anyone to find where his piping was
15  going to be located.
16  Q Okay.
17  A So basically by then doing so, he relieved
18  himself of his contractual obligation to coordinate
19  his work.
20  Q How was he supposed to coordinate, what
21  was he supposed to do?
22  A He was supposed to show the location of

233

1   the piping.
2   Q On your coordinated drawings?
3   A Yes, on his coordinated drawings.
4   Q Okay.
5   A He was supposed to provide coordinated
6   drawings also for all of his work.
7   Q Okay. Did Poole & Kent work with the
8   electrician to compile one set of coordinated
9   drawings?
10  A There was a coordination process. Whether
11  or not they wound up on the composite set, I'm not
12  aware of.
13  Q So --
14  A But even going to him and asking if he
15  could give us approximate locations for the piping
16  that he placed in the slabs, he was completely unable
17  to do it. Basically, it looked like a pile of
18  spaghetti. It was basically coiled flexible tubing
19  that he installed in the slab.
20  Q And I thought you mentioned something in
21  your first deposition that this tubing wasn't able to
22  be detected --

234

1   A It's really not readily or necessarily
2   identifiable in an X-ray process, although most of
3   the X-ray process is really prescribed on this
4   project to protect the structural elements of the
5   project. This was a posttension job on -- from the
6   second floor up. And basically the purpose of the
7   x-raying was so that he wouldn't damage the cables
8   supporting the structure.
9   Q Right.
10  A The intent was never to -- well, the
11  specification didn't include piping in the -- built
12  into the slab, that was basically an allowance given
13  to the electrician.
14  Q Okay. So you're not denying --
15  A I take issue -- I'm not denying that we
16  didn't chip into the floor and contact his conduit in
17  the floor, but what I'm saying is I felt that they
18  didn't -- there was no way for us not to encounter
19  this if we had to make a hole in the floor.
20  Q Okay. So --
21  A And that the electrician made no effort to
22  do any coordination of this work.

DEPOSITION OF THOMAS KESSLER - VOLUME 2
CONDUCTED ON MONDAY, NOVEMBER 19, 2007

12 (Pages 235 to 238)

235

1  Q  Okay.
2  A  And that, quite frankly, he saved a ton of
3  money doing it. It was a lot cheaper for him to do
4  this than it was to hang it.
5  Q  All right. Number 9.
6  A  Same thing.
7  Q  Okay. Number 9 says repair --
8  A  Damages due to core drilling. It's got a
9  T.A. Beach, how to refeed fan coil unit because Poole
10 & Kent drilled through pipe.
11 Q  So this is the same issue of whether
12 you're not --
13 A  This is the same issue. Like I say, he
14 did not -- he made no effort to coordinate any of his
15 work in the slab.
16 Q  Okay. So, again, you're not denying
17 that --
18 A  I'm not denying that we necessarily didn't
19 do any core drilling, but I am saying that he
20 provided no means for us to identify where his piping
21 is in the slab.
22 Q  But it would have been difficult to avoid

236

1  hitting his work?
2  A  It would have been very difficult. And,
3  well, there's also situations where we had -- we had
4  to -- we installed work that there was -- I mean,
5  basically we have to fit a piece of our work into
6  architectural confine. Meaning, that we can't change
7  the location of the hole, it has to go where it needs
8  to go.
9  Q  Number 11. Change order 11 says wiring
10 repairs due to water leaks. I'm sorry, I'm on 10.
11      MR. STOVER:  Yeah, we should be 10.
12      BY MS. KAMAS:
13 Q  Change order 10. I'm sorry.
14 A  My opinion of this is I don't know what
15 the water damage is. I mean, it was very late in the
16 project before this job had a roof on it. I know at
17 this time the roof was not completed. It could have
18 been from somebody using a fixture and flooded the
19 fixture. There's nothing here to indicate that Poole
20 & Kent had defective work that would have constituted
21 any of this damage, there's nothing here that said
22 there was a leaking pipe even to that -- it just says

237

1  water damage.
2  Q  Do you know when the roof was completed?
3  A  The roof was completed -- oh, gosh, I
4  think it was September before the roof was completed.
5  Q  So the T.A. Beach ticket that says --
6  A  Room 805 bathroom, DW 14 light fixture,
7  light fixture completely removed with part laying on
8  bathroom floor. Hunt removed light because of water
9  damage. Light fixture needs replaced and rehung.
10 Q  Okay. What about --
11 A  I would say this is insufficient
12 documentation to reasonably place blame on Poole &
13 Kent for this.
14 Q  I'm looking at ticket T.A. Beach under
15 60401.
16 A  Uh-huh. Is that 6 or 8? It's a little
17 bit -- okay, I know what -- last four digits are
18 401 -- last three digits are 401.
19 Q  Right. It says repair damage -- it says
20 at seven-inch Poole & Kent waterline leak.
21 A  Damage --
22 Q  This seems to be the amount of -- or at

238

1  least one of the amounts that have been back charged.
2  A  Well, they're completely different rooms.
3  One is room 805 and one is room 331. So they're not
4  providing -- I still don't feel they're providing
5  enough documentation to assess a reasonable
6  implication -- you know, Poole & Kent's responsible,
7  to assume Poole & Kent's reasonably responsible for
8  this.
9  Q  So do you have any recollection of a water
10 leak in this room?
11 A  No, not individually, no.
12 Q  When you had your conversation -- did you
13 have a conversation with Don Campbell regarding this
14 back charge?
15 A  I don't recall specifically.
16 Q  Okay. But your basis for objecting to
17 this back charge is that you feel there's
18 insufficient documentation; is that correct?
19 A  Yes.
20 Q  Now we're on number 11.
21     MR. STOVER:  We're on 11?
22     MS. KAMAS:  Change order 11.