UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HUNT CONSTRUCTION GROUP, INC. )<br><br>          )<br>          )<br>          )<br>          Plaintiff,          )<br>          )<br>     v.          )<br>          )<br>THE POOLE AND KENT CORPORATION )<br>          )<br>          )<br>          Defendant.          )<br>          ) | Civil Action No.: 1:06cv1850<br>Judge: James Robertson |

**HUNT CONSTRUCTION GROUP, INC.'S REPLY MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Hunt Construction Group, Inc. ("Hunt"), by and through undersigned counsel and

pursuant to Local Civil Rule 7(d), respectfully submits this Reply Memorandum in support of its

Motion for Summary Judgment against The Poole & Kent Corporation ("P&K").

## I.     INTRODUCTION

In opposing Hunt's motion for summary judgment, P&K relies on conclusory allegations

unsupported by record evidence and references to inadmissible hearsay. But this cannot obscure

the fact that the relationship between Hunt and P&K is governed by an unambiguous contract.

The terms of the Subcontract between Hunt and P&K govern the relationship between the parties

and specifically address the claims made by P&K. In its motion for summary judgment, Hunt

asked this Court to enforce those terms and to dismiss P&K's claims as a matter of law. For the

following additional reasons, Hunt renews its request.

## II.  ARGUMENT

### A.  P&K Is Not Entitled to Extra Payment for Davis-Bacon Compliance

P&K does not dispute that Davis-Bacon compliance was required of Hunt and its

subcontractors under Section A(17) of the General Contract between Hunt and the Owner.

Against that backdrop, the statements of P&K's project manager, E. Matthew Maltby, in his

April 27, 2005 letter are dispositive.  Mr. Maltby expressly states that the costs P&K was seeking

"were incurred as a result of the Davis-Bacon requirements." (*See*, 4/27/05 Letter from M.

Maltby to T. Page, included in Ex. 29 to P&K's Mem. in Opp. to Hunt's Mot. Summ. J. ("P&K

Opp.")).  Mr. Maltby's admission is based on an identical statement from P&K's subcontractor,

Regional Air.  Regional Air put P&K on notice that "R" workers were not allowed under the

Davis-Bacon Act.  (*See, e.g.,* 9/17/04 Letter from J. Elges to M. Maltby, included in Ex. 29 to

P&K Opp.).  Regional told P&K, "[i]f the Davis-Bacon Act is enforced we will not be able to

use R-Workers at all and our average man hour cost will increase." (*See id.*).  P&K admits in its

opposition that "R" workers "[have] not yet been generally recognized by the Department of

Labor under the Davis-Bacon Act." (P&K Opp. 32).  The undisputed contract interpretation and

P&K's concession regarding the origin of its costs is sufficient to warrant summary judgment for

Hunt.

It is true that, in March of 2005, the Owner agreed to allow Regional Air to use "R"

workers from that point on, but this is neither evidence nor justification to require Hunt to pay

for P&K's prior Davis-Bacon compliance.  It was P&K's responsibility to make sure that its

lower-tier subcontractors complied with the Davis-Bacon Act, and it appears that P&K did so.

But Hunt should not be penalized because P&K opted to use a subcontractor that planned to use

non-Davis-Bacon Act compliant wage rates.

2

B.    **P&K's Delay And Disruption Claims Are Barred**

1.    **P&K anticipated the issues about which it now complains**

P&K entered into its Subcontract with full knowledge of delays suffered on the Project and the related impacts of those delays. P&K executed the Subcontract knowing that the Project had suffered delays and despite misgivings concerning durations and sequencing of its work reflected in the Project schedule. (*See, e.g.*, Exhibit A, Transcript from the Expert Deposition of Thomas A. MacPhee ("MacPhee Expert Tr.") at 578:4-580:6). Having accepted these risks, P&K should not be heard to complain that they were unanticipated or not bargained for.

P&K's scheduling expert, Thomas MacPhee prepared a document entitled "Schedule Critique" and dated June 9, 2004 – 7 days before the subcontract was fully executed – that reflected his thoughts about the Project schedule, the Subcontract clauses, the current status of the Project, and the general impact of these things on P&K's scope of work. (*See* Ex. A, MacPhee Expert Tr. at 661:20-662:12; Exhibit B, Schedule Critique (attached as Ex. 14 to MacPhee Expert Tr.)). The Schedule Critique states that the Project was "approximately 32 [working days] behind schedule (45 Calendar Days)." (Ex. B). Mr. MacPhee also noted that the schedule attached to P&K's contract would have to be resequenced and that durations would have to be changed. (*See id.*; Ex. A, MacPhee Expert Tr., at 578:4-580:6).

P&K plainly anticipated alterations to the scheduling and sequencing of its work at the time it executed its Subcontract. P&K had been on the Project since February of 2004. (Maltby Aff. ¶3). P&K had observed the delays caused by Hunt's excavation subcontractor and the related impact to the Project schedule by the time the Subcontract was fully executed on June 16, 2004. (*See, e.g.*, Ex. B; P&K Opp. 11-12). In its opposition, P&K notes that the control point error was discovered in May of 2004 – again, while P&K was on the Project and before P&K executed its Subcontract. (P&K Opp. 13).

DC #362527 v3

The Schedule Critique also demonstrates that P&K was quite aware of various Subcontract provisions that it now contests. For example, the Schedule Critique states: "As written, the contract does not provider P&K equitable rights in the sequence, schedule and performance of its work, giving Hunt total control over schedule and sequence." (Ex. B). Commenting on Sections 10.1 and 10.2, the document acknowledges that "Hunt is not liable for delays, disruptions, or interferences by owner, designer or other subs" and that "Hunt can delay, disrupt or interfere in accordance with section 9.4 without engaging in section 10.2." (*See id.*). Thus, it is beyond question that P&K anticipated the issues about which it now complains before the Subcontract was executed. P&K could have insisted on additional protections in the Subcontract. It did not. The Court should decline P&K's invitation to rewrite its bargain.

P&K's attempt to avoid all of Section 10 by relying on the *Blake Construction* case is misplaced. The fundamental underpinnings of *Blake Construction* distinguish it from this case. Sections 10.1 and 10.2 of the Subcontract are not 'no damage for delay' clauses, they are both 'agreed to damage for delay' clauses. In Section 10.1, Hunt and P&K agreed that P&K would be compensated solely by the amount Hunt received from the Owner for any claim Hunt presented on P&K's behalf. In Section 10.2, Hunt and P&K agreed that P&K would be compensated, at Hunt's sole discretion, with additional time to complete its work or through a specified compensation formula that was expressed in Section 9.7(a), *i.e.*, the premium portion of overtime or additional shifts worked at Hunt's direction. The above-discussed understanding of the state of the Project in advance of Subcontract execution and the parties' agreed-upon compensation regime removes this case from the *Blake Construction* analysis, because it demonstrates that the parties anticipated and contemplated the acts about which P&K now complains.

DC #362527 v3

The parties mutual acknowledgement that these very complaints might arise is found in the text of Section 10.2 itself. The final sentence of Section 10.2 reads:

> Hunt's exercise of its rights pursuant to Section 9.4 shall not constitute a delay, disruption or interference with Subcontractor's Work under this section 10.2.

(Subcontract, attached as Ex. A to Declaration of Laura A. Kamas ("Kamas Decl.") filed with Hunt's Mot. Summ. J, §10.2). By specifically agreeing that any Hunt action taken within its rights under Section 9.4 would not be redressable under Section 10.2, the parties demonstrate that Section 10.2 is meant to address acts or omissions by Hunt that are not authorized by Section 9.4. Thus, to the extent P&K is claiming that Hunt went beyond its authority to act under Section 9.4, P&K is limited to the remedy it agreed to in Section 10.2. Of course, if Hunt acted within its authority under Section 9.4, there is no breach.

### 2.     Section 10 applies to bar P&K's delay and disruption claims

Section 10 of the Subcontract deals with Hunt's liability for delays, disruptions or interferences of every origin. Section 10.1 deals with causes for which Hunt is not liable, and Section 10.2 deals with causes for which Hunt may be liable. In short, Hunt is exculpated from damages caused by any source other than Hunt itself. And Section 10.2 expresses P&K's exclusive remedy for such damages.

P&K alleges that its delay and disruption damages "result from the compounding of multiple causes of delay, and are unaddressed by Hunt's form subcontract." (See P&K Opp. 29). This is contrary to both the interpretation in Mr. MacPhee's Schedule Critique and the plain language of the Subcontract. (Ex. B). P&K further alleges that the Subcontract does not address delays caused by other subcontractors. (P&K Opp. 29). This statement is also incorrect. Section 10.1, "Delays Caused by Others," applies to delay, disruption, or interference to P&K's work caused by the act, omission, neglect, or default of the Owner, Designer, their respective

5

subcontractors, "or other combined action of the workmen or others" or "any other cause beyond Hunt's direct control." (*See* Ex. A to Kamas Decl. §10.1).

The language holds Hunt harmless for the myriad issues raised by P&K. While Hunt agreed to cooperate with P&K in submitting claims to the Owner, Section 21.2 required timely submission. (*Id.* at §§10.1 and 21.2). P&K waited almost a year after it finished its work to submit its claims. By that time, the Subcontract barred P&K's recovery, and Hunt had no ability to press the claims with the Owner because the Project had been settled.

P&K alleges that Hunt "simply chose not to pass [P&K's claims] on to the Owner" and speculates that Hunt did so to avoid criticism from the Owner (P&K Opp. 30-31). In truth, Hunt was unable to submit P&K's claims to the Owner because P&K did not submit its claims until September 2006, months after Hunt and the Owner had reached final settlement. (*See* Ex. C to Kamas Decl., MacPhee Tr., at 255:5-256:4). Since P&K failed to submit its claims within the time limits specified by Section 21 or even in time to allow Hunt to consider them when settling with the Owner, they are barred under Section 21.4. (Ex. A to Kamas Decl. §21.4).

### C.    The Subcontract's "pay-if-paid" clause is enforceable

Under District of Columbia law, contractual conditions precedent are enforceable. *See Friedman v. Decatur Corp.*, 135 F.2d 812, 814 (D.C. Cir. 1943). Section 5.9 of the Subcontract states:

> **Final Payment by Owner to Hunt for [P&K's] Work.** Final Payment by the Owner to Hunt shall be an express condition precedent to Hunt's duty to make Final Payment to [P&K].

(Ex. A to Kamas Decl. §5.9(g)).

Hunt demonstrated in its opening memorandum that this condition precedent to Hunt's duty to pay has not occurred. The burden, therefore, is on P&K to prove that the condition has

been performed or is otherwise unenforceable. *See, Royal McBee Corp. v. Bryant*, 217 A.2d 603, 608 (D.C. 1966). P&K has failed to carry its burden.

The Subcontract's pay-if-paid clause is enforceable, and the Owner's failure to pay Hunt for amounts in P&K's claims bars P&K's recovery of these amounts. P&K cites *Urban Masonry Corp. v. N&N Contractors, Inc.*, 676 A.2d 26 (D.C. 1996), to support its allegation that "Hunt actively prevented the condition of owner payment" and that, therefore, the pay-if-paid clause should not be enforced. (P&K Opp. 33). *Urban Masonry* is distinguishable. In that case, the court found that a subcontractor had frustrated fulfillment of the pay-if-paid condition precedent because it had settled with the owner despite specific written promises to submit claims it had admitted were valid. *Urban Masonry*, 676 A.2d at 29, n. 5, 36. The subcontractor's failure to protect it's lower tier subcontractor's interest was deemed a breach of contract. *Id.*

Here, Hunt has never acknowledged P&K's claims as valid. Further, P&K did not submit its claims to Hunt until well after Hunt had settled with the Owner. Hunt simply had nothing to pass through to the Owner on P&K's behalf. Hunt was entitled to reach a final settlement with the Owner. In advance of its closeout discussions with the Owner, Hunt made its intention to achieve closeout known to all Project subcontractors. (*See, e.g.*, Exhibit C, Notice for Receipt of Final Pricing Issues). The fact that P&K waited until after Hunt settled with the Owner to submit its claims does not affect the enforceability of the pay-if-paid clause.

Like all other bargained-for terms of the Subcontract, the pay-if-paid clause is enforceable, and receipt of payment by Hunt from the Owner for P&K's work remains a condition precedent to P&K's right to receive payment from Hunt. P&K is barred from recovering the costs it seeks for overhead, interference, and/or delay because the Owner did not – and, because of the late submission of P&K's claims, could not – pay Hunt for such costs.

DC #362527 v3

### D.  **P&K's Claims Are Barred by The Execution of Waivers**

As explained in Hunt's opening memorandum, P&K, on a monthly basis, submitted payment applications to Hunt accompanied by an "Affidavit and Partial Waiver of Claims and Liens and Release of Rights." Hunt relied on P&K's waivers taking no exceptions to any claims when it closed out the Project with the Owner.

Over the course of the Project, Hunt and P&K agreed to several modifications to the waiver, also known as form SF330. The first modification was made in the execution of the Subcontract. P&K incorrectly asserts that this modification was the one and only. Also incorrect is P&K's claim that the waiver attached to Hunt's opening memorandum "is simply Hunt's general form." (P&K Opp. 27).

The unamended version of SF330 ends with a period after the words "or invoices" in the block quote below. The first amendment to SF330 added the words "or unpaid extras or change orders or claims submitted in accordance with the Contract Documents" after the words "or invoices." (Waivers including this amended language are attached hereto as Exhibit D). But later, the form was amended to read as follows:

> In addition, for and in consideration of the amounts and sums received, the undersigned hereby waives, releases and relinquishes any and all claims, rights or causes of action whatsoever arising out of or in the course of the work performed on the above-mentioned project, contract or event transpiring prior to the date hereof, excepting the right to receive payment for work performed and properly completed and retainage, if any, after the date of the above-mentioned payment application [Payment Application No. 14] **or invoices** or change proposals and time and material tickets.

(*See, e.g.,* 10/26/05 Waiver & Release, attached as Ex. E to Kamas Decl.) (emphasis added). It is on this version of the form that Hunt's motion relies.

It is generally accepted that parties to a contract have the ability to amend their agreement multiple times throughout the course of the contractual relationship. *See generally, Obelisk*

8

*Corp. v. Riggs Nat. Bank of Washington, D.C.*, 668 A.2d 847 (D.C. 1995). The waiver attached to Hunt's opening memorandum was executed on October 26, 2005 – well over a year after the execution of the Subcontract. This later amendment controls. And, the only claims P&K chose to preserve were its claims for work properly performed, retainage withheld, and invoices, proposed changes, and time and material tickets submitted after the date of Payment Application No. 14 – August 9, 2005. (Ex. E to Kamas Decl.; Payment Application 14, attached as Ex. F to Kamas Decl.). P&K has not disputed that all of the work described in entries P&K PCO #36R-100 (43 entries in total) was performed prior to August 9, 2005. To the extent that P&K incurred costs for this work prior to August 9, 2005, all claims for payment related to this work have been waived. Additionally, any amounts included in P&K's Extended Overhead and Labor Productivity claims related to work performed prior to August 9, 2005 have been waived.

**E.     P&K's Breach of Contract and Breach of Implied Duty Claims Fail**

P&K asserts that Hunt breached its obligations to P&K because it "incorporated *nothing* Poole and Kent submitted" regarding the Project schedule. (P&K Opp. 22-23). This self-serving and unsupported allegation is insufficient to defeat summary judgment. *See Hopps v. Washington Area Metro. Transit Auth.*, 480 F.Supp. 2d 243, 250 (D.D.C. 2007).

The Subcontract required P&K to provide input to be incorporated into the Project schedule. In fact, all subcontractors were required to provide information for the schedule. The simple truth is that, while input from all subcontractors was considered, Hunt could not incorporate every suggestion. As the general contractor, it is Hunt's prerogative to schedule the Project and incorporate subcontractor input in a manner that best serves the Project as a whole. (*See* Declaration of Robert M. Decker, filed with Hunt's Mot. Summ. J., ¶¶4-5).

Further, as P&K points out in its brief, under D.C. law, a contract "must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms." *1010 Potomac*

*Assocs. v. Grocery Mfrs, of Am., Inc.*, 485 A.2d 199, 205 (D.C. 1984) (citations omitted). P&K's

apparent position that it was entitled to have its schedule input incorporated in full is belied by

provisions in the Subcontract giving Hunt ultimate control over the Project schedule and the right

to alter the sequence of work as it deems necessary. For example, Section 9.4 states:

> Hunt also shall have the right to modify the time, order, and
> priority of the various portions of [P&K's] Work, and all other
> matters relating to the scheduling and coordination of [P&K's]
> Work, in order to respond to job conditions and/or achieve timely
> completion of the entire Project.

(Ex. A to Kamas Decl. §9.4).

The Subcontract states in general terms that P&K will have "input" into the schedule that

will be "incorporated." But Hunt's rights under the Subcontract are very specific, and, under

D.C. law, "specific terms and exact terms are given greater weight than general language."

*Washington Auto. Co. v. 1828 L Street Assocs.,* 906 A.2d 869, 880 (D.C. 2006) (citations

omitted). Because the Subcontract gave Hunt control of the schedule and the right to change the

sequence and priority of P&K's work "in whole or in part," Hunt is entitled to summary

judgment on Counts I and II of P&K's counterclaim. (*See* Ex. A to Kamas Decl. §9.4).

### F.    P&K's Quasi-Contractual Claims Fail

#### 1.    The Subcontract was not abandoned

P&K acknowledges that abandonment is determined by the intent of the parties to govern

their relationship by something other than their written contract. But without citing a single fact,

P&K suggests the parties abandoned the Subcontract. P&K submitted two affidavits with its

opposition – neither suggests the parties intended to abandon the Subcontract. No document

suggests the parties abandoned the Subcontract. P&K's sole basis is the unsupported conclusion

that Hunt failed to incorporate P&K's scheduling information into the Project. (P&K Opp. 35-

38). This bold conclusion is insufficient to prove that Hunt intended to abandon the Subcontract,

DC #362527 v3

and there is even less offered to support the argument that P&K abandoned the Subcontract. Since abandonment requires both parties' consent, P&K fails to create a question of fact regarding abandonment.

As stated in *C. Norman Peterson v. Container Corporation of America*, 218 Cal. Rptr. 592 (Cal. App. 1985), "abandonment requires a finding that *both* parties intended to disregard the contract." *Id.* at 600.  Given that Hunt and P&K rely on contractual provisions to support their respective claims, such a finding is not appropriate here.  The cases cited by P&K to support its position are inapposite.

For example, *C. Norman Peterson Co.*, involved a suit by a contractor against an owner where the owner imposed hundreds of changes and the contractor incurred $3,405,713.02 in extra costs on a project with an original contract amount of  $4,789,000.00. *Id.* at 599.  In *Opdyke & Butler*, 245 P.2d 306 (Cal. App. 1952), the court determined that the parties – an owner and a contractor hired to do remodeling work – had abandoned a price limitation of $15,900 and agreed to proceed on a straight cost-plus basis. *Id.* at 310-11.   In that case, a series of changes requested by the owner led to costs of completed work, plus 10 percent, totaling $24,253.79. *Id.* at 306.  These cases bear no resemblance to the present matter.

Because Hunt and P&K never abandoned the Subcontract, the parties' rights and remedies are governed by its express terms.  Any claim by P&K for quasi-contractual relief should be dismissed.

### 2.    A "cardinal change" did not occur

P&K next attempts to justify its entitlement to quasi-contractual relief by asserting that Hunt created a "cardinal change" to the Subcontract through mismanagement and failure to incorporate schedule input. (P&K Opp. 38-39).  The District of Columbia has not adopted the cardinal change doctrine, but its application in other jurisdictions demonstrates its inapplicability

DC #362527 v3

here. The facts of this case do not present a cardinal change because P&K performed no duties

"materially different from those originally bargained for" or beyond the scope of the

Subcontract. *See Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1332 (Fed. Cir. 2003) (citations

omitted).

In *Freedom NY*, the Court of Appeals for the Federal Circuit found that the following

findings of the Armed Services Board of Contract Appeals were supported by substantial

evidence:

> The Board found that the government: (1) improperly denied,
> suspended, and delayed making progress payments, *Freedom NY,*
> 01-2 B.C.A. (CCH) at 156,061; (2) improperly interfered with the
> contractor's ability to obtain financing, *id* at 156,063; (3) diverted
> menu items, *id.*; (4) delayed delivery of menu items it was
> contractually obligated to deliver, *id.* at 156,064; (5) imposed
> improper inspections, *id.*, and (6) imposed improper testing
> requirements, *id.* It further held that all of these breaches merely
> constituted governmental delay, which was compensable under the
> contract. *Id.* at 156,067-68.

*Id.* at 1332-1333.

Even given this evidence, the Court of Appeals held that "the Board could properly find

that these breaches did not constitute 'an alteration in the work so drastic that it effectively

requires the contractor to perform duties materially different from those originally bargained

for.'" *Id.* at 1333 (citation omitted). P&K's accusations also fail to warrant a finding of a

cardinal change, and, as the Court held in *Freedom NY*, P&K must look to contractual remedies

for its claims.

### 3.    "Substantial changes" warranting quasi-contractual relief did not occur

In P&K's final effort to justify its claims for quasi-contractual relief, it argues that Hunt

breached the Subcontract through "substantial changes." (P&K Opp. 42-44). P&K again points

to Hunt's failure to incorporate P&K schedule input, failure to update the schedule monthly, and

DC #362527 v3

failure to properly manage the sequencing of Project work. (*Id.* at 43). Even if these "failures" took place – and, as explained above, Hunt contends that they did not – they would not qualify as "substantial changes" warranting abandonment of the Subcontract and a resort to quasi-contract.

P&K also alleges that "Hunt stopped updating the schedule in a realistic manner in late 2004." (P&K Opp. 43). This statement is incorrect, and the letter P&K cites to support its allegation – a January 13, 2005 letter from the Owner citing errors in an updated schedule – does not suggest that Hunt ceased meaningful scheduling efforts in late 2004. Hunt issued schedule updates and "look-aheads" throughout the course of the Project. Tom Page, Hunt's project manager, personally maintained the Project schedule until June of 2005. (*See* Exhibit E, Transcript from the Deposition of Thomas G. Page ("Page Tr.") 46:20-47:4).

Again, the case law cited by P&K is inapposite. In *Specialized Grading Enterprises, Inc. v. Goodland Construction, Inc.*, 2001 WL 3197096 (Colo. App. Nov. 1, 2007), the Colorado Court of Appeals permitted an excavation subcontractor to seek quantum meruit relief where the general contractor's failure to dewater the site caused the subcontractor to incur extra costs associated with dewatering activities and with having to remove saturated soil instead of dry soil. *Id.* at *1. The court found – and the general contractor admitted – that dewatering was not in the subcontractor's scope of work. *Id.* at *4.

Here, P&K does not claim that it was forced to perform work outside its scope, as amended by change orders. Rather, it claims that it was forced to endure "changes" in the form of inadequate scheduling and sequencing. As stated in Hunt's opening memorandum, scheduling and sequencing of work – and P&K's remedy for damages incurred due to scheduling and sequencing – are addressed by the express terms of the Subcontract. Nothing in P&K's claims

demonstrates the existence of "substantial changes" warranting quasi-contractual relief, and

P&K's claims for such relief should be denied.

**III.    CONCLUSION**

For the reasons stated in this Reply Memorandum, Hunt's opening Memorandum, and the

documents filed contemporaneously therewith, Hunt respectfully requests that this Court enter

summary judgment in its favor as to all counts of P&K's Counterclaim.

Dated:  December 18, 2007

Respectfully submitted,

/s/ Laura A. Kamas
David T. Dekker (#358173)
Jeffrey R. Gans (#452332)
Laura A. Kamas (#499837)
THELEN REID BROWN RAYSMAN & STEINER, LLP
701 Eighth Street, N.W.
Washington, D.C.  20001
Telephone:    (202) 508-4000
Facsimile:    (202) 508-4321

OF COUNSEL:
José M. Pienknagura, Esq.
Hunt Construction Group, Inc.
6720 N. Scottsdale Road
Suite 300
Scottsdale, Arizona  85008
Telephone:  (480) 368-4740
Facsimile:  (480) 368-4745
*Counsel for Hunt Construction Group, Inc.*

DC #362527 v3

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of December, 2007, a copy of the forgoing was served to electronically via the CM-ECF System and via first-class mail to:

Robert F. Carney
William P. Pearce
Whiteford, Taylor & Preston, L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1626
Telephone: (410) 347-8700

Of Counsel:
Michael A. Stover
Whiteford, Taylor & Preston, L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1626
Telephone: (410) 347-8700

*Counsel for The Poole and Kent Corporation*

Donna M. Crowe
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, N.W., 12th Floor
Washington, D.C. 20036
Telephone: (202) 719-8212
Facsimile:   (202) 719-8312

*Counsel for Federal Insurance Company and*
*United States Fidelity and Guarantee Company*

_/s/ Laura A. Kamas_____
Laura A. Kamas

DC #362527 v3

# EXHIBIT A

1 (Pages 541 to 544)

541

1    IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF COLUMBIA
3
4    ---------------------------------x
5    HUNT CONSTRUCTION GROUP,        x
6         Plaintiff,       x Civil Action No.
7    v.                    x 1:06 CV 1850
8    THE POOLE AND KENT CORPORATION, x
9         Defendant.       x
10   ---------------------------------x
11
12            VOLUME 3
13
14      Deposition of THOMAS A. MACPHEE
15         Baltimore, Maryland
16       Tuesday, November 20, 2007
17            10:10 A.M.
18
19
20   Job No. 1-115178
21   Pages 541-819
22   Reported by:  Sharon D. Livingston, CSR-RPR

542

1         Deposition of THOMAS A. MACPHEE, held at
2    the offices of:
3
4       WHITEFORD, TAYLOR & PRESTON LLP
5       7 Saint Paul Street
6       Baltimore, Maryland 21202
7       (410) 347-8700
8
9         Pursuant to Notice, before Sharon D.
10   Livingston, Registered Professional Reporter and
11   Notary Public of the State of Maryland.
12
13
14
15
16
17
18
19
20
21
22

543

1             A P P E A R A N C E S
2
3
4    ON BEHALF OF THE PLAINTIFF:
5       JEFFREY R. GANS, ESQUIRE
6       THELEN REID BROWN RAYSMAN & STEINER, LLP
7       701 Eighth Street, Northwest, 8th Floor
8       Washington, D.C. 20001-3721
9       (202) 508-4000
10
11
12   ON BEHALF OF THE DEFENDANT:
13      ROBERT F. CARNEY, ESQUIRE
14      WHITEFORD, TAYLOR & PRESTON LLP
15      7 Saint Paul Street
16      Baltimore, Maryland 21202
17      (410) 347-8700
18
19
20
21
22

544

1             C O N T E N T S
2    EXAMINATION OF THOMAS A. MACPHEE        PAGE
3    By Mr. Gans                    6
4    By Mr. Carney                272
5    By Mr. Gans                  274
6
7
8             E X H I B I T S
9    (Attached to Deposition Transcript)
10   MACPHEE DEPOSITION EXHIBITS          PAGE
11   1   Subpoena and Notice of Deposition   7
12   2   Thomas A. MacPhee Expert Report    21
13       Volume 1
14   3   Labor Productivity Charges     21
15       Volume 2
16   4   Extended Overhead Damages Volume 3    21
17   5   Reply Report of Thomas MacPhee    21
18   6   Handwritten notes 9-11-04      55
19   7   Primavera schedule, run date 5-21-04   63
20   8   HVAC Labor Breakdown        74
21   9   Plumbing Labor Breakdown      82
22   10  Embassy Suites illustrations   107

Case 1:06-cv-01850-JR    Document 39-2    Filed 12/18/2007    Page 3 of 5
DEPOSITION OF THOMAS A. MACPHEE, VOLUME 3
CONDUCTED ON TUESDAY, NOVEMBER 20, 2007

2 (Pages 545 to 548)

545

1                    E X H I B I T S
2        (Attached to Deposition Transcript)
3   MACPHEE DEPOSITION EXHIBITS                    PAGE
4     11   White binder of Poole and Kent          113
5          presentation materials
6     12   White binder of Poole and Kent          115
7          presentation materials
8     13   White binder of Poole and Kent          117
9          presentation materials
10    14   Embassy Suites Schedule Critique        121
11    15   Handwritten notes           122
12    16   Handwritten notes           137
13    17   Handwritten notes           138
14    18   Handwritten notes           145
15    19   Handwritten notes           153
16    20   Memorandum 10-20-04 from Thomas         157
17         MacPhee to Joanne Laverdiere
18         with attachments
19    21   E-mail 10-27-04 from Tom MacPhee to     160
20         Matt Maltby; e-mail 10-27-04 from Tom
21         MacPhee to Matt Maltby with
22         attachments

547

1   for one reason or another, just let me know, I'll
2   find a good spot, and then we'll stop.
3        A   Okay.
4        Q   I honestly don't know in terms of time how
5   long we're going to go today.  It won't be late.
6   I'll try to get through this as quickly as we can,
7   not to belabor things.  I expect we'll take a break
8   for lunch.  Do you have a particular time you want to
9   break for lunch that I shoot for?
10       A   No.
11           MR. GANS:  Mr. Carney, do you have a
12   preference?
13           MR. CARNEY:  (Shakes head.)
14   BY MR. GANS:
15       Q   Okay.  So why don't we just see how it
16   feels around noon or 12:30, and we'll break sometime
17   around there.
18       A   That would be great.
19       Q   Okay.  Great.
20           (MacPhee Deposition Exhibit 1 marked for
21   identification and attached to transcript.)
22   BY MR. GANS:

546

1                P R O C E E D I N G S
2              THOMAS A. MACPHEE,
3     having been duly sworn, testified as follows:
4         EXAMINATION ON BEHALF OF PLAINTIFF
5   BY MR. GANS:
6        Q   Good morning, Mr. MacPhee.
7        A   Good morning.
8        Q   You'll recall I think that we've met
9   before.  My name is Jeff Gans, and I represent Hunt
10  Construction in the litigation between Hunt and Poole
11  and Kent.  I know that you've been deposed before
12  because I've done it, and we will operate today under
13  the same rules that we operated the last time.  Do
14  you recall generally the process we followed during
15  the last deposition?
16       A   I do.
17       Q   Do you need any clarification about how
18  we're going to work today?
19       A   I don't believe I do at this time.
20       Q   Okay.  If anything pops up, you let me
21  know, and I'll explain it.  Just to reiterate one
22  point, if we get to the point where you need a break

548

1        Q   Mr. MacPhee, you've been handed a document
2   that's been marked as MacPhee Exhibit 1 that purports
3   to be a subpoena and a deposition notice.  Have you
4   seen this document before, sir?
5        A   It does look familiar.
6        Q   And you are here today, right, because
7   Poole and Kent has named you as an expert in the
8   litigation?
9        A   That's correct.
10       Q   And in connection with your duties as an
11  expert, we asked for you to search and produce a
12  certain category of documents; is that correct?
13       A   There was a set of documents you asked for
14  within, correct.
15       Q   Right.  And the documents were described at
16  least in the Exhibit A to the subpoena that's now
17  MacPhee Exhibit 1; is that right?
18       A   I'm sorry.  Ask the question again.
19       Q   Sure.  The documents that we asked you to
20  produce for us were described in Exhibit A to the
21  subpoena that's now MacPhee Exhibit 1?
22       A   They are.

Case 1:06-cv-01850 DEPOSITION OF THOMAS A. FINKBEINER Document 224-8 Filed 12/18/2007 VOLUME Page 4 of 5
CONDUCTED ON TUESDAY, NOVEMBER 20, 2007

10 (Pages 577 to 580)

577

1    A    Partially correct.  I presume it's the
2  owner based on Hunt's documentation.
3    Q    Right.
4    A    Although the owner seems to have taken a
5  different position contemporaneously.
6    Q    Sure.  Do you explain anywhere in your
7  reports the extent of that site utilities impact on
8  the project?
9    A    I don't recall.
10   Q    Is it possible to quantify the extent of
11  the site utilities issue, the extent of the impact of
12  the site utilities issue on Poole and Kent's scope of
13  work?
14   A    I don't think in the end it's going to be
15  possible to discretely do that because it is so
16  widespread, and without having a detailed schedule,
17  accurate schedule at that time, it would be hard to
18  project what the critical path really was on the job.
19   Q    That actually reminds me of something I
20  meant to ask earlier.  Do you know sitting here today
21  where the critical path was on the project to any
22  degree of professional certainty?

578

1         MR. CARNEY:  Objection.
2    A    Yes and no.
3    Q    Explain that to me, please.
4    A    In the beginning of the project -- let me
5  back up.  The schedule that I believe I went off of
6  originally, looked at originally, was the December 1,
7  2005 schedule.  Okay?
8         MR. CARNEY:  2005?
9    A    I'm sorry.
10        MR. CARNEY:  2003?
11   A    2003.
12        MR. CARNEY:  Sorry.
13        MR. GANS:  No.  I appreciate it.  I hear
14  2003.
15   A    Right.
16   Q    You were saying you looked at the December
17  2003 schedule in the context of critical path?
18   A    You guys did a good job of diverting my
19  attention there.  It projected a final completion or
20  a substantial completion effectively of July 29th,
21  2005.  It did not provide flow.  It did not provide
22  logic.  We didn't necessarily agree with all the

579

1  durations associated with it, but taking it for what
2  it was, you could reasonably ascertain where the
3  critical path would be running early in the job.
4  There's nothing else going on but the structure.  So
5  what's the critical path of the construction during
6  the early phase of the job?  The structure.  Where it
7  jumps off, that's left to supposition to a large
8  extent without the details of the schedule and to the
9  extent that you have a complete and reasonable
10  schedule.  Okay?  So yes, early on, okay, no, I can't
11  determine exactly where the critical path was, let's
12  say predominantly through 2005, although I make some
13  attempts early on to quantify that.  Due to the
14  resequencing, the moving of people around, the
15  disruption that everyone was working under, work
16  being performed on all levels, it just wasn't
17  reasonably possible in my opinion to quantify that
18  with a whole lot more schedule information from Hunt,
19  albeit it would need to be accurate schedule
20  information.  I say accurate because when we get
21  later into the project, they provide more detail.  It
22  appears they provide a logical flow of work in

580

1  places, but they've compressed it, they've stacked it
2  up to perform more work and less time for all the
3  subcontractors, but once again the logic was not
4  available to get to the conclusion of where the
5  critical path was if in fact that schedule was
6  accurate.  So a big answer to a little question.
7    Q    This is often the case.  Let me ask you a
8  related question I think.  Did Poole and Kent's work
9  have its own discrete critical path?
10   A    By the definition of critical path, no.
11  Critical path -- and I think we covered this last
12  time -- is the longest path of activities or work
13  tasks scheduled through the logic from the start of
14  the job to the end of the job.  So there is only --
15  there could be multiple critical paths, but typically
16  it's only one, maybe two critical paths running
17  through the job.  So to say Poole and Kent has a
18  critical path would definitely be a misnomer.
19   Q    But there is a longest string of activities
20  that Poole and Kent needs to accomplish or have
21  accomplished by another subcontractor in order for it
22  to complete its scope of work?

Case 1:06-cv-01850-JR Document 29-3 Filed 12/18/2007 Page 5 of 5
DEPOSITION OF THOMAS A. MacPHEE, VOLUME 3
CONDUCTED ON TUESDAY, NOVEMBER 20, 2007

31 (Pages 661 to 664)

661

1  being paid against this data. Not what you see here,
2  but the source data.
3      Q   The source data, right.
4      A   Therefore, it wouldn't be a reflection of
5  what was happening in the past.
6      Q   Right. Because they wouldn't get a check
7  for it?
8      A   That's right.
9      Q   So the hours were spent in the time frame,
10  just not on the tasks?
11      A   Right. On the tasks shown in this
12  document. And it puts us in a bad position if we
13  want to use the data for anything. It's useless data
14  other than to show you what not to do.
15      Q   Right. It's the perfect example for when
16  your next presentation comes up.
17          (MacPhee Deposition Exhibit 14 marked for
18  identification and attached to transcript.)
19  BY MR. GANS:
20      Q   Now, Mr. MacPhee, you've been handed a
21  document that's been marked as MacPhee Exhibit 14.
22  Can you identify it for us, please?

662

1      A   Yes. This is a document that I produced.
2      Q   What is the document substantively?
3      A   Presumably sometime around the June 9th
4  time frame.
5      Q   Is that your handwriting?
6      A   That is my handwriting. What it reflects
7  is my thoughts about the contract clauses, the
8  schedules, the current status, the general impact on
9  Poole and Kent, and then some recommendations on
10  pages 3 and 4. Page 5 is contract references it
11  looks like, probably having something to do with the
12  first page, pertinent contract clauses.
13      Q   And this says you produced this on the 9th
14  of June. Does that help with your recollection about
15  when you started work on the project?
16      A   No more than the last couple of the
17  documents you've shown me. It would have been in the
18  couple, few weeks most probably prior to that date.
19          (MacPhee Deposition Exhibit 15 marked for
20  identification and attached to transcript.)
21  BY MR. GANS:
22      Q   Mr. MacPhee, there's a document of two

663

1  pages that we've just handed you marked as MacPhee
2  Exhibit 15. Do you recognize it, sir?
3      A   I recognize the document with my
4  handwriting.
5      Q   Do you have any idea when it was created?
6      A   I'm just taking a minute to look through
7  it. Your question was do I recall when I prepared
8  this?
9      Q   Can you give me a time frame? It's not
10  dated anywhere. Do you see a date on it?
11      A   I don't see a date on it anywhere.
12      Q   From the context can you tell when it was
13  produced by you, or written?
14      A   I really hate to hazard a guess, but I'm
15  going to put you probably sometime in the later part
16  of May. There's two reasons for that. One is the
17  staffing, item 2, the level of staffing, and the
18  second thing is if you look down at number 6,
19  overtime one day, one Saturday, not ready 5-22, it
20  would indicate to me that it probably occurred
21  sometime between that time and the time of June 9th
22  date.

664

1      Q   Help me interpret the personnel line there,
2  please. It says four personnel, three plumbing, one
3  mechanical?
4      A   Four personnel. And I probably wrote two
5  plumbing, one mechanical, but then crossed that out
6  and put in one foreman, two mechanics, which would be
7  effectively what I was calling a mechanic at that
8  point is a journeyman because if you take a look at
9  the union coding, they call them mechanics whether
10  they're HVAC or plumbing, and then one laborer. And
11  they were doing sleeves and garage drains at that
12  point. Once again probably another good indicator
13  that we were in that May time frame, late May, early
14  June.
15      Q   Because that kind of syncs up with some of
16  the scheduling data that we saw earlier?
17      A   Yeah. From what I recall, they were down
18  in the B2/B1 level when I had first gone there
19  because you had to look down into the hole the first
20  time I went there. There was concrete coming up, but
21  it was still below ground level.
22      Q   And there's also a note about the control

# EXHIBIT B

EMBASSY SUITES – WASHINGTON D.C.
# SCHEDULE CRITIQUE

6/9/04

## 3 SCHEDULES AVAILABLE:

- 12/1/03 Hunt Schedule Update: Completion Date – 7/29/05  (From Adam Snavely)
- 1/5/04 Hunt Schedule Update: Completion Date – 7/29/05 (From Matt Maltby)
- 5/21/04 Hunt Schedule Update: Completion Date 8/31/05 (Unofficial from Tom Kessler)

## PERTINENT CONTRACT CLAUSES:

- The contract requires either mutually agreeable schedule or schedule input, but not both
- The contract indicates, "Time is of the Essence", but does not provide an explicit completion date or duration. It apparently uses the schedule to set the completion date.
- The contract requires that all claims, delays or impacts be submitted within 48 hours to the start of the impact.
- The contract appears to indicate that Hunt can unilaterally delay, accelerate or re-sequence P&K's work without liability for compensation other than overtime premiums.
- P&K is also tied to the conditions of the prime contract. Do we have and have we reviewed the prime contract?
- The contract required that P&K submit a detailed plan and schedule in conformance with hunts schedule and other work on the project within 5 days after executing the contract.
- As written, the contract does not provide P&K equitable rights in the sequence, schedule and performance of its work, giving Hunt total control over schedule and sequence.

## 12/1/03 Schedule (Provided by Adam Snavely):

- This is the earliest schedule PK apparently has
- Completion date is July 29, 2004
- The schedule has no float value or late start dates making it difficult to determine underlying logic
- The apparent critical path runs from foundations thru the 14 levels of the structure, then into the penthouse followed by test and inspections and finally with finishes.
- General Construction Comments:
  o No activity for cure and strip time: The framing on the mezzanine level appears to be starting 1 workday after the mezzanine is poured.
  o Exterior and interior framing activity on each floor is completed prior start of MEP rough-in's
  o Windows and curtain walls above the ground floor don't start until 10/14
  o The roofing does not commence until 11/4/04
- MEP rough-ins Comments:
  o Work substantially starts on 6/10/04 with the B1 Mezzanine
  o 20 WD's for Mezzanine is insufficient (MER) (6/10 – 7/8)
  o 20 WD's for the ground floor is insufficient (Kitchen & Public areas)(7/9 – 8/5)

1



EXHIBIT 14

MACPHEE
11-20-07

EMBASSY SUITES – WASHINGTON D.C.
# SCHEDULE CRITIQUE

- o The 3rd thru 14th floor have 15WD's duration per floor with 3 floors being worked in a concurrent manner.  (7/23 – 11/22)
- o Penthouse has 60 WD's from 10/21/04 – 1/19/05) followed by test and inspection (1/20 – 2/16)
- o The MEP finish activity durations are either 5 or 10 WD's per floor with the 2nd through 14th floors having concurrent operations on 2 floors.

- <u>Personal Analysis of 12/1/03 Schedule:</u>
  - o There appears that insufficient shoring and reshore strip time has been scheduled to provide unencumbered access to the Mezzanine and ground floors along with the 11th through 14th floors.
  - o The Layout activity appears to be performed prior to the actual concrete placement from the 5th floor up.
  - o The B-1 Mezzanine has a MER allowing only 10 WD's for its work. This is insufficient
  - o The Main level has a kitchen allowing only 10 WD's for the rough-in. This too is insufficient.
  - o The 3rd thru 14th floors have a total of 15 WD's to complete all rough-in work. This is insufficient and needs to be detailed.
  - o The 3rd thru 14th floors have similar work occurring on 3 levels at a time. This will not be a productive sequence.
  - o The framing on each level is scheduled to be performed prior to MEP rough-ins. This is unacceptable and has verbally been corrected in the superintendents meeting, but the schedule remains unchanged.
  - o Nearly all the rough-in below the penthouse is complete prior to the start of dry-in activities leaving equipment and insulation exposed to potential damage. Roof and windows are not complete until December 2004 and January 2005 respectively; after all rough-ins below the penthouse is complete.
  - o The schedule is missing all the plumbing, mechanical and HVAC risers.
  - o The schedule is missing any/all insulation and controls.
  - o The schedule is far from complete and does not seem to be well coordinated!

## 5/21/03 Schedule (Provided by Tom Kessler):

- The schedule indicates a completion date of 8/31/05, 33 calendar days later than the previous schedules.
- The schedule provides substantially more detail for the structural aspects of the project.
- This schedule seems to have taken into account cure and striping time.
- The schedule indicates that MEP activities have been shortened to 10 days on the guest room floors with 2 floors working concurrently.
- The start of the MEP activities is approximately 7 weeks behind the dates displayed in the 12/1/03 schedule.
- This schedule also references the October 2003 schedule and its dates. P&K does not have a copy of that schedule.
- The critical paths runs through the structure to the penthouse level with a concurrent critical path through masonry and wall framing until the 3rd floor then moving into the electrical on floors 4 thru 14. Curtainwall, roof, temporary hoist and penthouse dry-in

2

EMBASSY SUITES – WASHINGTON D.C.
# SCHEDULE CRITIQUE

become critical prior to drywall and finishes through the 7th floor. Thereafter, the hotel furnishings are critical to 8/31/05.

## Current Status of the Schedule and Project thru 6/9/04:

- December schedule indicates that the structure should be have been complete through the ground floor deck by 5/21/04.
- Using the 5/24/04 start of ground floor columns and extrapolating the 40-day duration for the concrete Ground floor through the 7th floor activity, each floor should take 6 2/3 WD's. There are 13 WD's in the period of 5/24 thru 6/9, indicating that the structure should have been complete through the 3rd floor deck.
- In fact, as of 6/9/04, Hunts was only pouring the B-1 deck, leaving approximately 19 WD's to complete work through the ground floor deck and an additional 13 days to complete through the 3rd floor deck.
- *The project is approximately 32 WD's behind schedule (45 Calendar Days)*

## Impact on Poole and Kent:

- P&K has experienced up to 45 CD's of delay through June 9, 2004
- P&K has maintained management, supervision and tradesmen on the project throughout this impact period at an un-anticipated additional cost.
- Potential defects in the dimensions and layout are impacting P&K's placement of sleeves and embeds and could substantially impact the previously completed coordination drawings.
- Unanticipated drilling and cutting of post-tensioned slabs may be required to install plumbing and mechanical systems.
- Current schedule does not appear to be a logical and productive sequence for mechanical and plumbing work, while missing critical aspects of work such as risers, B1-MER and the kitchen.

## Recommendation:

- Make changes to the contract to provide adequate involvement and incorporation of P&K activities into the schedule in a logical and productive manner.
- Make changes to the contract that allows P&K to pursue and collect impact costs from the GC if necessary.
- Make changes to the contract that gives P&K more time to invoke the notice of delay and impact and remove the 72-hour requirement for submitting claims.
- Provide Hunt with notice of past and on-going delays to the structure.
- Provide Hunt notice of lost labor effort due to earlier delays
- Provide notice of potential impacts associated with dimensional, lay, configuration errors in the structure and/or its construction.
- Provide notice of insufficient time to place sleeves and embeds prior to concrete pours.
- Provide Hunt with a schedule of our activities.
  - B1-MER – 2 months after equipment delivery and riser completion
  - 1st Floor Kitchen activity details – 2 to 4 months
  - Detail guest room floors and expand from 4 months to 6 months
  - Add HVAC, plumbing and duct risers

3

EMBASSY SUITES – WASHINGTON D.C.
# SCHEDULE CRITIQUE

- o  Detail penthouse activities to ensure 60 WD's is sufficient
- o  Change finish durations and/or sequence to provide adequate time per floor
- o  Incorporate sheet metal, insulation and control activities.

EMBASSY SUITES – WASHINGTON D.C.
# SCHEDULE CRITIQUE

- Para. 9.3: Requires PK to participate & cooperate in development of Hunts Schedule, times and sequences
- Para. 9.3: Shall perform in accordance with schedule and final milestones
- Para. 9.3: Must provide plan & schedule for performing & coordinating its work in conformance with the project schedule.
- Para. 9.4: Hunt has right to delay, accelerate, suspend execution of subcontractors work and any other matter relating to scheduling and coordination without compensation except for overtime premiums if subcontractor is not behind schedule.
- Para. 10.1: Hunt is not liable for delays, disruptions or interferences by owner, designer or other subs
- Para 10.2: Allows claims if submitted within 48 Hrs of start of delay, disruption or interferences
- Para. 10.2: Hunt can delay, disrupt or interfere in accordance with section 9.4 without engaging section 10.2
- Para. 21.2: Requires claim submitted within 14 days of commencement or 5 days prior to time is required to file with owner
- Para. 32.1: PK liable for LD's & direct damages. Can apportion damages among responsible parties
- Attachment II, Page 4:
  - Section 27: requires PK input into schedule but also crosses out the term "mutually agreeable schedule"
  - Section 46: States that "Restaurant Padio Dining" area north of line 13 can't start until last 6 months of job.
  - Section C.1: Construction starts 10/1/03
  - Section C.33: permanent heating/cooling system shall be utilized for heating during installation of finishes for a period of 3 months prior to the project completion and turn over.

5

# EXHIBIT C

**Powell, Catherine**

| | |
|---|---|
| **From:** | Larry A. Weisman |
| **Sent:** | Monday, January 09, 2006 9:57 AM |
| **To:** | Embassy -P&K-Matt Maltby (E-mail) ' (E-mail) |
| **Cc:** | Joseph Palumbo |
| **Subject:** | Notice for receipt of final pricing |

**Importance:**    High

Matt,

On Friday January 6, 2006 the attached notice was issued to all Hunt Subcontractors for the Embassy Suites Project in Washington, DC. The Fax number we had on file for you was bounced back as disconnected. So attached find copy of said notice as issued.



1 Notice for receipt
   of final ...

**Larry A Weisman**
Hunt Construction Group
214 Carnegie Center, Suite 103
Princeton, New Jersey 08540
(609) 936-7100
(609) 936-8520 fax
lweisman@huntconstructiongroup.com

1



CONSTRUCTION GROUP™

# MEMORANDUM

(Issued via Fax)

To:        PCI - Rapid Response          Mike Anthony        202-269-0844 Fax
           Baltimore Masonry, Inc.       Tom Ford            410-781-4050 Fax
           AIW                           John Newhouse       301-277-4797 Fax
           Union Waterproofing           Cory Harwood        202-234-1556 Fax
           Allglass                      John Hermansen      215-752-1724 Fax
           Warren-Ehret                  Brad Koch           410-332-4510 Fax
           Federal Painting              Elifar Gonzalez     703-421-9810 Fax
           Adina, Inc.                   Brendan Johnston    703-658-4982 Fax
           Mr. David's Carpet Service, Ltd.  Michelle Zeitler  630-868-0095 Fax
           Otis Elevator Co.             Sam Guzman          301-324-4160 Fax
           PCI-Drywall                   Bill Fortner        202-626-0016 Fax
           National Fire                 Chuck Sandlin       301-309-1284 Fax
           Poole & Kent                  Matt Maltby         202-783-0630 Fax
           T. A. Beach                   Dave Pate           301-231-7236 Fax
           Monarch                       Steve Gaddes        401-247-5603 Fax
           Civil                         Mehdi Mheshahi      301-341-7137 Fax

From:      Larry A Weisman 

CC:        J Palumbo – Hunt (via Email)
           B Decker – Hunt (via email)
           File:   w/ the above sub's correspondence

Date:      January 6, 2006

RE:        Embassy Suites Hotel (Hunt Job No. 5003) Washington, DC
           **Notice for receipt of final pricing issues**

---

This is the final request for any and all change orders, and back charges. An up to-date change Order log, which reflects, signed, paid for, and pending issues is also needed no later than end of day January 13, 2006. Any invoices or paper work not received by this date will not be accepted for processing.

Issue all correspondence to:   Hunt Construction Group, Inc.
                               214 Carnegie Center, Suite 103
                               Princeton, New Jersey 08540.
                               E-mail addresses are Jpalumbo@huntconstructiongroup.com or
                               laweisman@huntconstructiongroup.com

Please include copies of all previously issued change orders. This should include a complete subcontract accounting summary. Please make sure that you list a contact person in your office.

Thank you for addressing this matter as soon as possible.

Please do not hesitate to contact the above signed with any questions and/or comments.

Hunt Construction Group, Inc
214 Carnegie Center, Suite 103
Princeton, NJ 08540
Phone: (609) 936-710    Fax: (609) 936-8529    www.huntconstructiongroup.com

Page 1 of 1

# EXHIBIT D

## AFFIDAVIT AND PARTIAL WAIVER OF CLAIMS AND LIENS
## AND RELEASE OF RIGHTS

STATE OF __Maryland__ )
COUNTY OF __Baltimore__ ) SS:

The undersigned, who is the __Contract Administrator__ (designate title) of __The Poole and Kent Corporation__ which is the __Subcontractor__ (designate whether subcontractor, supplier or otherwise) for the __Mechanical Work__ (designate the type of work, supplies or services rendered) on the improvements constructed or being constructed on the premises hereafter identified, declares that his contract with Hunt Construction Group, Inc. is in the total amount of $ __9,400,000.00__ , which includes extras and all change orders to the date hereof.

The undersigned further states that as of __April 30, 2004__ the total value of work completed and material stored is $ __283,875.00__ . Of this amount $ __255,487.50__ has been received (the receipt and sufficiency of which is hereby acknowledged by the undersigned including $ __255,487.50__ payment of Payment Application or Invoice Number __1__ . A total of $ __28,387.50__ is being held as retainage.

In consideration of the amounts and sums received, the undersigned does hereby waive and release to the Owner and to Hunt Construction Group, Inc. any and all claims and liens and rights to liens upon the premises described below (which may be more particularly described by an Exhibit "A" attached), and upon improvements now thereon, and upon the monies or other considerations (due as of the date of the aforesaid payment application or invoices from the Owner or Hunt Construction Group, Inc. or from any other person, firm or corporation), said claims and liens and rights to liens being on account of labor, services, materials, fixtures or apparatus heretofore furnished by or at the request of the undersigned. The premises as to which said claims and liens and rights to liens are hereby released are identified as follows:

Project Name: __Embassy Suites Hotel__
Address of Project: __1000 K St., N.W.__
City: __Washington__   County: __N/A__   State: __D.C.__
Owner: __1000K, LLC__   General Contractor: **Hunt Construction Group, Inc.**

The undersigned further represents and warrants that he is duly authorized and empowered to sign and execute this waiver on his own behalf and on behalf of the company or business for which he is signing; that he has properly performed all work and furnished all the materials of the specified quality per plans and specifications and in a good and workmanlike manner through the date of said payment application or invoice; that he has paid for all the labor, materials, equipment, and services that he has used or supplied to the above premises through the date of said payment application or invoice; that he has no other outstanding and unpaid payment applications, invoices, retentions, holdbacks, chargebacks or unbilled work or materials against Hunt Construction Group, Inc. as of the date of the aforementioned payment application; and that any materials which have been supplied or incorporated into the above premises were either taken from his fully-paid or open stock or were fully paid for and supplied as stated on the statement  (SF Form 320) accompanying the said payment application or invoice.

The undersigned further agrees to reimburse and does hold harmless and fully indemnify Owner and Hunt Construction Group, Inc. for any losses or expenses should any such claims, lien or right to a lien be asserted (by the undersigned or by any laborer, materialman or subcontractor of the undersigned), including, without implied limitation, attorneys' fees incurred in the defense thereof.

The undersigned further accepts and acknowledges the receipt of the aforesaid sums in full accord and satisfaction for the aforementioned claims with full knowledge that the contractors, Owner and Hunt Construction Group, Inc., their successors and assigns, are relying thereon; and furthermore, the undersigned agrees to perform, now and in the future, each and every covenant and provision of his written contract or supplier's agreement (as the case may be) as modified or changed in writing with Hunt Construction Group, Inc. or any subcontractor of Hunt Construction Group, Inc., hereby acknowledging that said contract or supplier's agreement is now in full force and effect.

In addition, and for and in consideration of the amounts and sums received, the undersigned hereby waives, releases and relinquishes any and all claims, rights or causes of action whatsoever arising out of or in the course of the work performed on the above-mentioned project, contract or event transpiring prior to the date hereof, excepting the right to receive payment for work performed and properly completed and retainage, if any, after the date of the above-mentioned payment application or invoices **

Signed and delivered this __30th__ day of __April__ , 20 __04__ .

The Poole and Kent Corporation
(Individual or Corporation Name)
By: _(signature)_
Title: __Contract Administrator__

Before me, the undersigned Notary Public in and for the said County and State, personally appeared __James R. Parker III__ , and acknowledged execution of the foregoing affidavit as his voluntary act and deed and further stated that the facts recited are true of his personal knowledge.

My Commission Expires: __11/01/06__

_(signature)_ Thomas
Notary Public
Residence County: __Anne Arundel County__

** = or unpaid extras or change orders, or claims submitted in accordance with the Contract Documents.

H023524

AFFIDAVIT AND PARTIAL WAIVER OF CLAIMS AND LIENS
AND RELEASE OF RIGHTS

STATE OF __MARYLAND__ )
                                          ) SS:
COUNTY OF __BALTIMORE__ )

5003  15318 9457

    The undersigned, who is the __Contract Administrator__ (designate title) of __The Poole and Kent Corporation__ which is the Subcontractor (designate whether subcontractor, supplier or otherwise) for the __Mechanical Work__ (designate the type of work, supplies or services rendered) on the improvements constructed or being constructed on the premises hereafter identified, declares that this contract with Hunt Construction Group, Inc. is in the total amount of $__9,400,000.00__, which includes extras and all change orders to the date hereof.

    The undersigned further states that as of __12/31/04__ the total value of work completed and material stored is $__4,591,687.00__. Of this amount $__4,132,518.30__ has been received (the receipt and sufficiency of which is hereby acknowledged by the undersigned including $__1,139,575.50__ in payment of Payment Application or Invoice Number __8__). A total of $__459,168.70__ is being held as retainage.

    In consideration of the amounts and sums received, the undersigned does hereby waive and release to the Owner and to Hunt Construction Group, Inc. any and all claims and liens and rights to liens upon the premises described below (which may be more particularly described by an Exhibit "A" attached), and upon improvements now thereon, and upon the monies or other considerations (due as of the date of the aforesaid payment application or invoices from the Owner or Hunt Construction Group, Inc. or from any other person, firm or corporation), said claims and liens and rights to liens being on account of labor, services, materials, fixtures or apparatus heretofore furnished by or at the request of the undersigned. The premises as to which said claims and liens and rights to liens are hereby released are identified as follows:

Project Name: __Embassy Suites Hotel__
Address of Project: __1000 K Street N.W.__
City: __Washington__   County: __N/A__   State: __DC__
Owner: __1000K LLC__   General Contractor: Hunt Construction Group, Inc.

    The undersigned further represents and warrants that he is duly authorized and empowered to sign and execute this waiver on his own behalf and on behalf of the company or business for which he is signing; that he has properly performed all work and furnished all the materials of the specified quality per plans and specifications and in a good and workmanlike manner through the date of said payment application or invoice; that he has paid for all the labor, materials, equipment, and services that he has used or supplied to the above premises through the date of said payment application or invoice; that he has no other outstanding and unpaid payment applications, invoices, retentions, holdbacks, chargebacks or unbilled work or materials against Hunt Construction Group, Inc. as of the date of the aforementioned payment application; and that any materials which have been supplied or incorporated into the above premises were either taken from his fully-paid or open stock or were fully paid for and supplied as stated on the statement   (SF Form 320) accompanying the said payment application or invoice.

    The undersigned further agrees to reimburse and does hold harmless and fully indemnify Owner and Hunt Construction Group, Inc. for any losses or expenses should any such claims, lien or right to a lien be asserted (by the undersigned or by any laborer, materialman or subcontractor of the undersigned), including, without implied limitation, attorneys' fees incurred in the defense thereof.

    The undersigned further accepts and acknowledges the receipt of the aforesaid sums in full accord and satisfaction for the aforementioned claims with full knowledge that the contractors, Owner and Hunt Construction Group, Inc., their successors and assigns, are relying thereon; and furthermore, the undersigned agrees to perform, now and in the future, each and every covenant and provision of his written contract or supplier's agreement (as the case may be) as modified or changed in writing with Hunt Construction Group, Inc. or any subcontractor of Hunt Construction Group, Inc., hereby acknowledging that said contract or supplier's agreement is now in full force and effect.

    In addition, for and in consideration of the amounts and sums received, the undersigned hereby waives, releases and relinquishes any and all claims, rights or causes of action whatsoever arising out of or in the course of the work performed on the above-mentioned project, contract or event transpiring prior to the date hereof, excepting the right to receive payment for work performed and properly completed and retainage, if any, after the date of the above-mentioned payment application or invoices *or unpaid extras or change orders or claims submitted in accordance with the Contract Documents*.

    Signed and delivered this __3rd__ day of __March__, 20__05__.

THE POOLE AND KENT CORPORATION
By: _____
Title: __James R. Parker, III – Contract Administrator__

    Before me, the undersigned Notary Public in and for the said County and State, personally appeared __James R. Parker, III__, and acknowledged execution of the foregoing affidavit as his voluntary act and deed and further stated that the facts recited are true of his personal knowledge.

My Commission Expires: 11/01/2006

_____
Notary Public
Residence County: __Anne Arundel County, Maryland__

H023105

# EXHIBIT E

1 (Pages 1 to 4)

---

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF COLUMBIA
 3
 4   - - - - - - - - - - - - - - - x
 5   HUNT CONSTRUCTION GROUP,      :
 6       Plaintiff,       : Civil Court Action
 7       vs.              : No.: 1:06CV1850
 8   THE POOLE AND KENT CORPORATION, :
 9       Defendant.        :
10   - - - - - - - - - - - - - - - x
11
12          Deposition of THOMAS G. PAGE
13              Washington, D.C.
14             Tuesday, July 10, 2007
15                 9:59 a.m.
16
17
18
19
20   Job No.: 1-106920
21   Pages: 1 - 308
22   Reported by: Sarah M. Bickel
```

---

2

```
 1          Deposition of THOMAS G. PAGE, held at the
 2   offices of:
 3       WHITEFORD, TAYLOR & PRESTON, LLP
 4       1025 Connecticut Avenue, N.W.
 5       Suite 400
 6       Washington, D.C. 20036
 7       (202) 659-6800
 8
 9
10
11
12
13
14          Pursuant to agreement, before Sarah M.
15   Bickel, Court Reporter and Notary Public in and for
16   the District of Columbia.
17
18
19
20
21
22
```

---

3

```
 1            A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFF:
 3       LAURA A. KAMAS, ESQ.
 4       Thelen, Reid, Brown, Raysman & Steiner
 5       701 Eighth Street, N.W.
 6       Washington, D.C. 20001
 7       (202) 508-4296
 8
 9
10
11
12   ON BEHALF OF THE DEFENDANT:
13       MICHAEL A. STOVER, ESQ.
14       Whiteford, Taylor & Preston, LLP
15       Seven Saint Paul Street
16       Baltimore, Maryland 21202
17       (401) 347-9426
18
19
20
21
22
```

---

4

```
 1            C O N T E N T S
 2   EXAMINATION OF THOMAS G. PAGE          PAGE
 3     By Mr. Stover            6
 4
 5
 6
 7            E X H I B I T S
 8          (Attached to the Transcript)
 9   PAGE DEPOSITION EXHIBIT               PAGE
10   No. 1  Subpoena                 6
11   No. 2  ResumT                  15
12   No. 3  3/12/05 Letter           87
13   No. 4  6/30/04 Letter           88
14   No. 5  5/19/04 Letter           91
15   No. 6  4/27/04 Daily Log            92
16   No. 7  3/1/05 Memorandum             94
17   No. 8  2/19/04 Letter          104
18   No. 9  3/23/04 Letter          112
19   No. 10 National Wrecking Cost Summary     119
20   No. 11 12/9/03 Letter          123
21   No. 12 1/13/05 Letter          150
22   No. 13 Backcharge Summary            153
```

5

1    EXHIBITS CONTINUED
2    PAGE DEPOSITION EXHIBIT                    PAGE
3    No. 14  8/13/04 Schedule Review            265
4    No. 15  10/19/04 Letter           266
5    No. 16  12/8/04 Letter            267
6    No. 17  2/2/05 Schedule Review             267
7    No. 18  5/25/05 Letter            268
8    No. 19  5/25/05 Letter            268
9    No. 20  5/25/05 Letter            269
10   No. 21  5/28/05 Schedule Review            269
11   No. 22  6/8/05 Schedule Review             270
12
13
14
15
16
17
18
19
20
21
22

6

1              PROCEEDINGS
2         (Page Exhibit No. 1 was marked for
3    identification and was attached to the deposition
4    transcript.)
5              THOMAS G. PAGE
6    having been first duly sworn, testified as follows:
7         EXAMINATION BY COUNSEL FOR DEFENDANT
8         BY MR. STOVER:
9         Q  Good morning.  My name is Mike Stover and
10   I'm representing Poole & Kent in this matter.  Please
11   state your full name and address for the record.
12        A  Thomas Gordon Page, 809 Downs Drive,
13   Silver Spring, Maryland 20904.
14        Q  Mr. Page, have you ever been deposed
15   before?
16        A  One other time.
17        Q  And I presume that was in connection with
18   the National Wrecking matter?
19        A  Yeah, about a year ago.
20        Q  Well, let me just refresh your
21   recollection as to what we're going to do here today.
22   I'm going to be asking questions and showing you some

7

1    documents and basically just trying to get your
2    recollection and your memory of events surrounding
3    the Embassy Suites Hotel project down on, what is it,
4    10th Street, I guess, New York Avenue?
5         A  Uh-huh.
6         Q  1000 K, I think the address was.  If I ask
7    a question that you don't understand, just ask me to
8    clarify it for you and we'll do the best we can.  If
9    you answer a question, we're going to presume that
10   you understood the question and that you were
11   answering it to the best of your ability.  If you
12   need to take a break, let us know.
13             When you're answering questions, we have
14   to be mindful of the fact that the court reporter is
15   taking down everything we say, so head nods and hand
16   gestures won't be recorded.  We have to verbalize
17   responses.  And the other thing is if, you know, if
18   I'm talking or you're talking, we can't talk over
19   each other because she can only take one of us down
20   at a time when she's typing.  We've got to try to
21   work together on that.  Your lawyer here -- are you
22   represented by counsel today?

8

1         MS. KAMAS:  Yes.
2         BY MR. STOVER:
3         Q  She may make objections during the course
4    of the examination, and we'll just give her a chance
5    to make her objections.  Unless she instructs you not
6    to answer, then go ahead and let her state her
7    objection and then answer the question.  She'll tell
8    you what she wants you to do if she wants to.
9              One thing I wanted to find out, do you
10   have any kind of agreement or arrangement with Hunt
11   to provide your testimony today?
12        A  No.
13        Q  Do you have any kind of an agreement or
14   arrangement with Hunt with respect to the National
15   Wrecking matter in testifying for Hunt in that
16   matter?
17        A  What do you mean by "agreement"?
18        Q  Well, I don't know.  Any kind of
19   understanding or arrangement where they will
20   compensate you for your time, for instance?
21        A  No, nothing like that.
22        Q  And today, did you do anything to prepare

45

1     A I'm more of a -- I guess I'm more of a
2 builder/scheduler than a documentation scheduler. On
3 the bigger projects I've been involved in, the
4 company would bring in a documentation-type
5 scheduler.
6     Q In this case, going forward beyond the
7 early time frame into '03 -- finishing '03, '04, '05,
8 what was your role for the Embassy Suites project
9 with respect to scheduling?
10    A Well, there was an initial schedule that I
11 inherited and I took what subcontractor information I
12 had at the time and incorporated it and then produced
13 basically what was the final version of the schedule.
14    Q What was the date of that?
15    A Boy.
16    Q December of '03?
17    A No, no, it was really prior to going to
18 contract. What we did on that job is we had a -- we
19 had a 23 -- that was a 23-month schedule with the
20 owner and then we had a 20 -- something less than
21 22-month schedule that we produced for all the
22 subcontractors. So we were hoping to get the job

46

1 done early, basically.
2        You know, from the documents, I know
3 you're well aware of the issues we have with National
4 Wrecking. I mean, after pretty short time we
5 realized it wasn't going to get done early and we
6 were going to struggle to get it done on time. So
7 then in a relatively short period we were off of that
8 more aggressive 22-month schedule and on a 23-month
9 schedule.
10    Q The 23-month schedule, did that
11 contemplate a September 1st, '05 finish?
12    A Yes.
13    Q And the 22-month schedule, that
14 contemplating a July '05 finish, right?
15    A End of July, yeah.
16    Q But going forward, you inherited the
17 initial schedule --
18    A Yeah, it wasn't complete. It was a
19 starter. I don't think it was issued to anybody.
20    Q And then you went forward -- going forward
21 in the job, there were schedules and there were
22 schedule updates, revised schedules and accelerated

47

1 schedules. What was your role with scheduling going
2 forward as this job moved forward?
3     A I maintained it. Basically, I maintained
4 it up until June of '05, plus or minus a month.
5     Q Was there anyone else who worked on
6 maintaining the schedule with you?
7     A Not during that time, no.
8     Q Mr. Langhoff testified that he thought
9 there might have been somebody in New Jersey who was
10 also involved in scheduling.
11    A There was a fellow late in the project
12 that participated a little bit because I was
13 transitioning to try to clean up old issues.
14    Q Do you know who that was?
15    A Brian Kleinschmidt.
16    Q Can you spell that?
17    A No.
18    Q Can you say it a little bit slower so I
19 can --
20       MS. KAMAS: It's K-L-E-I-N-S-C-H-M-I-D-T.
21       THE WITNESS: Good job.
22       BY MR. STOVER:

48

1     Q Good job. He was in New Jersey?
2     A Yeah, he worked on it maybe a month. It
3 was very minor. That's my recollection. He may have
4 done more than I realized.
5     Q Recognizing that the project, you know,
6 changes over time, it evolves from in the beginning
7 it's just a hole, there's not much to do and in the
8 end --
9     A There's a lot to do.
10    Q -- there's a lot to do. What was your
11 day-to-day activities on the project as the project
12 manager in a typical day?
13       MS. KAMAS: Object to the form.
14       THE WITNESS: Just try to make sure
15 everything stays on track cost-wise and time-wise.
16       BY MR. STOVER:
17    Q But I guess in terms of the meetings you
18 had participated in, the documents that you were
19 involved in, reviewing and preparing, maintaining, we
20 talked about schedule.
21    A We had weekly sub meetings.
22    Q And you attended those?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HUNT CONSTRUCTION GROUP, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 1:06cv1850 |
| v. | ) | Judge: James Robertson |
| | ) | |
| THE POOLE AND KENT CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**HUNT CONSTRUCTION GROUP, INC.'S REPLY TO THE POOLE AND KENT
CORPORATION'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Hunt Construction Group, Inc. ("Hunt"), by and through undersigned counsel and

pursuant to Local Civil Rules 7(d) and 7(h), respectfully submits this Reply to The Poole & Kent

Corporation's ("P&K") Statement of Material Facts Not in Dispute.

52.     In response to Paragraph 52, for purposes of summary judgment only, Hunt

admits that work began on the Project in September 2003 and that excavation began in October

2003.

53.     In response to Paragraph 53, although P&K performed some work on the Project

prior to February 2004, for purposes of summary judgment only, Hunt admits that P&K did not

fully mobilize until February 2004, which was prior to P&K executing the Subcontract.

54.     In response to Paragraph 54, for purposes of summary judgment, Hunt admits that

P&K performed under-slab and layout Subcontract work.  Because the term "as it became

available" is vague and ambiguous, Hunt denies P&K's allegation that such work was performed

"as it became available."

55.    In response to Paragraph 55, for purposes of summary judgment, Hunt admits that

P&K achieved substantial completion on or about October 31, 2005.

56.    Paragraph 56 contains statements regarding the allegations of National Wrecking

and findings of the Owner's Geotechnical Engineer that are inadmissible hearsay and, as such,

insufficient to defeat summary judgment. *See, e.g., Gleklen v. Democratic Cong. Campaign

Comm., Inc.,* 199 F.3d 1365, 1369 (D.C. Cir. 2000) (citations omitted). Hunt objects to P&K's

use of these inadmissible statements.

57.    Paragraph 57 contains statements regarding the allegations of National Wrecking

that are inadmissible hearsay and, as such, insufficient to defeat summary judgment. *See, e.g.,*

*Gleklen v. Democratic Cong. Campaign Comm., Inc.,* 199 F.3d 1365, 1369 (D.C. Cir. 2000)

(citations omitted). Hunt objects to P&K's use of these inadmissible statements.

58.    Paragraph 58 contains statements regarding the allegations of National Wrecking

that are inadmissible hearsay and, as such, insufficient to defeat summary judgment. *See, e.g.,*

*Gleklen v. Democratic Cong. Campaign Comm., Inc.,* 199 F.3d 1365, 1369 (D.C. Cir. 2000)

(citations omitted). Hunt objects to P&K's use of these inadmissible statements.

59.    Paragraph 59 contains statements regarding the allegations of National Wrecking

that are inadmissible hearsay and, as such, insufficient to defeat summary judgment. *See, e.g.,*

*Gleklen v. Democratic Cong. Campaign Comm., Inc.,* 199 F.3d 1365, 1369 (D.C. Cir. 2000)

(citations omitted). Hunt objects to P&K's use of these inadmissible statements.

60.    Paragraph 60 contains statements regarding the allegations of National Wrecking

that are inadmissible hearsay and, as such, insufficient to defeat summary judgment. *See, e.g.,*

*Gleklen v. Democratic Cong. Campaign Comm., Inc.,* 199 F.3d 1365, 1369 (D.C. Cir. 2000)

(citations omitted). Hunt objects to P&K's use of these inadmissible statements.

61.     Paragraph 61 contains statement regarding the allegations of National Wrecking that are inadmissible hearsay and, as such, insufficient to defeat summary judgment. *See, e.g., Gleklen v. Democratic Cong. Campaign Comm., Inc.,* 199 F.3d 1365, 1369 (D.C. Cir. 2000) (citations omitted). Hunt objects to P&K's use of these inadmissible statements.

62.     In response to Paragraph 62, for purposes of summary judgment, Hunt admits that it made certain allegations regarding National Wrecking in its reply to National Wrecking's Counterclaim. To the extent that P&K's allegations contained in Paragraph 62 are inconsistent with the allegations in Hunt's reply, they are denied.

63.     Paragraph 63 contains statements regarding the allegations of Kite Companies that are inadmissible hearsay and, as such, insufficient to defeat summary judgment. *See, e.g., Gleklen v. Democratic Cong. Campaign Comm., Inc.,* 199 F.3d 1365, 1369 (D.C. Cir. 2000) (citations omitted). Hunt objects to P&K's use of these inadmissible statements.

64.     In response to Paragraph 64, for purposes of summary judgment only, Hunt admits that there was a control point error on the Project and that, according to the Owner's representative, "Hunt put together a tremendous effort to correct the problem and stay on schedule." (Transcript from the Deposition of Arthur L. Shepherd ("Shepherd Tr."), attached as Ex. 10 to P&K Opp., at 60:1-6). The remaining statements in Paragraph 64 are mere conclusory statements that are unsupported by evidence in the record and, as such, insufficient to defeat summary judgment. *See, e.g., Greene v. Dalton,* 164 F.3d 671, 675 (D.C. Cir. 1999).

65.     In response to Paragraph 65, for purposes of summary judgment only, Hunt admits that there was some impact due to the control point error. Hunt denies the remaining allegations contained in Paragraph 65.

3

66.    In response to the allegations contained in Paragraph 66, for purposes of summary judgment only, Hunt admits that, in August 2004, P&K provided a document entitled Review of Schedule & Job Site Progress Analysis which document speaks for itself. To the extent that the allegations contained in Paragraph 66 are inconsistent with this document, Hunt denies them.

67.    In response to Paragraph 67, for purposes of summary judgment, Hunt admits that it received a letter from P&K dated October 19, 2004, which document speaks for itself. To the extent that the allegations contained in Paragraph 67 are inconsistent with this document, Hunt denies them.

68.    In response to Paragraph 68, for purposes of summary judgment only, Hunt admits that it received a letter from P&K dated December 8, 2004 which document speaks for itself. To the extent that the allegations contained in Paragraph 68 are inconsistent with this document, Hunt denies them.

69.    In response to Paragraph 69, for purposes of summary judgment, Hunt admits that it received a document entitled Review of Schedule & Job Site Progress dated February 2, 2005 which document speaks for itself. To the extent that the allegations contained in Paragraph 69 are inconsistent with this document, Hunt denies them.

70.    In response to Paragraph 70, for purposes of summary judgment only, Hunt admits that it received a letter from P&K dated February 28, 2005 which document speaks for itself. To the extent that the allegations contained in Paragraph 70 are inconsistent with this document, Hunt denies them.

71.    In response to Paragraph 71, for purposes of summary judgment only, Hunt admits that it received a letter from P&K dated May 25, 2005 which document speaks for itself.

DC #367085 v1

To the extent that the allegations contained in Paragraph 71 are inconsistent with this document, Hunt denies them.

72.     In response to Paragraph 72, for purposes of summary judgment only, Hunt admits that Exhibit 25 to P&K's Opposition contains copies of documents dated May 18, 2005, June 8, 2005, July 6, 2005, July 23, 2005, and August 9, 2005.

73.     In response to Paragraph 73, Hunt denies that it never responded to the documents noted in Paragraphs 67-72. (*See* Declaration of Thomas G. Page ("Page Decl.") at ¶6).

74.     In response to Paragraph 74, Hunt denies that it failed to incorporate any of P&K's schedule input. (*See id.*).

75.     In response to Paragraph 75, for purposes of summary judgment only, Hunt admits that it instructed P&K to accelerate its work in the penthouse in April 2005. For purposes of summary judgment, Hunt further admits that one reason for issuing this instruction was to facilitate the installation, testing, and start up of equipment used to provide air conditioning.

76.     In response to Paragraph 76, for purposes of summary judgment, Hunt admits that, at some point, P&K dedicated additional labor and/or supervision to the penthouse. Hunt denies that P&K fully complied with Hunt's direction for increased manpower and hours worked during the period of penthouse acceleration. Hunt denies the remaining allegations contained in Paragraph 76.

77.     In response to Paragraph 77, Hunt denies that P&K worked at the accelerated pace required by Hunt until mid-May 2005. Hunt lacks knowledge information necessary to admit or deny P&K's reasons for decreasing manpower and hours worked on the penthouse.

DC #367085 v1

78.    In response to Paragraph 78, for purposes of summary judgment only, Hunt admits that P&K submitted a proposed change order in the amount of $181,9292 for penthouse acceleration.

79.    In response to Paragraph 79, for purposes of summary judgment only, Hunt admits that there were on-going delays on the Project regarding site utility tie-ins and that delays were caused by an inability to obtain WASA permits and the discovery of a sewer main that was not in place as indicated.

80.    In response to Paragraph 80, for purposes of summary judgment only, Hunt admits that it allocated responsibility for the impacts referenced in P/RCO 051 to the Owner.

81.    In response to Paragraph 81, for purposes of summary judgment only, Hunt admits that WASA would not allow a tie into the domestic water supply until the Project's sanitary line had been tied into the sewer line.

82.    Paragraph 82 seeks to characterize a May 20, 2005 letter from Hunt to the Owner, which document speaks for itself. To the extent that the allegations contained in Paragraph 82 are inconsistent with this document, Hunt denies them.

83.    In response to Paragraph 83, Hunt denies that the lack of permanent water impacted the ability to perform leak testing of pipes. P&K tested its pipes with air and could have tested its pipes with temporary water.

84.    In response to Paragraph 84, for purposes of summary judgment only, Hunt admits that Jeffrey Lynch stated that he believed Thomas Page should be replaced on the Project in June 2004. For purposes of summary judgment only, Hunt further admits that it did not replace Mr. Page in June 2004.

6

85.     Paragraph 85 contains statements regarding the allegations of Kite Companies that are inadmissible hearsay and, as such, insufficient to defeat summary judgment. *See, e.g., Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (citations omitted). Hunt objects to P&K's use of these inadmissible statements.

86.     In response to Paragraph 86, for purposes of summary judgment, Hunt admits that Tom Page left the Project and employment with Hunt in September, 2005.

87.     In response to Paragraph 87, for purposes of summary judgment, Hunt admits that the Owner hired WDG construction in the fall of 2005 to supplement Hunt in completing the Project. Hunt denies the remaining allegations contained in Paragraph 87.

88.     In response to Paragraph 88, for purposes of summary judgment, Hunt admits the Jeffrey Lynch, the Senior Vice President of Kite Companies, stated in his deposition that he was unaware of any pass-through claims submitted by Hunt to the Owner on behalf of subcontractors. However, when asked if change orders that Hunt submitted to the Owner included "impacts or costs that were incurred by subcontractors," Mr. Lynch responded "I never saw the detail, so I don't know." (Transcript from the Deposition of Jeffrey D. Lynch, attached as Exhibit 24 to P&K Opp., at 91:21-92:1). The allegation that Hunt failed to "pass[] through" claims of P&K or "any other subcontractor" to the Owner is vague and ambiguous, and Hunt therefore denies the remaining allegations contained in Paragraph 88.

89.     In response to Paragraph 89, for purposes of summary judgment only, Hunt admits that it entered into a final settlement with the Owner. Hunt denies that the Owner paid Hunt "for the subcontract balance."

DC #367085 v1

90.     In response to Paragraph 90, Hunt denies that Regional Air incurred additional costs as a result of Hunt's imposition of a wage standard higher than that mandated by the Prime Contract.

91.     In response to Paragraph 91, Hunt denies that the Owner's consultant, CHW, Inc., found that the wage rates used by Regional Air in bidding the Project complied with the Prime Contract's Davis-Bacon requirements. Specifically, Hunt denies that the use of "R" workers was permissible under the Prime Contract's Davis-Bacon requirements.

92.     P&K's Statement of Material Facts Not in Dispute did not contain a Paragraph 92.

93.     In response to Paragraph 93, Hunt denies that it required Regional Air to pay "the higher Davis-Bacon rates." For purposes of summary judgment only, Hunt admits that it required subcontractors to comply with the Prime Contract's Davis-Bacon requirements.

94.     In response to Paragraph 94, for purposes of summary judgment only, Hunt admits that, in response to a non-project-specific question posed by counsel for P&K regarding the processing of change orders, Hunt's expert, Larry Hazen, stated:

> So if everything is absolutely proper, correctness of the contract, sufficient backup, everything, and there's no reason for seeking more information. If it's specified in the contract, then that amount of time would be the appropriate time to return it. Other than that, just in general, a month or two barring administrative impedances ... So it varies, but if everything's proper, the cash is available, a month or two.

(Transcript from the Deposition of Lawrence M. Hazen ("Hazen Tr."), attached as Exhibit 4 to P&K Opp., at 62:15-63:8). To the extent that the allegations contained in Paragraph 94 are inconsistent with Mr. Hazen's statement, Hunt denies them.

95.     In response to Paragraph 95, for purposes of summary judgment only, Hunt admits that it has not paid P&K for amounts requested in its Unpaid Funds Summary.

Dated:  December 18, 2007

Respectfully submitted,

/s/ Laura A. Kamas
David T. Dekker (#358173)
Jeffrey R. Gans (#452332)
Laura A. Kamas (#499837)
THELEN REID BROWN RAYSMAN & STEINER, LLP
701 Eighth Street, N.W.
Washington, D.C.  20001
Telephone:    (202) 508-4000
Facsimile:    (202) 508-4321

OF COUNSEL:
José M. Pienknagura, Esq.
Hunt Construction Group, Inc.
6720 N. Scottsdale Road
Suite 300
Scottsdale, Arizona  85008
Telephone:  (480) 368-4740
Facsimile:   (480) 368-4745
*Counsel for Hunt Construction Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of December, 2007, a copy of the forgoing was served to electronically via the CM-ECF System and via first-class mail to:

Robert F. Carney
William P. Pearce
Whiteford, Taylor & Preston, L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1626
Telephone:  (410) 347-8700

Of Counsel:
Michael A. Stover
Whiteford, Taylor & Preston, L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1626
Telephone:  (410) 347-8700

*Counsel for The Poole and Kent Corporation*


Donna M. Crowe
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, N.W., 12th Floor
Washington, D.C. 20036
Telephone:  (202) 719-8212
Facsimile:   (202) 719-8312

*Counsel for Federal Insurance Company and*
*United States Fidelity and Guarantee Company*


_____/s/ Laura A. Kamas_____
Laura A. Kamas

DC #367085 v1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUNT CONSTRUCTION GROUP, INC. | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: 1:06cv1850 |
| v. | ) ) | Judge: James Robertson |
| THE POOLE AND KENT CORPORATION | ) ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF THOMAS G. PAGE

I, Thomas G. Page, declare under penalty of perjury under the laws of the United States of America as follows:

1.     I am over the age of eighteen and am otherwise competent to make this declaration.

2.     I am an former employee of Hunt Construction Group, Inc. ("Hunt"). I served as Project Manager for Hunt on the Embassy Suites Hotel Project (the "Project").

3.     As Project Manager, I interacted with The Poole & Kent Corporation's ("P&K") Project Manager, E. Matthew Maltby, on a regular basis throughout my time on the Project.

4.     From time to time, I received correspondence from P&K regarding the Project.

5.     Hunt required and received schedule input from all Project subcontractors.

6.     Hunt reviewed the input provided by all Project subcontractors, including P&K, and incorporated the input into the Project scheduling in a manner that best served the interests of the Project as a whole.

7.      I personally maintained the Project schedule until June of 2005 and provided detailed schedule updates and "look aheads" throughout my time on the Project.

I declare under penalty of perjury under the laws of the United States of America that the statements in the foregoing declaration are true and correct.

Thomas G. Page

Dated:  December 17, 2007.

2